IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY DUFOUR, et al., | No. C 09-03770 CRB |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** |
| v. | |
| BE LLC, et al., | |
| Defendants. | |

This is the third motion to come before this Court in this case. Plaintiffs first moved for a preliminary injunction, which was granted as to the primary defendant (Be, LLC), but denied as to the various other defendants. Next, certain defendants moved to dismiss the claims against them. These motions were granted and Plaintiffs were granted leave to amend. Plaintiffs have now filed an amended complaint, and two defendants—Monterey Financial Services, Inc. and Jacob Steinbeck—move to dismiss.

Plaintiffs offer new reasoning to support the application of California's Advance-Fee Talent Agency Act to a broader class of defendants, but this court remains unpersuaded. While the statute is somewhat ambiguous, its language indicates that the state legislature never intended the statute to reach either corporate officers or peripheral corporate actors. Therefore, it does not reach either Monterey or Steinbeck. However, Plaintiffs successfully

state claims for deceit and RICO, in addition to claims under California's Unfair Competition Law. Most remaining claims are dismissed.[1]

## BACKGROUND

Because this case has already been the subject of two written orders in this court, this order will only outline the facts that are directly relevant to these motions. Also, because the factual allegations regarding Monterey and Steinbeck differ in important ways, it will outline the relevant facts as to each defendant separately.

Plaintiffs' First Amended Complaint ("FAC") alleges that Monterey Financial Services ("Monterey") participated in a scheme to violate California's Advanced Fee Talent Services Agency Act ("AFTSA"). According to the FAC, Monterey became involved in Be's operations in 2008, approximately two years after Be's predecessor business set up shop. FAC ¶¶ 104-06.

> Be's expansion and the costs of producing its television programming created financial strains. To address these financial strains, Be began to use Monterey as a finance company in 2008. As Be's finance company, Monterey loaned significant sums of money to Be and Be assigned its account receivables to Monterey. Monterey provided Be with its own contracts which specifically discussed Be members' purported obligation to make payments to Monterey for Be's services, such that Monterey itself knowingly received advance fees.

Id. ¶ 106. Monterey collected unpaid balances on Be Contracts, and "markets itself as a debt collector to clients like Be." Id. ¶ 107.

The Complaint further alleges that Monterey, "[t]hrough its [Better Business Bureau] membership, . . . received notification of consumer complaints arising from its collection of unpaid Be accounts. Some of these complaints explicitly indicated that Be did not comply with AFTSA. Other complaints indicated that Be's Misrepresentations were false and misleading." Id. ¶ 109. Furthermore, the agreement between Be and Monterey also provided that Be's officers—Steinbeck and two other non-moving defendants—"were . . . to give personal guarantees on the sums loaned by Monterey to Be." Id. "Additionally, Monterey's

---

[1] The only exceptions are Plaintiffs' claims under the Rosenthal Fair Debt Collection Act and the California Consumer Credit Reporting Agencies Act. Defendant Monterey lists these claims in a heading in its memorandum, presumably because it intended to move to dismiss them, but it failed to offer any argument in support of dismissing these claims. Monterey conceded at the hearing that these claims should survive. They are therefore not dismissed.

2

United States District Court
For the Northern District of California

agreement contained provisions that required Be to make detailed disclosures and warranties about its operations, which included disclosure of any information that Be's operations were illegal. By April 2008, at least one Be member communicated to DeSando and other Be agents that Be was violating AFTSA" Id. ¶ 110. The FAC also alleges that Monterey was made aware over time of the fact that Be had made various misrepresentations to its members. Id. ¶ 113.

In mid-2008, Be began to suffer financially. Id. ¶ 114. Be members stopped making their payments to Monterey, which investigated and "concluded that Be did in fact stop servicing its members . . . . Monterey demanded that Be resume 'servicing' its members, so that Monterey could continue to collect money from Be members to recoup its loans to Be." Id. ¶ 124-25.

By May of 2009, Monterey and certain other parties "had complete control over Be. Monterey effectively had control over Be's financial operations; by May 2009, Be would no longer issue refunds to consumers that canceled their Be membership without Monterey's approval." Id. ¶ 130.

As for Defendant Jacob Steinbeck, he is alleged to have been a controlling officer of Be LLC. Id. ¶ 9. Steinbeck, in addition to Defendants DeSando and Falck, "are natural persons who are, on information and belief, members, officers or managers of Be, and controlled Be." Id. Steinbeck was "personally involved in the management of Be's business operations" and he "formulated the policies and procedures alleged [in the complaint], directly ordered, [and] . . . authorized or participated in Be's acts alleged herein." Id. ¶ 73.

The FAC further alleges that, when Be LLC began experiencing financial pressure, Steinbeck arranged for another defendant, 1901 Co. "to provide Be with additional financing." Id. ¶ 119. Both Steinbeck himself and 1901 Co. recorded security interests, with Steinbeck's taking priority over 1901 Co.'s. Id. Soon thereafter, "Steinbeck began to muscle Flack and DeSando out of Be's day to day operations, presumably through legal threats and exercise of his security interest." Id. ¶ 126. Steinbeck "hired Vitaly Rashkovan to restructure and 'turn Be around' in or about January 2009. Rashkovan's primary

3

responsibility at the start was pursuing Be's account receivables, in order to address Monterey['s] complaints to Steinbeck." Id.

## DISCUSSION

1. Legal Standard

Under Rule 12(b)(6), a party may move to dismiss a cause of action which fails to state a claim upon which relief can be granted. On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Wyler-Summit Partnership v. Turner Broadcasting System, Inc., 135 F.3d 658, 661 (9th Cir. 1998). To survive a Rule 12(b)(6) motion to dismiss, the complaint must state a claim to relief that is "plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). A claim has "facial plausibility" when the pleaded factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Moreover, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Despite the requirement that factual allegations in the complaint be taken as true, a legal conclusion "couched as a factual allegation" need not be accepted. Id.

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleadings was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990). In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect "without contradicting any of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990). Leave to amend should be liberally granted. Id. at 296-97.

2. Analysis

A number of legal claims are brought jointly against both moving defendants. This order will therefore analyze the claims at issue one by one, discussing how they fare against each defendant.

    A.    Breach of Fiduciary Duty

Plaintiffs allege that both moving defendants breached their fiduciary duties to Plaintiffs. However, based upon the facts alleged and the relevant California case law, neither moving defendant owed such a duty, and so could not have violated it.

"Before a person can be charged with a fiduciary obligation, he must undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposed that undertaking as a matter of law." Committee On Children's Television, Inc. v. General Foods Corp., 35 Cal. 3d 197, 221 (1983), superseded on other grounds as recognized in Gartin v. S&M NuTec LLC, 245 F.R.D. 429 (C.D. Cal. 2007). "He must undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary." Id. at 222.

As illustrated by the cases cited by Plaintiffs, the FAC fails to allege facts sufficient to support existence of a fiduciary duty in this case. Plaintiffs first cite to Massow v. Gianaclis, 120 Cal. App. 2d 24 (1953), to support the proposition that a fiduciary duty exists in this case. In Massow, however, the Defendant not only helped plaintiff "obtain contracts to appear in motion pictures," he also entered into a real estate deal with plaintiff in which defendant loaned her money to purchase a property, and then, at defendant's request, she conveyed to him a half interest in the property." Id. at 26. Plaintiff then brought an action "to have the grant deed declared a trust deed." Id. The Court explained that the defendant was her "business and professional manager," in which "a fiduciary relationship existed between them and plaintiff relied upon, and trusted defendant implicitly." Id.

These facts illustrate why such a fiduciary duty does not exist in this case. Defendants here offered a series of "services" on a retail basis to hundreds if not thousands of individuals. By no stretch do the allegations in the FAC amount to defendants acting as "business and professional manager[s]." To conclude otherwise stretches the concept of "fiduciary duty" beyond what California courts have recognized.

This conclusion is further supported by Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974 (2008). Plaintiffs cite this case for its observation that "this court has received dozens of letters from personal managers working in the entertainment industry who suggest they owe a fiduciary duty to their clients to procure employment." Id. at 980 n.1. However,

5

the Court never addresses one way or another whether it agrees with these managers' conclusions. More importantly, the case explains that the managers in that case "accept a higher risk clientele and offer a much broader range of services, focusing on advising and counseling each artist with an eye to making the artist as marketable and attractive to talent buyers as possible, as well as managing the artist's personal and professional life in a way that allows the artist to focus on creative productivity." Id. at 983-84 (emphasis added). Further, these managers "advise in both business and personal matters, frequently lend money to young artists, and serve as spokespersons for the artists." Id. at 984. Therefore, even if such a manager did owe a fiduciary duty (which Marathon never decides), this would tell us nothing about Be's obligations. Be operated a far different kind of business, in which a series of services were offered to members. No individual, nor the company at large, was alleged to have been a "personal manager." Because the services provided by Defendants were offered to hundreds of individuals and did not constitute a true personal representation, and because defendants were never in control of plaintiffs' property, there is no fiduciary duty. See Persson v. Smart Inventions, Inc., 125 Cal. App. 4th 1141, 1160 n.8 (2005) ("The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another."). These claims must therefore be dismissed. Furthermore, because the facts alleged here would in fact be inconsistent with the sort of management relationship that gives rise to a fiduciary duty, dismissal of this claim is with prejudice. See Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990)

B. Deceit

Plaintiffs also bring a cause of action for deceit against all Defendants. Deceit consists of "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true" and "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact[.]" Cal. Civ. Code § 1710(2), (3) (2010). Such a claim is subject to Rule 9(b)'s heightened pleading standard.

6

The Complaint lists five instances of fraud. First, Plaintiffs allege that "Be concealed Payments to entertainment professionals who attended Be's auditions." FAC ¶ 89. Second, "Be concealed that class members were selected on the basis of their ability to pay," instead of based upon their likelihood of obtaining work in the entertainment industry. Id. ¶ 92. Third, Be "misrepresented the 'discounts' available to Be members." Id. The FAC alleges that there were, in fact, no discounts, because the services were not made available to anybody other than Be members. "[T]he rates Dynamic Showcases charged were not actually discounted at all but simply the rate Dynamic Showcases charged to all its clients." Id. Fourth, Be "concealed that Dynamic Showcases' Fees were illegal." Id. ¶ 96. Fifth, "Be conceal[ed] right to cancel the contracts and demand a refund of Be's Fees."

For the reasons discussed below, the deceit claim based upon the Second alleged misrepresentation survives as to both Defendant Steinbeck and Defendant Monterey. The other allegations, however, are not sufficient. We proceed by first discussing whether there was any actionable deceit, and will then discuss whether it can properly be asserted against the moving defendants.

### 1. Was there misrepresentation?

As to the First averment of misrepresentation, Plaintiffs allege that Defendants should have disclosed that the entertainment professionals were paid to attend auditions. They rely primarily on the statute's second theory of liability for failure to disclose a material fact. As noted above the statute provides for liability for suppression of a fact by one who gives "information of other facts which are likely to mislead for want of communication of that fact[.]" Cal. Civ. Code § 1710(3). Plaintiffs cite to Persson for support, but the analogy is not convincing. Persson notes that "nondisclosure or concealment may constitute actionable fraud when the defendant makes partial representations but also suppresses some material facts." Persson, 125 Cal. App. 4th at 1165 (citing Lymantria v. Judkins, 52 Cal. App. 4th 326, 336 (19997)). In Persson, the Defendant had promised the plaintiff to "paint you the truest picture possible of where the company is right now," but in fact concealed important information. There was no comparable promise of full disclosure in this case. On the

7

contrary, Be informed potential consumers that entertainment professionals would attend auditions. Without more, this does not imply to a consumer that those professionals were attending on a volunteer basis. The complaint does not allege that the individuals were not, in fact entertainment professionals, nor that they were not interested in hiring or casting Be members. Given that factual context, the Defendants had no duty to disclose that the professionals were also paid.

However, as to the second allegation, Plaintiffs have satisfactorily alleged fraudulent misrepresentation. They allege that all Plaintiffs were told that they were selected based upon their "screen test," and were led to believe that being selected at all was some indicator of talent and possibility of success. FAC ¶ 92. This in turn encouraged them to sign up and pay fees to Defendants. Plaintiffs were told that "[o]nly a small percentage of the children screened meet the industry profile that top agents, talent managers and casting directors are looking for." Id. Plaintiffs allege here that they were told this in person, and that a similar assertion was made in Be's promotional material and on its website. However, the FAC alleges that every applicant was called back and invited to join so long as "your income level fit the bill." In other words, there was no process that selected only those who "meet the industry profile." Everybody who could pay was selected. As alleged, this is a misstatement of fact. The FAC also sufficiently alleges that the misstatement was material, as Plaintiffs were encouraged to pay their fees because they were led to believe they had passed some threshold test that indicated they met "the industry profile" and as such had a relatively higher chance of securing employment. Defendants fail to discuss this specific averment of fraud, and it appears to satisfy all statutory requirements to survive a 12(b)(6) motion.

The final three averments, however, fail to sufficiently state a claim. The third, for instance, alleges that there were, in fact, no "discounts" as promised in the contracts. The FAC alleges that Defendants "had essentially no other clients besides Be members and those clients were generally charged the same rate as Be members." Id. ¶ 94. However, Plaintiffs have failed to allege that this statement was, in fact, false. Even if the providers had few other clients, and even if those clients were charged the same rate, this does not mean that Be

8

members were not charged some sort of "discount." The service could very well be discounted compared to comparable services offered by other providers.[2] As an example, a "discount gas station" might be presumed to offer lower rates than other gas stations, even those same rates are offered to everyone. Alternatively, the services provided by Defendants could be discounted compared to what the they would charge on the open market, where clients did not pay a membership fee. Given the heightened pleading standard, Plaintiffs fail to allege sufficient facts to support the conclusion that this representation constitutes fraud.

Plaintiffs' final two example of misrepresentation similarly fail. Both attempt to ground deceit claims in Defendants' alleged failure to comply with AFTSA. The FAC alleges that Be concealed the fact that the "fees were illegal," and that it concealed "the right to cancel the contracts and demand a refund of Be's fees." Id. ¶¶ 96-98. This is an attempt to broaden the scope of AFTSA. As discussed below, a claim under AFTSA can only be brought against the talent agency, not against Defendants like Steinbeck and Monterey. Concealment of the "fact" that the "fees were illegal," or concealment of Plaintiffs' right to rescind, is not subject to a suit for fraud.

Such omissions relate to Defendants' supposed duties under AFTSA, and as such relate to Defendants' legal obligations and are not misstatements of fact. The Ninth Circuit has held that, in most cases, an action for fraud cannot be predicated on misrepresentations as to matters of law. Miller v. Yokohama Tire Corp, 358 F.3d 616, 621 (9th Cir. 2004) (citing Am. Jur. 2d of Fraud & Deceit ¶ 97 (2001)). While Plaintiffs are correct that there are certain exceptions to this rule, none of them applies here. Given the fact that AFTSA is written so as to confine liability to the talent agent, it would be contrary to the legislature's intent to permit liability to defendants such as Steinbeck and Monterey.

2. Who is liable?

As noted above, Plaintiffs have sufficiently stated a claim for fraud relating to Defendants' assertions that Be members are selected based upon their special talents. The

---

[2] These few "other" clients could very well have been members in some other discounted group. The fact that they exist, and pay similar rates, is not sufficient to make the promise of "discounted" services a false statement of fact. Plaintiffs must allege more.

9

1 question remains whether either moving defendant can be held responsible for this claim.
2 Plaintiffs allege that Steinbeck, as an officer and manager of Be, directed its affairs and so is
3 responsible for the corporation's torts. Steinbeck was "personally involved in the
4 management of Be's business operations" and he "formulated the policies and procedures
5 alleged [in the complaint], directly ordered, [and]. . . authorized or participated in Be's acts
6 alleged herein." Id. ¶ 73. In California, corporate officers and directors can be held
7 personally liable if they "authorized, directed or participated" in a corporation's torts.
8 Frances T. v. Village Green Owners Ass'n, 42 Cal. 3d 490, 508 (1986). The FAC
9 sufficiently alleges that Steinbeck controlled Be and directed its activities, and so it properly
10 asserts a claim of fraud against him.

11 Monterey is further alleged to have had an influential role. According to the FAC, Be
12 had effectively ceased operating by January of 2009. Monterey, however, insisted that Be
13 continue to operate, and "[b]y May 2009, Steinbeck/1901 Co. and Monterey had complete
14 control over Be. Monterey effectively had control over Be's financial operations; by May
15 2009, Be would no longer issue refunds to consumers that canceled their Be membership
16 without Monterey's approval." FAC ¶ 125. The FAC therefore suggests that the only reason
17 Be continued to operate after January 2009 was because of Monterey's insistence. The FAC
18 further alleges that Monterey was fully aware of the nature of misrepresentations made by Be
19 LLC. It is well-established that aiding-and-abetting liability can exist for fraud claims in
20 California. See In re First Alliance Mortg. Co., 471 F.3d 977 (9th Cir. 2006). Such liability
21 exists where one "knows the other's conduct constitutes a breach of a duty and gives
22 substantial assistance or encouragement to the other to so act." Id. at 993 (quoting Fiol v.
23 Doellstedt, 50 Cal. App. 4th 1318 (1996)). The allegations in the FAC meet this standard,
24 and so the claim of fraud is properly asserted against Monterey.

25 The motions are therefore denied as to this claim for deceit.

26     C.    Violation of AFTSA

27 This Court previously dismissed without prejudice Plaintiffs' AFTSA claims as to
28 many defendants. This Court concluded that aider-and-abettor liability did not exist under

AFTSA, but dismissed without prejudice to permit Plaintiffs to formulate some new theory of liability. This Court remains convinced that, had the California legislature wished to impose secondary liability for violations of AFTSA, it would have done so explicitly. See, e.g., Cal. Gov't Code § 12948 (declaring it unlawful "for a person to deny or to aid, incite, or conspire in the denial of rights created" under the Fair Employment and Housing Act).

### A. Steinbeck's Liability

Plaintiffs present new arguments to support liability under AFTSA. As to Defendant Steinbeck, Plaintiffs argue that his "authorization and control over Be's actions is sufficient to hold him directly liable." However, AFTSA's statutory language does not contemplate a suit for damages against an officer. Section 1701.16, for instance, provides that when "an advance-fee talent service refuses or is unwilling to pay damages awarded by a judgment that has become final, the judgment may be satisfied from the bond or deposit maintained by the Labor Commissioner." There is no reference anywhere in the statute to a suit against third party, and the language appears to presume that suits can only be brought against the Talent Agency itself. This is consistent with this Court's prior conclusion that, in the absence of statutory guidance, the statute is presumed not to provide for third-party liability. See Wynn v. NBC Universal, 234 F. Supp. 2d 1067, 1113-14 (C.D. Cal. 2002) (holding there is no claim for aiding and abetting violation of the Age Discrimination in Employment Act because the act does not specifically authorize such liability, in contrast with the California Fair Employment and Housing Act, which specifically does). Plaintiff has failed to allege new facts, or make new legal arguments, sufficient to alter this Court's prior conclusion.[3] AFTSA presumes that an action for damages can only be maintained against the talent agency itself.

---

[3] For instance, Plaintiffs cite to cases for the proposition that a controlling officer is liable for torts committed at his behest by a corporation. But this is not helpful. It is painfully clear that a controlling officer can be liable for his corporation's torts, but this tells us nothing about secondary liability under AFTSA. Plaintiff argues that AFTSA is in fact the codification of a tort, but this is similarly unpersuasive. AFTSA is a narrowly applicable statutory regulation that imposes a series of exceedingly specific requirements on Advance Fee Talent Agencies. No common law tort is codified in such a statute.

11

The FAC also alleges in passing that Be, LLC is an alter ego of Steinbeck. The FAC fails to allege sufficient facts to support this legal conclusion. California law has two "general requirements" to establish alter ego liability: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." Say & Say, Inc. v. Ebershoff, 20 Cal. App. 4th 1759, 1768 (1993). Neither factor is satisfied here. First, Be, LLC clearly has some separate existence beyond Defendant Steinbeck. It has (or had) a number of other employees, other directors, and Steinbeck apparently worked with a number of other entities in the management of the business. Second, given the number of claims that are properly asserted against Steinbeck personally, no inequitable result will flow from declining to extend AFTSA liability to him as well.

### B. Monterey's Liability

Plaintiffs also makes three arguments specific to Monterey: (1) that AFTSA applies to Monterey by virtue of the Unruh Act; (2) that AFTSA applies to Monterey because of Monterey's contracts with Be LLC; and (3) that AFTSA applies to Monterey because Monterey is an Advance Fee Talent Agency. They are all unpersuasive.

First, Plaintiffs argue that Section 1804.2 of the Unruh Act makes Monterey "directly liable for Be's AFTSA violations." Opp. to Monterey at 6. The Unruh Act provides that an "assignee of the seller's rights is subject to all equities and defenses of the buyer against the seller arising out of the sale[.]" Cal. Civ. Code § 1804.2(a) (2010). Plaintiffs cite to Vasquez v. Superior Court, 4 Cal. 3d 800 (1971), and Music Acceptance Corp. v. Lofing, 32 Cal. App. 4th 610 (1995). However, a close analysis of these two cases reveals that the Unruh Act does not reach the controversy in this case. Music Acceptance, for example, explains that the purpose of the Unruh Act is to ensure that a consumer who prevails against a seller does not "remain liable to the finance companies, which as the assignees of the installment contracts claim they are entitled to payment even if the seller acted fraudulently . . . . Obviously, if [the consumers] are to be made whole for the wrongs allegedly done to them, the finance company . . . must be held liable as assignees if [the seller] is culpable." 32 Cal. App. 4th at

12

626 (quoting <u>Vasquez</u>, 4 Cal. 3d at 823). In other words, the Unruh Act permits a consumer to rely on claims arising against the seller in order to prevent the assignee from collecting on a fraudulent debt.

Neither <u>Music Acceptance</u> nor any other case cited by Plaintiffs permits a consumer to bring a separate damages action—let alone an action for treble damages—against the assignee. On the contrary, all cases cited by Plaintiffs involve the Unruh Act being invoked either to provide a consumer with a defense to an action, or to support rescission of a contract. However, the Unruh Act was not designed to permit an independent action for damages. The text of the statute further supports this interpretation, as it subjects the assignee to all "equities and defenses." Cal. Civ. Code § 1804.2. It does not use the word "claim" or suggest that the assignee stands in the shoes of the seller for all purposes.

The best case for Plaintiffs is <u>Vasquez</u>. In that case, the California Supreme Court permitted a class of consumers to pursue an action for rescission against certain finance companies. But the <u>Vasquez</u> court specifically distinguished between an action for damages and an action for rescission. <u>See</u> 4 Cal. 3d at 811 n.23 (noting that the drafter of 1804.2 explained that it was designed to avoid certain <u>damages</u> claims against assignees, but was not designed to "deprive a buyer of his right to bring an action to rescind a contract fraudulently induced"). Therefore, <u>Vasquez</u> does not stand for the proposition that the Unruh Act supports a consumer's action for damages against an assignee. Plaintiffs have failed to identify any such case. Permitting such an action to proceed would greatly increase the scope of liability for innumerable finance companies, as they would stand in the shoes of the assignor for all manner of misconduct. The background of the Act, in addition to the California courts' explication of it, counsels against reliance on the Act to permit an AFTSA suit to be brought against Monterey.

Next, Plaintiffs argue that Monterey is liable because its contracts with Be included the following notice:

> ANY HOLDER OF THIS AGREEMENT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.

13

FAC ¶¶ 44, 67. This notice is required by the FTC rule, codified at 16 C.F.R. § 433.2. Similar to their arguments under the Unruh Act, Plaintiffs argue that this notice makes Monterey liable for Be, LLC's misconduct. Once again, case law does not support such a broad interpretation. The FTC agrees that this provision does not permit an affirmative suit for damages based upon the assignor's independent liabilities beyond restitutionary damages entailed by rescission of a contract. See 40 Fed. Reg. 53,527 (1975) ("Consumers will not be in a position to obtain affirmative recovery from a creditor unless they have actually commenced payments and received little or nothing of value from the seller. In a case of non-delivery, total failure of performance, or the like, we believe that the consumer is entitled to a <u>refund</u> of monies paid on account." (emphasis added)). This explanation does not encompass an award for treble damages under AFTSA, but rather contemplates a rescissionary remedy. As with the Unruh Act, the required notice is intended to ensure that an assignee is not permitted to continue to collect a fraudulent debt.

In conclusion, while a claim for rescission may be cognizeable under this rule, there is no support for relying on this disclaimer to extend the reach of AFTSA treble-damages provision.

Finally, Plaintiffs claim that AFTSA is applicable to Monterey because Monterey is, in fact, an Advance Fee Talent Service. The statute defines "advance-fee talent service" as a "person who charges, attempts to charge, <u>or receives an advance fee from an artist</u> . . . in order to obtain from or through the service one or more of the following [talent management services]" (emphasis added). Because Be assigned to Monterey its rights to the membership fees, Plaintiffs argue that Monterey "receive[d] an advance fee from an artist," and that it is therefore an Advance Fee Talent Service. This is unpersuasive. Monterey only "received" the payment because Be assigned its right to those payments to Monterey in exchange for a payment. Be had the initial right to payment, and chose to enter into an arrangement by which that right was assigned to Monterey. If this is sufficient to bring Monterey within the ambit of AFTSA, the statute would similarly apply to a Talent Service's bank or any other party to which such monies are transmitted. Such a result stretches the concept of an

14

1  "Advance Fee Talent Service" beyond all recognition. Moreover, the definition goes on to
2  require that the fee be paid "in order to obtain <u>from or through the service</u> one or more of the
3  following" services (emphasis added). Be's members were not obtaining any services "from
4  or through" Monterey, but rather through Be LLC. The definition therefore reaches only an
5  entity that receives payment <u>and</u> provides or promises to provide some service. Monterey
6  had no such obligations, and so is not a talent service.

      D. <u>Unfair Competition Law</u>

8  Next, Plaintiffs argue that Steinbeck and Monterey are liable under California's Unfair
9  Competition Law ("UCL"). <u>See</u> Cal. Bus. & Prof. Code § 17200. Essentially Plaintiffs
10 argue that, even if Defendants are not liable under AFTSA itself, the "unlawful" and "unfair"
11 prong of the UCL can reach their conduct. This Court agrees.

12 Plaintiffs allege that Steinbeck was responsible for Be LLC's misrepresentations, and
13 for the conduct that violated AFTSA. California case law provides that a corporate officer
14 who participates in conduct that violates the UCL can be held personally liable. <u>See</u> <u>People</u>
15 <u>v. Toomey</u>, 157 Cal. App. 3d 1, 14-15 (1984). Steinbeck's only response is that the Ninth
16 Circuit applies a heightened pleading requirement to claims under the UCL's "fraudulent"
17 prong. <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009). But this claim also
18 relies on the "unlawful" prong, as Be, LLC's conduct is alleged to have violated AFTSA. As
19 to the misrepresentation claims that do indeed sound in fraud, it is explained above that the
20 allegations are sufficiently particular as to Defendant Steinbeck.

21 The FAC also makes sufficient allegations as to Defendant Monterey so as to survive
22 a Rule 12(b)(6) dismissal. The FAC alleges that Monterey had actual knowledge that Be was
23 in violation of AFTSA, but despite this knowledge continued to collect unenforceable debts.
24 Moreover, the FAC alleges that Monterey, despite knowing the debts were unenforceable,
25 reported the unpaid balances to credit reporting agencies. FAC ¶ 143. Finally, the FAC
26 alleges that Monterey acted to ensure that Be's "services" would continue to be provided by
27 MTS, a successor corporation, so that Monterey could continue to collect payments from the
28 members. It took this active role in reorganizing the company despite knowing that the

15

1  contracts were illegal.  If Plaintiffs were able to prove this, they would succeed in
2  establishing a claim under the Unfair Competition Law.

### E. RICO

Plaintiffs also assert RICO claims against Monterey and Steinbeck.  18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  The FAC alleges that the racketeering activity in this case was wire fraud in violation of 19 U.S.C. § 1343.  This allegation is premised on the fact that much of Be, LLC's business was transacted over the web.  In the Ninth Circuit, such allegations are subject to the heightened pleading requirements of Rule 9(b).  Lancaster Comt. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991).  The complaint should "detail with particularity the time, place and manner of each act of fraud, plus the role of each defendant in each scheme."  Id.

Defendants argue that Plaintiffs have failed to alleged an "independent proceed-distributing structure" as is supposedly required by Ninth Circuit law.  Any such requirement, however, was overruled by Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007).  According to Odom, to prove an associated-in-fact enterprise requires "evidence of an ongoing organization, formal or informal," and "evidence that the various associates function as a continuing unit."  Id. at 552 (citing United States v. Turkette, 452 U.S. 576 (1981)).  Such allegations are made in the complaint.

Defendants also argue that Plaintiffs have not alleged harm that is cognizeable under RICO.  They argue that "[f]inancial loss alone is insufficient."  Steinbeck Mot. at 28.  In support of this, they cite to Canyon County v. Syngenta Seeds, Inc., 519 F.3d 969 (9th Cir. 2008).  That case, however, explained that "[i]n the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money."  Id. at 976.  The Court went on to note that "[m]oney, of course, is a form of property."  Id. (internal citations omitted).  Plaintiffs here

1 allege that they were deprived of their money based upon Defendants' conduct, which is 2 sufficient. Canyon County's reference to financial loss being insufficient in certain 3 circumstances concerned governmental entities, which are not involved in this case.

The closest question is whether the FAC sufficiently alleges wire fraud as a racketeering activity. Section 1343 provides that wire fraud requires a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. It further requires that a defendant "transmits or causes to be transmitted by means of wire . . . any writings . . . for the purpose of executing such scheme or artifice." The Ninth Circuit has interpreted this section as requiring: "(1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." Odom, 486 F.3d at 554. The FAC alleges that the scheme to defraud required by § 1343 is satisfied by the five allegations of misrepresentation discussed above.

As discussed above, the only actionable misrepresentation in the complaint concerns Be, LLC's representation that it was a selective service, choosing only those applicants with promise. See FAC ¶ 232. This misrepresentation is material, and Plaintiffs have properly alleged reliance and damages. It is also clear that this misrepresentation made use of the wires, as it was posted on Be's website. Id. Even if it were not, it is not necessary that the misrepresentation itself be communicated over the wires. See Gonzales v. Lloyds TSB Bank, PLC, 532 F. Supp. 2d 1200, 1211 (C.D. Cal. 2006) ("[E]ven innocuous communications can qualify [for wire fraud] so long as they are incident to an essential part of the scheme [to defraud]." (citations omitted)). Similarly, it is not necessary that all named defendants themselves used the wires. "A knowing participant in a scheme to defraud is vicariously liable for substantive acts of mail fraud or wire fraud committed by co-schemers." United States v. Stapleton, 293 F.3d 1111, 1117-18 (9th Cir. 2002). Therefore, it is not necessary for Steinbeck to have sent any messages himself; it is sufficient that he knew of the scheme and participated in it.

Monterey's liability, however, is a closer question. Nevertheless, the allegations are sufficient. The FAC alleges that as Be, LLC began to suffer financial pressure, Monterey entered into agreements designed to keep the company in business so that Monterey could continue to collect payments from members. The FAC alleges that an "association-in-fact" arose in January of 2009, by which time Monterey was more involved in the day-to-day operations of Be, and in fact exercised partial control over the company. The FAC has therefore sufficiently alleged Monterey's involvement.

Finally, the FAC also alleges a claim under 18 U.S.C. § 1962(d), for conspiracy to commit a RICO violation. The FAC specifically alleges that Defendants Steinbeck and Monterey "made agreements with certain each other with the intent to facilitate the execution and completion of the pattern of racketeering activity alleged above – to wit, the operation of Be to initiate and complete the schemes alleged above to use the Misrepresentations and to violate AFTSA to obtain membership fees from Class members." FAC ¶ 237. Given the underlying allegations in support of § 1962(c), this further allegation of an agreement is sufficient to support a cause of action under § 1962(d).

## Conclusion

For the reasons explained above, this Court concludes that the deceit, UCL, and RICO actions survive as to both defendants. However, the breach of fiduciary duty and AFTSA claims fail and are therefore DISMISSED WITH PREJUDICE. Finally, Monterey failed to make any argument in support of dismissed of the claims under the Rosenthal Fair Debt Collection Practice Act or the California Credit Reporting Act. Because there was no argument in favor of dismissal, the motion is denied as to those claims.

**IT IS SO ORDERED.**

Dated: June 22, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE