1
Ethan Preston (263295)
PRESTON LAW OFFICES
21001 N. Tatum Blvd., Ste. 1630-430
2
Phoenix, Arizona 85050
(480) 269-9540 (telephone)
3
(866-509-1197 (facsimile)
ep@eplaw.us
4

Robert M. Bramson (102006)
5
Michael S. Strimling (96135)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
6
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
7
 (925) 945-0200 (telephone)
 (925) 945-8792 (facsimile)
8
rbramson@bramsonplutzik.com
mstrimling@bramsonplutzik.com
9

David C. Parisi (162248)
10
Suzanne Havens Beckman (188814)
PARISI & HAVENS LLP
11
15233 Valleyheart Drive
Sherman Oaks, California 91403
12
(818) 990-1299 (telephone)
(818) 501-7852 (facsimile)
13
dcparisi@parisihavens.com
shavens@parisihavens.com
14

*Attorneys for Plaintiffs*
15

**IN THE UNITED STATES DISTRICT COURT**
16
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**
17

18
TIMOTHY and JEANNE DuFOUR and
KENNETH TANNER, individuals, on
their own behalves and on behalf of all
19
others similarly situated,

20
                           Plaintiffs,

21
              v.

22
 BE., LLC, DYNAMIC SHOWCASES,
LLC,  California limited liability
23
companies, MONTEREY FINANCIAL
SERVICES, INC., a California
24
corporations, BE MARKETING
LIMITED, a private limited company
25
registered in England and Wales, BARRY
FALCK, and DOES 1-100, inclusive,
26

                           Defendants.
27

28

No. 09-03770-CRB

Judge Charles R. Breyer

**PROPOSED SECOND AMENDED
COMPLAINT**

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Timothy and Jeanne DuFour ("DuFours") and Kenneth Tanner ("Tanner"), by their attorneys, make this complaint against Defendants Be., LLC ("Be"), Dynamic Showcases, LLC ("Dynamic Showcases"), Monterey Financial Services, Inc. ("Monterey"), MTS Holdings Group, Inc. ("MTS"), Be Marketing Ltd. ("Be UK"), Erik DeSando ("DeSando"), Barry Falck ("Falck"), and Does 1 to 100, (collectively, "Defendants"). Plaintiffs' allegations as to their own actions are based on knowledge. The other allegations are based on their counsel's investigation of publicly available documents and interviews with witnesses, and information and belief.

**Parties**

1.      Plaintiff Timothy and Jeanne DuFour are natural persons residing in Granada Hills, California.

2.      Plaintiff Kenneth Tanner is a natural person residing in North Hollywood, California.

3.       Defendant Be., LLC is a California limited liability company which listed its address with the California Secretary of State at 2029 Century Park East, Suite 900, Los Angeles, California 90067. On February 6, 2010, Be's agent for service of process at this address resigned. Be is the corporate predecessor to My Artist's Place, LLC. Until May 2009, Be maintained its headquarters in Emeryville, California.

4.      Defendant Monterey Financial Services, Inc. is a California corporation. It maintains its headquarters at 4095 Avenida De La Plata, Oceanside, California 92056.

5.      Defendant Dynamic Showcases, LLC is a California limited liability company which lists its address with the California Secretary of State as 1841 N Avenue 52, Los Angeles, California 90042.

6.      Defendant Be Marketing Limited is a private limited company organized under the laws of England and Wales. Be UK lists its registered address with the Registrar of Companies for England and Wales in the United Kingdom. Be UK's registered company secretary is Bournewood Limited, which lists its address as Palm Grove House PO Box 438, Road Town, Tortola, British Virgin Islands. Be UK does business in California, but has not

1   registered with the California Secretary of State.

2       7.    Defendant Barry Falck is a natural person who is, on information and belief, a

3   member, officer or manager of Be, and controls Be, and is and at all time herein mentioned was

4   residing in California.

5       8.    Be's other managers included Erik DeSando and Jacob Steinbeck. Steinbeck and

6   DeSando are not named as Defendants in this Second Amended Complaint because Plaintiffs

7   voluntarily dismissed Steinbeck and because DeSando has filed for bankruptcy under Chapter 7.

8       9.    Plaintiffs are currently ignorant of the true names and capacities, whether

9   individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious

10  names Does 1 through 100, inclusive, and therefore, sues such defendants by such fictitious

11  names. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities

12  of said fictitiously named defendants when their true names and capacities have been

13  ascertained. Plaintiffs are informed and believe and based thereon alleges that each of the

14  fictitiously named Doe defendants is legally responsible in some manner for the events and

15  occurrences alleged herein, and for the damages suffered by Plaintiffs.

16      10.   Plaintiffs are informed and believe and based thereon alleges that all Defendants,

17  including the fictitious Doe defendants, were at all relevant times acting as actual agents,

18  conspirators, ostensible agents, partners and/or joint venturers, alter egos, and employees of all

19  other defendants, and that all acts alleged herein occurred within the course and scope of said

20  agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the

21  express and/or implied permission, knowledge, consent, authorization and ratification of their co-

22  defendants; however, each of these allegations are deemed "alternative" theories whenever not

23  doing so would result in a contradiction with the other allegations.

### Jurisdiction and Venue

25      11.   Plaintiffs DuFour and Tanner assert a claim under 18 U.S.C. § 1964. This Court

26  has subject matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

27      12.   Defendants Be, Dynamic Showcases, and Monterey are California entities which

28  have their principal place of business in California, and can only be citizens of California.

1  Defendant Be UK is a foreign entity whose principal place of business is, on information and

2  belief, in California. Defendant Barry Falck is a natural person who resides in California, and is a

3  citizen of California. This Complaint alleges claims on behalf of a proposed class whose

4  members reside in California and throughout the other forty-nine states and U.S. territories. The

5  members of the proposed class are minimally diverse from the Defendants. On information and

6  belief, the aggregate of the amount in controversy in these class claims exceed the sum or value

7  of $5 million and the total number of class members exceeds 100. This Court has subject matter

8  jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

9       13.    This Court has personal jurisdiction over the Defendants under California Code of

10  Civil Procedure section 410.10 because, inter alia, the acts alleged herein were committed in

11  Alameda County. Further, the undersigned declares, pursuant to 28 U.S.C. 1746, that Alameda

12  County is where Monterey does business and in which substantial portions of the transactions

13  alleged in Plaintiffs' CLRA claim occurred.

14      14.    Venue is also proper before this Court under 28 U.S.C. § 1391(a)(2), (c).

15                              **Intradistrict Assignment**

16      15.    A substantial part of the events which give rise to the claim occurred in Alameda

17  County. Under Local Rule 3-2(c), (d), this civil action should be assigned to the San Francisco or

18  Oakland division of the Northern District of California.

19                                    **Introduction**

20      16.    This case concerns Defendants' involvement in a scheme in violation of

21  California and federal law which injured thousands of families in California and outside of

22  California. As set forth below, the scheme involved a plan by Defendants and certain non-

23  parties, and with the knowledge and ratification of all of them, to extract money from class

24  members through an extended sales pitch directed at children and intended to manipulate and

25  exploit unsophisticated children and their parents by representing that, through the efforts of Be

26  and other Defendants, the children would become famous actors in television, all with

27  knowledge that defendants did not have such ability or expertise and with the knowledge that

28  California law prohibits the fees Defendants sought to charge.

---

17.     **The Initial Approach and the Screentest:** Be hired sales representatives, equipped them with a standardized sales script, and sent them into middle-class shopping malls and other places where Defendants expected families with children would congregate. Following the sales script, the sales representatives would make a show of admiring children in the families that strolled by, take photographs of the children, and tell the adults, within earshot of the children, that casting directors were looking for just such a child to put into television productions or other entertainment. They would drop the names of well-known child actors and imply or state outright that such stars as those in Disney's "Hannah Montana" program were discovered and got their start in just such a manner. The representative would then make a show of giving the parents of the family, in front of the child, audition cards and directions to offices or a rented venue (like hotel conference room) that was usually easily accessible, and urge the children to participate in a screen test at their offices and then afterwards have the family attend a presentation. The screen test only served to create the illusion of a "selection" and exclusivity: in fact, the only criteria for a child's subsequent "selection" as a Be member was the perception that the families would be profitable victims for this scheme.

18.     **The Sales Pitch:** At the presentation, Be would culminate this process with a sales pitch. The central thrust of this sales pitch was that Be would lead to opportunities for professional employment in the entertainment industry, including auditions, casting calls and "showcases" with entertainment industry professionals, who in turn could secure professional employment for Be members. The sales pitch included a video that extolled Be's services, prominently displayed the pictures of contemporary child stars (who would be immediately recognized by the families' children), and otherwise falsely implied that Be or its founders had been instrumental in starting their careers. Indeed, the sales pitch expressly stated that Be could help children become professionally successfully in the entertainment industry by coordinating and introducing members to various such services provided by others, such as acting classes, photo shoots and styling, for which Be's members would be eligible for a supposed discounted rate. Finally, the sales pitch would tout the opportunity to act in television shows produced by Be.

19.     After this initial presentation, Plaintiffs and thousands of other families who are members of the proposed class were separated individually from the other families and herded into back rooms for a high-pressure sales pitch. In the back office, each child that attended the presentation was told that they were talented and/or had strong marketing appeal, and was virtually assured of being in television and films if the family would only subscribe to Be's services. Only once the families were in the back offices would the Be sales personnel reveal that membership with Be would cost thousands of dollars. Be's membership came in three different packages, whose cost ranged from $2,500 to $5,000. Naturally, most families in this economy cannot absorb these expenses out of pocket, and had to pay the fees via credit card or (worse) through Be's finance company, Monterey. Monterey supplied financing contracts and other forms to Be (and, on information and belief, to MTS) to facilitate Be members financing their contracts with Be – and becoming indebted to make installment payments to Monterey. In turn, Monterey provided loans to Be in exchange for these financing contracts.

20.     Be's entire sales scheme – from the initial contact through the screen test sales to the final sales presentation – was designed to build the children's emotional investment in sale and build their expectations and excitement to the point that they anticipated that they would be acting with their favorite TV stars and would be famous soon after they signed with Be. The sales scheme was also designed to weaken financially strapped parents' resistance to Be's exorbitant fees and (not coincidently) to appeal to their hopes for their children and that their children could provide another source of income. As DeSando wrote in the October 23, 2008 Bumble (an internal email sent to Be employees), "People just need to believe that there is something better for them out there. They have to believe we can IMPROVE the quality of their life as well as their kids." If families asked for time to think it over or delay the decision, the representatives would say that there were only a few places left in available classes or programs that would be taken if plaintiff did not sign up immediately, or that the price was a special offer which would increase. With the child present, the sales person would say or imply that failure to take advantage of the plan would deny the child a sure chance at stardom. Be's sales scheme was thus intended to ruthlessly exploit parent's natural hopes and aspirations for their children's

1  happiness and natural aversion to disappointing their children by being obstacles to the child's

2  talent, success and fame.

3       21.    **Purported Membership Benefits:** Be operated like a Ponzi scheme. Early Be

4  members appeared on "showcases" produced by Defendants, and some even obtained legitimate

5  connections in the entertainment industry after signing with Be (this was inevitable, given the

6  large number of Be's victims in California, and their interest in and proximity to employment in

7  the entertainment industry). Just as a Ponzi pays out to early investors to create the appearance of

8  a investment, Be's owners spent some membership fees to cultivate the appearance that Be made

9  a material contribution to its members' professional success, so that it could attract new victims

10  and new revenue. However, just as the late comers to a Ponzi scheme lose their entire

11  investment, the vast majority of its members derived absolutely no benefit to their employment

12  prospects from their Be membership fee.

13       22.    **Auditions:** The benefit Be's sales process touted the most was the access to its

14  "showcases" or auditions. The auditions were marketed as a gateway to professional

15  employment, and the fame and income that could follow. (Technically, Dynamic Showcases

16  offered these auditions, but Falck and DeSando controlled Dynamic Showcases and Be marketed

17  the auditions and referred members to Dynamic Showcases for the auditions.) While Be made

18  misrepresentations and misleading statements about its experience and its connections with the

19  entertainment industry, the fact is that Be and the other Defendants had essentially no

20  connections or capability to help any child obtain employment in the entertainment industry on

21  their own.

22       23.    Rather, Be paid exorbitant fees to established talent agents and talent managers to

23  lure them to its showcases, including Bonnie Liedke (at the William Morris Agency) and

24  Mitchell Gossett (United Talent Agency). Given that Be's members had no qualification other

25  than their parents' ability to finance Be's fee, Be had no other way of inducing these

26  professionals to attend these auditions without paying them. Naturally, these professionals then

27  had no obligation and no particular incentive to represent any Be member. Be's members might

28  as well have pooled their fees together and paid these professionals the same fee to show up – Be

1    provided no value.

2        24.    Conversely, because established talent agents required larger fees, Be also

3    located and paid less-established agents, and even unlicensed talent agents, who had no more

4    ability to find employment for Be members than Be did. Be typically concealed the identity of

5    these alternate agents from its members. Be also paid fees to minor celebrities to make

6    occasional appearances or to participate in auditions. These celebrities had no more ability to

7    obtain professional employment for Be members than Be did, effectively making these

8    celebrities  shills for Be and creating the misleading impression that Be had more connections to

9    successful entertainers and entertainment professionals than it did.

10        25.    **Career Guidance:** The Be employees tasked with preparing Be members to be

11    "evaluated by top agents, managers and casting directors" and providing the "services,

12    experience and exposure that [Be's members needed] in order to succeed in the entertainment

13    industry" were Be's talent directors. To paraphrase H.L. Mencken, those who can are talent

14    agents and talent managers, and those who can't became Be's talent directors. If Be's talent

15    directors had the experience and connections to successfully identify people who can be

16    successful in the entertainment industry, prepare them for auditions, and arrange those auditions,

17    they would most likely already have been employed as legitimate talent managers.

18        26.    In fact, the talent directors' primary job and primary performance metric was

19    sales of Be memberships. Be received its fees entirely up front (even if the fees were financed

20    through Monterey, Monterey basically paying Be cash for procuring such contracts). Once a

21    member paid his or her fee, the only benefit Be could derive from its talent director spending

22    time on the member was to delay or frustrate the members' efforts to seek a refund. As the

23    California Legislature has determined, such advance fees are improper and illegal, as further

24    alleged below. Hence, Be's talent directors had no other incentive to interact with members after

25    obtaining their fee other than to lull them into not acting to take their fee back and to string them

26    along before they became dissatisfied.

27        27.    **Be's TV Programming:** Be produced three children's television shows, called

28    "The Big Talent Bee," "Say What," and "Kids Unlimited." This programming mainly constituted

1   "talent shows" or skits, and were essentially infomercials for Be. This programming was never

2   intended to generate income from advertisers (unlike the popular and commercially successful

3   television shows, such as "Hannah Montana," references to which Be used to lure its members).

4   Rather, Be paid to broadcast this programming during early morning hours on cable stations. The

5   programming primarily served as a marketing tool for selling Be memberships with supposedly

6   legitimate opportunities for children to be on television, and to burnish Be's image as a

7   legitimate entertainment company.

8        28.    **"Discounted" Service Providers:** The only concrete benefit Be purported to

9   provide for every member was discounts for service providers. Be's members had to pay to

10  service providers these "discounted" rates on top of the already exorbitant "membership" fee

11  paid to Be in order to obtain access to Be's auditions. While Be's express and implied

12  representations were that this preparing regimen would materially improve members' chance of

13  succeeding in the entertainment industry, Be's service providers were deeply unprofessional and

14  could not be reasonably expected to improve members' chances of success. Moreover, as Be and

15  the other Defendants knew, the rates of such service providers were not actually a "discount"

16  available to only Be members, as Be represented.

17       29.    The most prominent example of Be's service provider was the Rising Stars acting

18  class. Rising Stars followed Be as it set up shop in new locales. To accommodate Be's growth,

19  Rising Stars locating purported "acting instructors" by simply advertising on websites like

20  craiglist – without even the basic precaution of checking the background of the potential

21  instructors, let alone verifying whether the instructor had any credentials as a professional actor.

22  More blatantly, the purported "discounts" on these service providers which Be offered were

23  illusory. The rates Rising Stars charged to Be members were not actually discounted at all but

24  simply the rate Rising Stars charged to virtually all their clients. Likewise, Dynamic Showcases

25  only arranged talent showcases for Be members, and so the rates Dynamic Showcases charged

26  were not actually discounted at all but simply the rate Dynamic Showcases charged to all its

27  clients.

28       30.    In fact, the service providers were nothing more than a fig leaf to hide the fact that

1    Be was basically a Ponzi scheme. Even with the monetary lures discussed above, industry

2    professionals who could obtain professional employment could only be induced to spend so

3    much time on Be's showcases. Likewise, the high costs of Be's television programming

4    necessarily limited the number of members who could participate in that programming.

5    Inevitably, the demand for auditions and spots in the programming outstripped the supply. In the

6    end, most Be members never even got to "audition," or to act on Be's television "shows." Be

7    used its preparation regimen to restrict the number of members who were "eligible" to audition

8    or to appear in Be's programming to members who completed an extensive (and expensive)

9    series of "lessons" or services with its service providers. Publicly, Be justified its fees as the cost

10   of Be identifying and steering members to skilled service providers that would increase its

11   members' marketability. In fact, Be's founders controlled, directly or indirectly, these service

12   providers. In truth, Be's referrals of "members" to service providers provided it a thinly

13   disguised subterfuge to conceal the fact that Be and Monterey received advance fees from Be

14   members, in violation of California's Advance-Fee Talent Services Act.

### Plaintiff's Individual Claims

16       31.   **Kenneth Tanner:** On or about January 24, 2009, Tanner and his son encountered

17   one of Be's salespeople in the Northridge Fashion Center Mall, in Northridge, California. The

18   salesperson indicated that the Tanners' son would be a good candidate for some acting work and

19   invited the Tanners' son to participate in a Be screentest. On or about January 31, 2009, Tanner's

20   wife and son attended the screentest at Be's offices in Tarzana. After the initial encounter and

21   particularly after the screentest, Tanner's son frequently expressed an interest in becoming a

22   professional actor, and expressed interest in earning money by acting in a TV show or a movie.

23       32.   On February 5, 2009, Tanner and his son had a third meeting with Be's

24   salespeople in Be's Tarzana offices, including Liz Brainard (a Talent Coordinator), Ludwig

25   Minassian (a Talent Director), and Rebecca Whitman (Be's VP of Talent Recruitment). During

26   this meeting, Whitman and Be's other salespeople made the sales pitch alleged above and

27   otherwise marketed Be's services. The main selling point in the sales pitch was that Be's services

28   would provide access to auditions with talent agents, who could then secure professional

employment as an actress or model for Tanner's son. Tanner and his wife signed a contract with Be at the third meeting (the "Contract"). (The copy of this contract is attached to this Complaint as Exhibit 1 is true and correct, except that certain private information has been redacted). At the February 5 meeting, the Tanners received an instructions manual. (A true and correct excerpt of the instructions manual is attached to this Complaint as Exhibit 2.)

33.     The Contract purports to provide "discounts" on the fees charged by Be's service providers, including a "discounted" $25 "Showcase Registration Fee." The portion of the Contract concerning financing states in relevant part: "ANY HOLDER OF THIS AGREEMENT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF."

34.     Immediately after returning home from the February 5 meeting, Tanner read the instruction manual. Tanner also immediately skimmed through Be's website at http://www.Gonnabe.com ("Gonnabe.com"). The instruction manual and Gonnabe.com were consistent with the representations made in the February 5, 2009 sales pitch.

35.     The purposes for which Tanner and his son retained Be's services were (1) to have the son participate in a "showcase" or audition with a talent agent, in order to obtain representation for Tanner's son that would provide him with gainful employment as a professional actor and income from the same; and (2) to receive any career advice or assistance necessary for Tanner's son to obtain such representation. Tanner's son has never received any income as a professional actor, or any other income from the entertainment industry. Indeed, no one from Be ever contacted Tanner or his family about arranging a showcase for his son after the February 5 meeting.

36.     Tanner would not have agreed to the Contract or paid Be for its membership fee, and would have sought to rescind or cancel his Contract if Be had disclosed that:

> a. Be selected Tanner's son on the basis of Tanner's ability to pay rather than his son's marketability in the entertainment industry;
>
> b. Be paid the talent agents and talent managers would participated in the showcase;

c.  Be's purported "discounted" price on acting lessons and the "Showcase Registration Fee" were no lower than any other person who was charged for those services;

d.  the "Showcase Registration Fee" violated California law in any event; and

e.  California law required Be to refund fees for services that it promised to perform and which were not performed.

Be failed to disclose this information at any of its meetings with Tanner or in any of its marketing materials. In fact, Be never disclosed the foregoing information, and Tanner only learned of it through investigation by his counsel.

37.     At the February 5 meeting or immediately thereafter, Tanner made an initial payment to Be of $325 and signed a form authorizing Monterey to make withdrawals to make payment on the unpaid balance of the Contracts. (A true and correct copy of this authorization form is attached to this Complaint as Exhibit 3, except that certain private information has been redacted.) Monterey withdrew four monthly payments of $208.38 from Tanner's bank account for March, April, May, and June via his debit card. In late June or early July 2009, Tanner canceled Monterey's authorization to debit fees from his bank account. Beginning on or about July 6, Monterey began to call Tanner and his family virtually daily to demand that he continue to pay under his contract with Be.

38.     **Timothy and Jeanne DuFour:** On or about February 28, 2009, Jeanne DuFour and her daughter encountered Maral Mollaey, one of Be's salespeople in the Northridge Fashion Center Mall, in Northridge, California. Mollaey invited the DuFours' daughter to participate in Be screentest at Be's Tarzana office. On March 1, 2009, Timothy and Jeanne DuFour and their daughter attended the screentest. After the initial encounter and particularly after the screentest, the DuFours' daughter would frequently discuss her plans to get into show business and the possibility of earning money as a professional actress and/or model with great excitement after this interaction.

39.     On March 7, 2009, the DuFours and their daughter had a third meeting with Be's salespeople in the Tarzana offices – this time, with Rebecca Whitman. During this meeting, Whitman and other salespeople made the sales pitch alleged above and otherwise marketed Be's

services, focusing on the DuFours' daughter. The main selling point in the sales pitch was that Be's services would provide access to auditions with talent agents, who could then secure professional employment as an actress or model for the DuFours' daughter. At this third meeting, the DuFours signed a Contract with Be. (The copy of this Contract is attached to this Complaint as Exhibit 4 is true and correct, except that certain private information has been redacted). The contract purports to provide "discounts" on the fees charged by Be's service providers, including a "discounted" $50 "Showcase Registration Fee."

40.    At the third meeting, the DuFours received an instructions manual and a promotional pamphlet. (A true and correct excerpt of the instructions manual and a true and correct copy the promotional pamphlet are attached to this Complaint as Exhibits 5 and 6, respectively.)

41.    Within a day or two after the March 7 meeting, the DuFours read the instruction manual. The instruction manual was consistent with the representations made by Be's salespeople in the March 7 sales pitch.

42.    Within two or three days after the March 7 meeting, the DuFours reviewed Gonnabe.com. Gonnabe.com's representations about Be's services were consistent with the representations made by Be's salespeople in the March 7 sales pitch.

43.    The purposes for which the DuFours and their daughter retained Be's services were (1) to have the daughter participate in a "showcase" or audition with a talent agent, in order to obtain representation for the DuFours' daughter that would provide her with gainful employment as a professional actress or model and income from the same; and (2) to receive any career advice or assistance necessary for the DuFours' daughter to obtain such representation. Be never provided the DuFours' daughter with a successful audition, and the DuFours' daughter has never received any income as a professional actress or model, or any other income from the entertainment industry.

44.    The DuFours would not have agreed to the Contract or paid Be for its membership fee, and would have sought to rescind or cancel the Contract if Be had disclosed that:

    a.      Be selected the DuFours' daughter on the basis of the DuFours' ability to pay rather than their daughter's marketability in the entertainment industry;

    b.      Be paid the talent agents and talent managers would participated in the showcase;

    c.      Be's purported "discounted" price on acting lessons and the "Showcase Registration Fee" were no lower than any other person who was charged for those services;

    d.      the "Showcase Registration Fee" violated California law in any event; and

    e.      California law required Be to refund fees for services that it promised to perform and which were not performed.

Be failed to disclose this information at any of its meetings with the DuFours or in any of its marketing materials. In fact, Be never disclosed the foregoing information, and the DuFours only learned of it through investigation by their counsel.

45.    At the third meeting or immediately thereafter, the DuFours made an initial payment to Be of $375 shortly after signing the contract, and signed a form authorizing Monterey to make withdrawals to make payment on the unpaid balance of the Contracts. (A true and correct copy of this authorization form is attached to this Complaint as Exhibit 7, except that certain private information has been redacted.) Monterey withdrew four monthly payments of $375 from the DuFours' bank account for April, May, and June via my debit card. In June 2009, Jeanne DuFour canceled Monterey's authorization to debit fees from their bank account. Beginning in or about July 2009, Monterey began to call the DuFours and their family regularly to demand that they continue to pay under the Contract.

### Class Certification Allegations

46.    **Class Definition:** Plaintiffs seek to certify a class and a subclass under Federal Rule 23(b)(2) and 23(b)(3). Plaintiffs bring this Complaint against Defendants on behalf of themselves and the class (the "Class") of

    a.      persons who entered into a contract with Be., LLC (or any its corporate successors or predecessors) which stated "We are an entertainment company that offers a membership comprised of a collection of resources, discounts and a support system designed to help individuals get started on a pathway to success," and purported to provide discounted fees for e.g., Acting Workships and Showcase Registration, in exchange for upfront payments prior to professional employment of the contract beneficiary;

b.      but not any person who is i) any Judge or Magistrate presiding over this action and members of their families; ii) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and current or former employees, officers and directors of Defendants; iii) persons who properly execute and file a timely request for exclusion from the class; iv) and the legal representatives, successors or assigns of any such excluded persons.

Members of the Class may be notified of the pendency of this action by email, mail, and/or supplemented (if deemed necessary or appropriate by the Court) by published notice. Members of the Class can be readily identified from Defendants' records and public records.

47.     **Subclass Definition:** Plaintiffs bring this Complaint against Defendants on behalf of themselves and a subclass (the "Subclass") of Class members who have (1) paid money to Monterey under their contract with Be; or (2) received communications from Monterey seeking to collect unpaid portions of Be Productions' fees.

48.     **Class Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiffs at this time. Gonnabe.com indicates that it has close to 7,000 registered users. DeSando stated publicly in 2008 that Be had over 5,000 members. On this basis, Plaintiffs therefore believe that members of the Class number in the thousands. Therefore, individual joinder of all members of the Class is likely to be impracticable.

49.     **Subclass Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiffs at this time, but such information is readily ascertainable by Defendants. As there are likely thousands of Class members, and it is likely that a significant portion of those have not fully paid Be Productions' fees, individual joinder of all members of the Subclass is likely to be impracticable.

50.     **Class Commonality:** Common questions of fact and law exist as to all members of the Class and predominate over the questions affecting only individual members of the Class. Identification of the individuals who qualify as a member of the Class will be sufficient to establish liability to the Class member. These common questions include whether:

a.      one or more of the Defendants are advance-fee talent services, under the definition of California Labor Code subsection 1701(a) (2009);

b.      Be Productions' contracts violated California Labor Code subsection 1701.4 (2009);

c.  any of the Defendants charged Class members for providing auditions;

d.  any of the Defendants charged Class members for registering or listing them for employment in the entertainment industry, or as a customer of Be Productions;

e.  any of the information regarding Be's services or prices which any of the Defendants caused to be published was false, fraudulent, or misleading information;

f.  any of Defendants' conduct constituted a violation of chapter 1701;

g.  any of Defendants' conduct constituted a breach of fiduciary duty;

h.  any of Defendants' conduct constituted deceit;

i.  any of Defendants' conduct violated Cal. Bus. & Prof. Code § 17200;

j.  any of Defendants aided and abetted the others' deceit or violation of the UCL;

k.  the Defendants entered into a civil conspiracy to assist and promote the others' deceit or violation of the UCL;

l.  any Defendants violated 18 U.S.C. § 1962(c);

m.  any Defendants violated 18 U.S.C. § 1962(d);

n.  Plaintiffs and other members of the Class are entitled to damages, costs, injunctive relief, and attorneys' fees.

51.    **Subclass Commonality:** In addition to the common questions of fact and law pertaining to the Class, common questions of fact and law exist as to all members of the Subclass and predominate over the questions affecting only individual members of the Subclass. Identification of the individuals who qualify as a member of the Subclass will be sufficient to establish liability to the Subclass member. These common questions include whether:

a.  Monterey knew or should have known that Be Productions' contracts were void, illegal, or otherwise not enforceable;

b.  Monterey collected sums purportedly owed on Be's contracts;

c.  Monterey communicated to Subclass members without sending written notice consistent with 15 U.S.C. § 1692g(a);

d.  Monterey has threatened or implied that it would report unpaid sums on Be Productions' contracts as valid debts to the CRAs, so that the Be Productions contracts would impact Subclass members' credit reports;

e.  Monterey's conduct violated Cal. Civ. Code § 1788.17;

      f.   Monterey's conduct violates Cal. Civ. Code § 1785.25(a);

      g.   Plaintiff and other members of the Subclass are entitled to damages, costs, injunctive relief, and attorneys' fees.

52.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass, respectively. Plaintiffs are not different in any relevant way from any other member of the Class or Subclass, and the relief they seek is common to the Class and Subclass.

53.    **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclass: their interests do not conflict with their respective interests. Plaintiffs have retained counsel competent and experienced in complex class actions, and they intend to prosecute this action vigorously.

54.    **Predominance and Superiority:** The Class and Subclass alleged in this Complaint is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual member of the Class and Subclass will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for members of the Class and Subclass individually to obtain effective relief from Defendant's misconduct. Even if members of the Class and Subclass themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

55.    **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole, and to the Subclass as a whole. The policies of the

1  Defendants challenged herein apply and affect members of the Class and Subclass uniformly,

2  and Plaintiff's challenge of these policies hinges on Defendants' conduct, not on facts or law

3  applicable only to Plaintiff.

4  **Class Allegations**

5      56.    The Contracts signed by Plaintiffs are the same as the Contracts signed by every

6  of the other Class members in all material respects. Be's sales pitch and marketing (in its

7  website, its hardcopy promotional material, or its agent's scripted statements), and its policies

8  and representations regarding auditions and discounted fees, have remained materially consistent

9  through the duration of its active operations.

10      57.    **AFTSA Applies to Class Members:** AFTSA defined an artist to include any

11  person who seeks to become an actor (on stage or in motion pictures), musical artists, models,

12  and other artists or persons rendering professional services in motion picture, theatrical, radio,

13  television, and other entertainment enterprises. Cal. Lab. Code § 1701(c) (2009). In light of Be's

14  specific representations below, it is reasonable to infer that the children of Plaintiffs and all of

15  other Class members were "artists" under AFTSA at the time they paid Be. There is no rational

16  reason why a person would have paid Be's membership fee unless the person sought professional

17  employment in the entertainment industry.

18      58.    **AFTSA Applied to the Fees Paid by Class Members to Be:** AFTSA defines an

19  "advance fee" as any fee due from an artist prior to the artist obtaining actual employment as an

20  artist or that exceeds the actual earnings received by the artist as an artist. Cal. Lab. Code §

21  1701(a) (2009). In light of Be's specific representations below, it is reasonable to infer that

22  Plaintiffs and the other Class members paid "advance fees" as defined in AFTSA. There is no

23  rational reason why a person would have paid Be's membership fee if the person already had

24  professional employment in the entertainment industry.

25      59.    **Falck Controlled Be:** Falck is personal liable for Be's acts alleged herein.

26  DeSando indicated in various communications in 2009 to Class members and others that he,

27  Falck, and Jacob Steinbeck were the "principal officers" of Be. Steinbeck, DeSando, and Falck

28  were personally involved in the management of Be's business operations. For instance,

1   Steinbeck, DeSando, and Falck are each listed as a producer on Be's three self-produced

2   television shows (ran from October 27, 2007 to November 8, 2008) in the Independent Movie

3   Database. DeSando personally appeared in the video presentation for the sale pitch alleged

4   above, and made misleading representations about Be's business in the newscast investigations

5   into Be alleged below.

6          60.     Falck and Steinbeck were personally involved in Be's business operations. Falck

7   attempted to prevent the newscast investigations into Be alleged below. On February 6, 2006,

8   Falck caused My Artist's Place, LLC to be formed through a filing with the California secretary

9   of state. On May 8, 2008, Falck caused My Artist's Place, LLC to change its name to Be., LLC.

10  Steinbeck was involved in obtaining additional funding for Be in 2008, with the intent to provide

11  Be with funds to expand and prolong its scheme into other locales and far past where DeSando

12  and Falck could have carried it on their own. As alleged in further detail below, Steinbeck

13  wrested control over Be in early 2009.

14         61.     In addition to the acts alleged above, Steinbeck, DeSando, and Falck's acts

15  alleged elsewhere in this Complaint reflect their personal involvement in Be's operations. As

16  Steinbeck, DeSando, and Falck controlled Be and formulated the policies and procedures alleged

17  herein, directly ordered, direct, authorized or participated in Be's acts alleged herein, Falck is

18  personally liable for such acts.

19         62.     **DeSando and Falck Controlled Dynamic Showcases:** DeSando and Falck are

20  personal liable for Dynamic Showcases's acts alleged herein. There was a newscast investigation

21  into Be Productions by the ABC affiliate station for San Francisco which aired August 23, 2008.

22  *See* KGO-TV, *Complaints over East Bay talent agency's business*, at

23  http://abclocal.go.com/kgo/story?section=news/7_on_your_side&id=6345835 (Aug. 23, 2008).

24  The KGO-TV newscast describes DeSando and Falck's relationship with Dynamic Showcases:

25         7 On Your Side investigated and found the showcase company that Be contracts
           with is Dynamic Showcases. *State records show Desando is the chief executive*
26         *officer of Dynamic Showcases and Be co-owner Barry Falck is a principal*
           *executive. We reached Desando by phone. He told us he did own Dynamic*
27         *Showcases, but in order to comply with Section 1701 he sold it to Barry Falck's*
           *son, Ryan Falck.* "When we discovered we couldn't own it, we sold it to Ryan,
28         but he didn't follow through with the correct state documents. We never made any

> money on the company, but we made a deal," said Desando.  Desando said he did not recall when the sale was made. We checked and found Ryan Falck's name was added to the corporate documents in June after 7 On Your Side began asking questions.

(A true and correct copy of a transcript of this newscast is attached as Exhibit 8.) On this information, DeSando and Falck are alleged to be Dynamic Showcases's managers until June 2008, and to have de facto control over Dynamic Showcases at all times. Given DeSando and Falck's knowledge of Dynamic Showcases's operations, and their apparent response to the KGO newscast investigation, it is apparent that DeSando and Falck controlled Dynamic Showcases and formulated the policies and procedures alleged herein, directly ordered, direct, authorized or participated in Dynamic Showcases' acts alleged herein. As such, Falck is personally liable for such acts.

63.     **Be Charged Advance Fees for Career Management:** Be fits neatly into the AFTSA definition of an advance-fee talent service because it charged advance fees for "[m]anaging or directing the development or advancement of the artist's career as an artist," and "[c]areer counseling, career consulting, . . . evaluation, or planning . . . relating to the preparation of the artist for employment as an artist." Cal. Lab. Code § 1701(b)(2), (3) (2009). Each of Be's contracts contain the following description of its services:

> We are an entertainment company that offers a membership comprised of a collection of resources, discounts and a support system designed to help individuals get started on a pathway to success.

(Exs. 1 and 4.) The disclaimer in each of Be's contracts eliminates any ambiguity about whether that "pathway to success" involved employment in the entertainment industry:

> Purchaser acknowledges and agrees that none of the offerings of be. [sic] include any promise or guarantee of employment in the entertainment industry, whether oral or written, expressed or implied.

(*Id.*) Even in its contracts, Be has marketed its services as facilitating the professional success of its clients in the entertainment industry ("a support system designed to help individuals get started on a pathway to success") (*Id.*)

64.     Gonnabe.com stated that Be gave "young artists the resources, services, experience and exposure that they need in order to succeed in the entertainment industry." (A true and correct copy of the foregoing webpage is attached as Exhibit 9.) Likewise,

Gonnabe.com stated that Be Productions is "a proven game plan in which the artist gets to work with top entertainment pros that who will prepare them to be evaluated" by entertainment industry professionals, and that if its customers "want[ed] to get their career launched in the entertainment industry, you've come to THE right place." (A true and correct copy of the foregoing webpage is attached as Exhibit 10.) "Remember there are a lot of things you will need to prepare before you can get started in TV, film and commercials! Here at BE, we'll help you with the details of everything you'll need to know." (*Id.*) These representations are clear evidence that the "support system" which Be marketed and which Be members paid an advance fee for included career management and/or career consulting in the entertainment industry. Be falls under subsection 1701(b) for that reason alone.

65.     **Dynamic Showcases Charged Advance Fees for Auditions:** Dynamic Showcases was an advance-fee talent service because it charged Be members for attending auditions with talent agents, talent managers, and casting directors. *Cf.* Cal. Lab. Code § 1701(b)(1) (2009) (advance-fee talent service charges advances fees for "[p]rocuring, offering, promising, or attempting to procure employment, engagements, or auditions for the artist"). In its contracts, Be offered purported "discounts" on its service providers' fees, including "Talent Showcases" from Dynamic Showcases. Be distributed instruction manuals to its members, which clearly and unambiguously market the "Talent Showcases" as "real audition[s]":

> Agents, managers and casting directors are always looking for new talent. Talent showcases are your opportunity to interview with several of these professionals at once with the goal of gaining representation. Showcases give you a chance to experience a real audition. You will gain access to and benefit from the opinions of top industry professionals. Each showcase has a $25 registration fee. . . . DYNAMIC SHOWCASES wants every member to have a chance to acquire an agent! . . . DYNAMIC SHOWCASES works with top agents and managers, helping in the showcase process of thousands of kids in the industry.

(Exs. 2 and 5.) As the quotation above shows, Be's marketing indicated that Dynamic Showcases charged an advance fee for these auditions. Dynamic Showcases was an advance-fee talent service.

66.     **Be Marketed Its Services As Providing Access to Auditions and the Prospect of Employment:** Be is also an advance-fee talent service because it marketed its services as

1  providing indirect access to Dynamic Showcases' auditions. *Cf.* Cal. Lab. Code § 1701(b) (2009)

2  (advance-fee talent service receives advance fee "in order to obtain" auditions, etc. "*from or*

3  *through the service*") (emphasis added). Although Dynamic Showcases actually charged the fee

4  specifically attributable to these auditions, the most significant part of Be's services (as

5  confirmed by its contracts and marketing) was access to the auditions. Plaintiffs and the other

6  Class members paid advance fees in order to obtain auditions through the Be's "support system."

7       67.     Be is also an advance-fee talent service because its members paid it advance fees

8  in order to obtain offers for, or attempts to procure, employment in the entertainment industry

9  through the Be LLC "support system." Each of Gonnabe.com's webpages explicitly solicited

10  talent agents to browse its member profiles for potential actors: "Are You an AGENT Looking

11  for Talent? Looking for talent for your next big production? CLICK HERE." (See, e.g., Exs. 9

12  and 10.) Gonnabe.com also devotes an entire webpage to soliciting entertainment industry

13  professionals to provide employment for Be Productions members. (A true and correct copy of

14  the foregoing webpage is attached as Exhibit 11.)

15       68.     Even where Be's "support system" offers the prospect of employment in the

16  entertainment industry indirectly – through auditions with Dynamic Showcases or through a

17  profile on Gonnabe.com, and then through representation with an agent, it falls within the broad

18  definition of an advance-fee talent service. *Cf.* Cal. Lab. Code § 1701(b)(1) (2009) (advance-fee

19  service includes person paid advance fee "in order to obtain . . . through the service . . .

20  [p]rocuring, offering, promising, or attempting to procure . . . engagements, or auditions for the

21  artist").

22       69.     **Be Marketed Its Services As Providing Access to Professional Evaluations:**

23  Be is also an advance-fee talent service because it marketed and charged an advance fee for its

24  members to obtain an "evaluation . . . relating to the preparation of the artist for employment as

25  an artist" through its "support system." Cal. Lab. Code § 1701(b)(3) (2009). These evaluations

26  were an integral part of Be's marketing its auditions and other services:

27

28

Ethan Preston (263295)
PRESTON LAW OFFICES
21001 N. Tatum Blvd., Ste. 1630-430
Phoenix, Arizona 85050
(480) 269-9540 (telephone)
(866-509-1197 (facsimile)
ep@eplaw.us

Robert M. Bramson (102006)
Michael S. Strimling (96135)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
 (925) 945-0200 (telephone)
 (925) 945-8792 (facsimile)
rbramson@bramsonplutzik.com
mstrimling@bramsonplutzik.com

David C. Parisi (162248)
Suzanne Havens Beckman (188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
(818) 990-1299 (telephone)
(818) 501-7852 (facsimile)
dcparisi@parisihavens.com
shavens@parisihavens.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| TIMOTHY and JEANNE DuFOUR and KENNETH TANNER, individuals, on their own behalves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br> BE., LLC, DYNAMIC SHOWCASES, LLC,  California limited liability companies, MONTEREY FINANCIAL SERVICES, INC., a California corporations, BE MARKETING LIMITED, a private limited company registered in England and Wales, BARRY FALCK, and DOES 1-100, inclusive,<br><br>Defendants. | No. 09-03770-CRB<br><br>Judge Charles R. Breyer<br><br>**PROPOSED SECOND AMENDED COMPLAINT** |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Timothy and Jeanne DuFour ("DuFours") and Kenneth Tanner ("Tanner"), by their attorneys, make this complaint against Defendants Be., LLC ("Be"), Dynamic Showcases, LLC ("Dynamic Showcases"), Monterey Financial Services, Inc. ("Monterey"), MTS Holdings Group, Inc. ("MTS"), Be Marketing Ltd. ("Be UK"), Erik DeSando ("DeSando"), Barry Falck ("Falck"), and Does 1 to 100, (collectively, "Defendants"). Plaintiffs' allegations as to their own actions are based on knowledge. The other allegations are based on their counsel's investigation of publicly available documents and interviews with witnesses, and information and belief.

**Parties**

1. Plaintiff Timothy and Jeanne DuFour are natural persons residing in Granada Hills, California.

2. Plaintiff Kenneth Tanner is a natural person residing in North Hollywood, California.

3. Defendant Be., LLC is a California limited liability company which listed its address with the California Secretary of State at 2029 Century Park East, Suite 900, Los Angeles, California 90067. On February 6, 2010, Be's agent for service of process at this address resigned. Be is the corporate predecessor to My Artist's Place, LLC. Until May 2009, Be maintained its headquarters in Emeryville, California.

4. Defendant Monterey Financial Services, Inc. is a California corporation. It maintains its headquarters at 4095 Avenida De La Plata, Oceanside, California 92056.

5. Defendant Dynamic Showcases, LLC is a California limited liability company which lists its address with the California Secretary of State as 1841 N Avenue 52, Los Angeles, California 90042.

6. Defendant Be Marketing Limited is a private limited company organized under the laws of England and Wales. Be UK lists its registered address with the Registrar of Companies for England and Wales in the United Kingdom. Be UK's registered company secretary is Bournewood Limited, which lists its address as Palm Grove House PO Box 438, Road Town, Tortola, British Virgin Islands. Be UK does business in California, but has not

1  registered with the California Secretary of State.

2         7.    Defendant Barry Falck is a natural person who is, on information and belief, a

3  member, officer or manager of Be, and controls Be, and is and at all time herein mentioned was

4  residing in California.

5         8.    Be's other managers included Erik DeSando and Jacob Steinbeck. Steinbeck and

6  DeSando are not named as Defendants in this Second Amended Complaint because Plaintiffs

7  voluntarily dismissed Steinbeck and because DeSando has filed for bankruptcy under Chapter 7.

8         9.    Plaintiffs are currently ignorant of the true names and capacities, whether

9  individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious

10  names Does 1 through 100, inclusive, and therefore, sues such defendants by such fictitious

11  names. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities

12  of said fictitiously named defendants when their true names and capacities have been

13  ascertained. Plaintiffs are informed and believe and based thereon alleges that each of the

14  fictitiously named Doe defendants is legally responsible in some manner for the events and

15  occurrences alleged herein, and for the damages suffered by Plaintiffs.

16        10.    Plaintiffs are informed and believe and based thereon alleges that all Defendants,

17  including the fictitious Doe defendants, were at all relevant times acting as actual agents,

18  conspirators, ostensible agents, partners and/or joint venturers, alter egos, and employees of all

19  other defendants, and that all acts alleged herein occurred within the course and scope of said

20  agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the

21  express and/or implied permission, knowledge, consent, authorization and ratification of their co-

22  defendants; however, each of these allegations are deemed "alternative" theories whenever not

23  doing so would result in a contradiction with the other allegations.

24                                     **Jurisdiction and Venue**

25        11.    Plaintiffs DuFour and Tanner assert a claim under 18 U.S.C. § 1964. This Court

26  has subject matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

27        12.    Defendants Be, Dynamic Showcases, and Monterey are California entities which

28  have their principal place of business in California, and can only be citizens of California.

1   Defendant Be UK is a foreign entity whose principal place of business is, on information and

2   belief, in California. Defendant Barry Falck is a natural person who resides in California, and is a

3   citizen of California. This Complaint alleges claims on behalf of a proposed class whose

4   members reside in California and throughout the other forty-nine states and U.S. territories. The

5   members of the proposed class are minimally diverse from the Defendants. On information and

6   belief, the aggregate of the amount in controversy in these class claims exceed the sum or value

7   of $5 million and the total number of class members exceeds 100. This Court has subject matter

8   jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

9        13.    This Court has personal jurisdiction over the Defendants under California Code of

10  Civil Procedure section 410.10 because, inter alia, the acts alleged herein were committed in

11  Alameda County. Further, the undersigned declares, pursuant to 28 U.S.C. 1746, that Alameda

12  County is where Monterey does business and in which substantial portions of the transactions

13  alleged in Plaintiffs' CLRA claim occurred.

14       14.    Venue is also proper before this Court under 28 U.S.C. § 1391(a)(2), (c).

15                          **Intradistrict Assignment**

16       15.    A substantial part of the events which give rise to the claim occurred in Alameda

17  County. Under Local Rule 3-2(c), (d), this civil action should be assigned to the San Francisco or

18  Oakland division of the Northern District of California.

19                                **Introduction**

20       16.    This case concerns Defendants' involvement in a scheme in violation of

21  California and federal law which injured thousands of families in California and outside of

22  California. As set forth below, the scheme involved a plan by Defendants and certain non-

23  parties, and with the knowledge and ratification of all of them, to extract money from class

24  members through an extended sales pitch directed at children and intended to manipulate and

25  exploit unsophisticated children and their parents by representing that, through the efforts of Be

26  and other Defendants, the children would become famous actors in television, all with

27  knowledge that defendants did not have such ability or expertise and with the knowledge that

28  California law prohibits the fees Defendants sought to charge.

17.     **The Initial Approach and the Screentest:** Be hired sales representatives, equipped them with a standardized sales script, and sent them into middle-class shopping malls and other places where Defendants expected families with children would congregate. Following the sales script, the sales representatives would make a show of admiring children in the families that strolled by, take photographs of the children, and tell the adults, within earshot of the children, that casting directors were looking for just such a child to put into television productions or other entertainment. They would drop the names of well-known child actors and imply or state outright that such stars as those in Disney's "Hannah Montana" program were discovered and got their start in just such a manner. The representative would then make a show of giving the parents of the family, in front of the child, audition cards and directions to offices or a rented venue (like hotel conference room) that was usually easily accessible, and urge the children to participate in a screen test at their offices and then afterwards have the family attend a presentation. The screen test only served to create the illusion of a "selection" and exclusivity: in fact, the only criteria for a child's subsequent "selection" as a Be member was the perception that the families would be profitable victims for this scheme.

18.     **The Sales Pitch:** At the presentation, Be would culminate this process with a sales pitch. The central thrust of this sales pitch was that Be would lead to opportunities for professional employment in the entertainment industry, including auditions, casting calls and "showcases" with entertainment industry professionals, who in turn could secure professional employment for Be members. The sales pitch included a video that extolled Be's services, prominently displayed the pictures of contemporary child stars (who would be immediately recognized by the families' children), and otherwise falsely implied that Be or its founders had been instrumental in starting their careers. Indeed, the sales pitch expressly stated that Be could help children become professionally successfully in the entertainment industry by coordinating and introducing members to various such services provided by others, such as acting classes, photo shoots and styling, for which Be's members would be eligible for a supposed discounted rate. Finally, the sales pitch would tout the opportunity to act in television shows produced by Be.

19.     After this initial presentation, Plaintiffs and thousands of other families who are members of the proposed class were separated individually from the other families and herded into back rooms for a high-pressure sales pitch. In the back office, each child that attended the presentation was told that they were talented and/or had strong marketing appeal, and was virtually assured of being in television and films if the family would only subscribe to Be's services. Only once the families were in the back offices would the Be sales personnel reveal that membership with Be would cost thousands of dollars. Be's membership came in three different packages, whose cost ranged from $2,500 to $5,000. Naturally, most families in this economy cannot absorb these expenses out of pocket, and had to pay the fees via credit card or (worse) through Be's finance company, Monterey. Monterey supplied financing contracts and other forms to Be (and, on information and belief, to MTS) to facilitate Be members financing their contracts with Be – and becoming indebted to make installment payments to Monterey. In turn, Monterey provided loans to Be in exchange for these financing contracts.

20.     Be's entire sales scheme – from the initial contact through the screen test sales to the final sales presentation – was designed to build the children's emotional investment in sale and build their expectations and excitement to the point that they anticipated that they would be acting with their favorite TV stars and would be famous soon after they signed with Be. The sales scheme was also designed to weaken financially strapped parents' resistance to Be's exorbitant fees and (not coincidently) to appeal to their hopes for their children and that their children could provide another source of income. As DeSando wrote in the October 23, 2008 Bumble (an internal email sent to Be employees), "People just need to believe that there is something better for them out there. They have to believe we can IMPROVE the quality of their life as well as their kids." If families asked for time to think it over or delay the decision, the representatives would say that there were only a few places left in available classes or programs that would be taken if plaintiff did not sign up immediately, or that the price was a special offer which would increase. With the child present, the sales person would say or imply that failure to take advantage of the plan would deny the child a sure chance at stardom. Be's sales scheme was thus intended to ruthlessly exploit parent's natural hopes and aspirations for their children's

happiness and natural aversion to disappointing their children by being obstacles to the child's talent, success and fame.

21.     **Purported Membership Benefits:** Be operated like a Ponzi scheme. Early Be members appeared on "showcases" produced by Defendants, and some even obtained legitimate connections in the entertainment industry after signing with Be (this was inevitable, given the large number of Be's victims in California, and their interest in and proximity to employment in the entertainment industry). Just as a Ponzi pays out to early investors to create the appearance of a investment, Be's owners spent some membership fees to cultivate the appearance that Be made a material contribution to its members' professional success, so that it could attract new victims and new revenue. However, just as the late comers to a Ponzi scheme lose their entire investment, the vast majority of its members derived absolutely no benefit to their employment prospects from their Be membership fee.

22.     **Auditions:** The benefit Be's sales process touted the most was the access to its "showcases" or auditions. The auditions were marketed as a gateway to professional employment, and the fame and income that could follow. (Technically, Dynamic Showcases offered these auditions, but Falck and DeSando controlled Dynamic Showcases and Be marketed the auditions and referred members to Dynamic Showcases for the auditions.) While Be made misrepresentations and misleading statements about its experience and its connections with the entertainment industry, the fact is that Be and the other Defendants had essentially no connections or capability to help any child obtain employment in the entertainment industry on their own.

23.     Rather, Be paid exorbitant fees to established talent agents and talent managers to lure them to its showcases, including Bonnie Liedke (at the William Morris Agency) and Mitchell Gossett (United Talent Agency). Given that Be's members had no qualification other than their parents' ability to finance Be's fee, Be had no other way of inducing these professionals to attend these auditions without paying them. Naturally, these professionals then had no obligation and no particular incentive to represent any Be member. Be's members might as well have pooled their fees together and paid these professionals the same fee to show up – Be

1  provided no value.

2        24.     Conversely, because established talent agents required larger fees, Be also

3  located and paid less-established agents, and even unlicensed talent agents, who had no more

4  ability to find employment for Be members than Be did. Be typically concealed the identity of

5  these alternate agents from its members. Be also paid fees to minor celebrities to make

6  occasional appearances or to participate in auditions. These celebrities had no more ability to

7  obtain professional employment for Be members than Be did, effectively making these

8  celebrities  shills for Be and creating the misleading impression that Be had more connections to

9  successful entertainers and entertainment professionals than it did.

10        25.    **Career Guidance:** The Be employees tasked with preparing Be members to be

11  "evaluated by top agents, managers and casting directors" and providing the "services,

12  experience and exposure that [Be's members needed] in order to succeed in the entertainment

13  industry" were Be's talent directors. To paraphrase H.L. Mencken, those who can are talent

14  agents and talent managers, and those who can't became Be's talent directors. If Be's talent

15  directors had the experience and connections to successfully identify people who can be

16  successful in the entertainment industry, prepare them for auditions, and arrange those auditions,

17  they would most likely already have been employed as legitimate talent managers.

18        26.     In fact, the talent directors' primary job and primary performance metric was

19  sales of Be memberships. Be received its fees entirely up front (even if the fees were financed

20  through Monterey, Monterey basically paying Be cash for procuring such contracts). Once a

21  member paid his or her fee, the only benefit Be could derive from its talent director spending

22  time on the member was to delay or frustrate the members' efforts to seek a refund. As the

23  California Legislature has determined, such advance fees are improper and illegal, as further

24  alleged below. Hence, Be's talent directors had no other incentive to interact with members after

25  obtaining their fee other than to lull them into not acting to take their fee back and to string them

26  along before they became dissatisfied.

27        27.    **Be's TV Programming:** Be produced three children's television shows, called

28  "The Big Talent Bee," "Say What," and "Kids Unlimited." This programming mainly constituted

"talent shows" or skits, and were essentially infomercials for Be. This programming was never intended to generate income from advertisers (unlike the popular and commercially successful television shows, such as "Hannah Montana," references to which Be used to lure its members). Rather, Be paid to broadcast this programming during early morning hours on cable stations. The programming primarily served as a marketing tool for selling Be memberships with supposedly legitimate opportunities for children to be on television, and to burnish Be's image as a legitimate entertainment company.

28.      **"Discounted" Service Providers:** The only concrete benefit Be purported to provide for every member was discounts for service providers. Be's members had to pay to service providers these "discounted" rates on top of the already exorbitant "membership" fee paid to Be in order to obtain access to Be's auditions. While Be's express and implied representations were that this preparing regimen would materially improve members' chance of succeeding in the entertainment industry, Be's service providers were deeply unprofessional and could not be reasonably expected to improve members' chances of success. Moreover, as Be and the other Defendants knew, the rates of such service providers were not actually a "discount" available to only Be members, as Be represented.

29.      The most prominent example of Be's service provider was the Rising Stars acting class. Rising Stars followed Be as it set up shop in new locales. To accommodate Be's growth, Rising Stars locating purported "acting instructors" by simply advertising on websites like craiglist – without even the basic precaution of checking the background of the potential instructors, let alone verifying whether the instructor had any credentials as a professional actor. More blatantly, the purported "discounts" on these service providers which Be offered were illusory. The rates Rising Stars charged to Be members were not actually discounted at all but simply the rate Rising Stars charged to virtually all their clients. Likewise, Dynamic Showcases only arranged talent showcases for Be members, and so the rates Dynamic Showcases charged were not actually discounted at all but simply the rate Dynamic Showcases charged to all its clients.

30.      In fact, the service providers were nothing more than a fig leaf to hide the fact that

1   Be was basically a Ponzi scheme. Even with the monetary lures discussed above, industry

2   professionals who could obtain professional employment could only be induced to spend so

3   much time on Be's showcases. Likewise, the high costs of Be's television programming

4   necessarily limited the number of members who could participate in that programming.

5   Inevitably, the demand for auditions and spots in the programming outstripped the supply. In the

6   end, most Be members never even got to "audition," or to act on Be's television "shows." Be

7   used its preparation regimen to restrict the number of members who were "eligible" to audition

8   or to appear in Be's programming to members who completed an extensive (and expensive)

9   series of "lessons" or services with its service providers. Publicly, Be justified its fees as the cost

10  of Be identifying and steering members to skilled service providers that would increase its

11  members' marketability. In fact, Be's founders controlled, directly or indirectly, these service

12  providers. In truth, Be's referrals of "members" to service providers provided it a thinly

13  disguised subterfuge to conceal the fact that Be and Monterey received advance fees from Be

14  members, in violation of California's Advance-Fee Talent Services Act.

15                          **Plaintiff's Individual Claims**

16          31.    **Kenneth Tanner:** On or about January 24, 2009, Tanner and his son encountered

17  one of Be's salespeople in the Northridge Fashion Center Mall, in Northridge, California. The

18  salesperson indicated that the Tanners' son would be a good candidate for some acting work and

19  invited the Tanners' son to participate in a Be screentest. On or about January 31, 2009, Tanner's

20  wife and son attended the screentest at Be's offices in Tarzana. After the initial encounter and

21  particularly after the screentest, Tanner's son frequently expressed an interest in becoming a

22  professional actor, and expressed interest in earning money by acting in a TV show or a movie.

23          32.    On February 5, 2009, Tanner and his son had a third meeting with Be's

24  salespeople in Be's Tarzana offices, including Liz Brainard (a Talent Coordinator), Ludwig

25  Minassian (a Talent Director), and Rebecca Whitman (Be's VP of Talent Recruitment). During

26  this meeting, Whitman and Be's other salespeople made the sales pitch alleged above and

27  otherwise marketed Be's services. The main selling point in the sales pitch was that Be's services

28  would provide access to auditions with talent agents, who could then secure professional

employment as an actress or model for Tanner's son. Tanner and his wife signed a contract with Be at the third meeting (the "Contract"). (The copy of this contract is attached to this Complaint as Exhibit 1 is true and correct, except that certain private information has been redacted). At the February 5 meeting, the Tanners received an instructions manual. (A true and correct excerpt of the instructions manual is attached to this Complaint as Exhibit 2.)

33.     The Contract purports to provide "discounts" on the fees charged by Be's service providers, including a "discounted" $25 "Showcase Registration Fee." The portion of the Contract concerning financing states in relevant part: "ANY HOLDER OF THIS AGREEMENT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF."

34.     Immediately after returning home from the February 5 meeting, Tanner read the instruction manual. Tanner also immediately skimmed through Be's website at http://www.Gonnabe.com ("Gonnabe.com"). The instruction manual and Gonnabe.com were consistent with the representations made in the February 5, 2009 sales pitch.

35.     The purposes for which Tanner and his son retained Be's services were (1) to have the son participate in a "showcase" or audition with a talent agent, in order to obtain representation for Tanner's son that would provide him with gainful employment as a professional actor and income from the same; and (2) to receive any career advice or assistance necessary for Tanner's son to obtain such representation. Tanner's son has never received any income as a professional actor, or any other income from the entertainment industry. Indeed, no one from Be ever contacted Tanner or his family about arranging a showcase for his son after the February 5 meeting.

36.     Tanner would not have agreed to the Contract or paid Be for its membership fee, and would have sought to rescind or cancel his Contract if Be had disclosed that:

        a.  Be selected Tanner's son on the basis of Tanner's ability to pay rather than his son's marketability in the entertainment industry;

        b.  Be paid the talent agents and talent managers would participated in the showcase;

c. Be's purported "discounted" price on acting lessons and the "Showcase Registration Fee" were no lower than any other person who was charged for those services;

d. the "Showcase Registration Fee" violated California law in any event; and

e. California law required Be to refund fees for services that it promised to perform and which were not performed.

Be failed to disclose this information at any of its meetings with Tanner or in any of its marketing materials. In fact, Be never disclosed the foregoing information, and Tanner only learned of it through investigation by his counsel.

37.     At the February 5 meeting or immediately thereafter, Tanner made an initial payment to Be of $325 and signed a form authorizing Monterey to make withdrawals to make payment on the unpaid balance of the Contracts. (A true and correct copy of this authorization form is attached to this Complaint as Exhibit 3, except that certain private information has been redacted.) Monterey withdrew four monthly payments of $208.38 from Tanner's bank account for March, April, May, and June via his debit card. In late June or early July 2009, Tanner canceled Monterey's authorization to debit fees from his bank account. Beginning on or about July 6, Monterey began to call Tanner and his family virtually daily to demand that he continue to pay under his contract with Be.

38.     **Timothy and Jeanne DuFour:** On or about February 28, 2009, Jeanne DuFour and her daughter encountered Maral Mollaey, one of Be's salespeople in the Northridge Fashion Center Mall, in Northridge, California. Mollaey invited the DuFours' daughter to participate in Be screentest at Be's Tarzana office. On March 1, 2009, Timothy and Jeanne DuFour and their daughter attended the screentest. After the initial encounter and particularly after the screentest, the DuFours' daughter would frequently discuss her plans to get into show business and the possibility of earning money as a professional actress and/or model with great excitement after this interaction.

39.     On March 7, 2009, the DuFours and their daughter had a third meeting with Be's salespeople in the Tarzana offices – this time, with Rebecca Whitman. During this meeting, Whitman and other salespeople made the sales pitch alleged above and otherwise marketed Be's

services, focusing on the DuFours' daughter. The main selling point in the sales pitch was that Be's services would provide access to auditions with talent agents, who could then secure professional employment as an actress or model for the DuFours' daughter. At this third meeting, the DuFours signed a Contract with Be. (The copy of this Contract is attached to this Complaint as Exhibit 4 is true and correct, except that certain private information has been redacted). The contract purports to provide "discounts" on the fees charged by Be's service providers, including a "discounted" $50 "Showcase Registration Fee."

40.     At the third meeting, the DuFours received an instructions manual and a promotional pamphlet. (A true and correct excerpt of the instructions manual and a true and correct copy the promotional pamphlet are attached to this Complaint as Exhibits 5 and 6, respectively.)

41.     Within a day or two after the March 7 meeting, the DuFours read the instruction manual. The instruction manual was consistent with the representations made by Be's salespeople in the March 7 sales pitch.

42.     Within two or three days after the March 7 meeting, the DuFours reviewed Gonnabe.com. Gonnabe.com's representations about Be's services were consistent with the representations made by Be's salespeople in the March 7 sales pitch.

43.     The purposes for which the DuFours and their daughter retained Be's services were (1) to have the daughter participate in a "showcase" or audition with a talent agent, in order to obtain representation for the DuFours' daughter that would provide her with gainful employment as a professional actress or model and income from the same; and (2) to receive any career advice or assistance necessary for the DuFours' daughter to obtain such representation. Be never provided the DuFours' daughter with a successful audition, and the DuFours' daughter has never received any income as a professional actress or model, or any other income from the entertainment industry.

44.     The DuFours would not have agreed to the Contract or paid Be for its membership fee, and would have sought to rescind or cancel the Contract if Be had disclosed that:

a.  Be selected the DuFours' daughter on the basis of the DuFours' ability to pay rather than their daughter's marketability in the entertainment industry;

b.  Be paid the talent agents and talent managers would participated in the showcase;

c.  Be's purported "discounted" price on acting lessons and the "Showcase Registration Fee" were no lower than any other person who was charged for those services;

d.  the "Showcase Registration Fee" violated California law in any event; and

e.  California law required Be to refund fees for services that it promised to perform and which were not performed.

Be failed to disclose this information at any of its meetings with the DuFours or in any of its marketing materials. In fact, Be never disclosed the foregoing information, and the DuFours only learned of it through investigation by their counsel.

45.     At the third meeting or immediately thereafter, the DuFours made an initial payment to Be of $375 shortly after signing the contract, and signed a form authorizing Monterey to make withdrawals to make payment on the unpaid balance of the Contracts. (A true and correct copy of this authorization form is attached to this Complaint as Exhibit 7, except that certain private information has been redacted.) Monterey withdrew four monthly payments of $375 from the DuFours' bank account for April, May, and June via my debit card. In June 2009, Jeanne DuFour canceled Monterey's authorization to debit fees from their bank account. Beginning in or about July 2009, Monterey began to call the DuFours and their family regularly to demand that they continue to pay under the Contract.

## Class Certification Allegations

46.     **Class Definition:** Plaintiffs seek to certify a class and a subclass under Federal Rule 23(b)(2) and 23(b)(3). Plaintiffs bring this Complaint against Defendants on behalf of themselves and the class (the "Class") of

a.  persons who entered into a contract with Be., LLC (or any its corporate successors or predecessors) which stated "We are an entertainment company that offers a membership comprised of a collection of resources, discounts and a support system designed to help individuals get started on a pathway to success," and purported to provide discounted fees for e.g., Acting Workships and Showcase Registration, in exchange for upfront payments prior to professional employment of the contract beneficiary;

b.  but not any person who is i) any Judge or Magistrate presiding over this action and members of their families; ii) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and current or former employees, officers and directors of Defendants; iii) persons who properly execute and file a timely request for exclusion from the class; iv) and the legal representatives, successors or assigns of any such excluded persons.

Members of the Class may be notified of the pendency of this action by email, mail, and/or supplemented (if deemed necessary or appropriate by the Court) by published notice. Members of the Class can be readily identified from Defendants' records and public records.

47.  **Subclass Definition:** Plaintiffs bring this Complaint against Defendants on behalf of themselves and a subclass (the "Subclass") of Class members who have (1) paid money to Monterey under their contract with Be; or (2) received communications from Monterey seeking to collect unpaid portions of Be Productions' fees.

48.  **Class Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiffs at this time. Gonnabe.com indicates that it has close to 7,000 registered users. DeSando stated publicly in 2008 that Be had over 5,000 members. On this basis, Plaintiffs therefore believe that members of the Class number in the thousands. Therefore, individual joinder of all members of the Class is likely to be impracticable.

49.  **Subclass Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiffs at this time, but such information is readily ascertainable by Defendants. As there are likely thousands of Class members, and it is likely that a significant portion of those have not fully paid Be Productions' fees, individual joinder of all members of the Subclass is likely to be impracticable.

50.  **Class Commonality:** Common questions of fact and law exist as to all members of the Class and predominate over the questions affecting only individual members of the Class. Identification of the individuals who qualify as a member of the Class will be sufficient to establish liability to the Class member. These common questions include whether:

a.  one or more of the Defendants are advance-fee talent services, under the definition of California Labor Code subsection 1701(a) (2009);

b.  Be Productions' contracts violated California Labor Code subsection 1701.4 (2009);

c.  any of the Defendants charged Class members for providing auditions;

d.  any of the Defendants charged Class members for registering or listing them for employment in the entertainment industry, or as a customer of Be Productions;

e.  any of the information regarding Be's services or prices which any of the Defendants caused to be published was false, fraudulent, or misleading information;

f.  any of Defendants' conduct constituted a violation of chapter 1701;

g.  any of Defendants' conduct constituted a breach of fiduciary duty;

h.  any of Defendants' conduct constituted deceit;

i.  any of Defendants' conduct violated Cal. Bus. & Prof. Code § 17200;

j.  any of Defendants aided and abetted the others' deceit or violation of the UCL;

k.  the Defendants entered into a civil conspiracy to assist and promote the others' deceit or violation of the UCL;

l.  any Defendants violated 18 U.S.C. § 1962(c);

m.  any Defendants violated 18 U.S.C. § 1962(d);

n.  Plaintiffs and other members of the Class are entitled to damages, costs, injunctive relief, and attorneys' fees.

51.  **Subclass Commonality:** In addition to the common questions of fact and law pertaining to the Class, common questions of fact and law exist as to all members of the Subclass and predominate over the questions affecting only individual members of the Subclass. Identification of the individuals who qualify as a member of the Subclass will be sufficient to establish liability to the Subclass member. These common questions include whether:

a.  Monterey knew or should have known that Be Productions' contracts were void, illegal, or otherwise not enforceable;

b.  Monterey collected sums purportedly owed on Be's contracts;

c.  Monterey communicated to Subclass members without sending written notice consistent with 15 U.S.C. § 1692g(a);

d.  Monterey has threatened or implied that it would report unpaid sums on Be Productions' contracts as valid debts to the CRAs, so that the Be Productions contracts would impact Subclass members' credit reports;

e.  Monterey's conduct violated Cal. Civ. Code § 1788.17;

f.   Monterey's conduct violates Cal. Civ. Code § 1785.25(a);

g.   Plaintiff and other members of the Subclass are entitled to damages, costs, injunctive relief, and attorneys' fees.

52.   **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass, respectively. Plaintiffs are not different in any relevant way from any other member of the Class or Subclass, and the relief they seek is common to the Class and Subclass.

53.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclass: their interests do not conflict with their respective interests. Plaintiffs have retained counsel competent and experienced in complex class actions, and they intend to prosecute this action vigorously.

54.   **Predominance and Superiority:** The Class and Subclass alleged in this Complaint is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual member of the Class and Subclass will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for members of the Class and Subclass individually to obtain effective relief from Defendant's misconduct. Even if members of the Class and Subclass themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

55.   **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole, and to the Subclass as a whole. The policies of the

1   Defendants challenged herein apply and affect members of the Class and Subclass uniformly,

2   and Plaintiff's challenge of these policies hinges on Defendants' conduct, not on facts or law

3   applicable only to Plaintiff.

4                                  **Class Allegations**

5         56.    The Contracts signed by Plaintiffs are the same as the Contracts signed by every

6   of the other Class members in all material respects. Be's sales pitch and marketing (in its

7   website, its hardcopy promotional material, or its agent's scripted statements), and its policies

8   and representations regarding auditions and discounted fees, have remained materially consistent

9   through the duration of its active operations.

10        57.    **AFTSA Applies to Class Members:** AFTSA defined an artist to include any

11  person who seeks to become an actor (on stage or in motion pictures), musical artists, models,

12  and other artists or persons rendering professional services in motion picture, theatrical, radio,

13  television, and other entertainment enterprises. Cal. Lab. Code § 1701(c) (2009). In light of Be's

14  specific representations below, it is reasonable to infer that the children of Plaintiffs and all of

15  other Class members were "artists" under AFTSA at the time they paid Be. There is no rational

16  reason why a person would have paid Be's membership fee unless the person sought professional

17  employment in the entertainment industry.

18        58.    **AFTSA Applied to the Fees Paid by Class Members to Be:** AFTSA defines an

19  "advance fee" as any fee due from an artist prior to the artist obtaining actual employment as an

20  artist or that exceeds the actual earnings received by the artist as an artist. Cal. Lab. Code §

21  1701(a) (2009). In light of Be's specific representations below, it is reasonable to infer that

22  Plaintiffs and the other Class members paid "advance fees" as defined in AFTSA. There is no

23  rational reason why a person would have paid Be's membership fee if the person already had

24  professional employment in the entertainment industry.

25        59.    **Falck Controlled Be:** Falck is personal liable for Be's acts alleged herein.

26  DeSando indicated in various communications in 2009 to Class members and others that he,

27  Falck, and Jacob Steinbeck were the "principal officers" of Be. Steinbeck, DeSando, and Falck

28  were personally involved in the management of Be's business operations. For instance,

1  Steinbeck, DeSando, and Falck are each listed as a producer on Be's three self-produced

2  television shows (ran from October 27, 2007 to November 8, 2008) in the Independent Movie

3  Database. DeSando personally appeared in the video presentation for the sale pitch alleged

4  above, and made misleading representations about Be's business in the newscast investigations

5  into Be alleged below.

6      60.    Falck and Steinbeck were personally involved in Be's business operations. Falck

7  attempted to prevent the newscast investigations into Be alleged below. On February 6, 2006,

8  Falck caused My Artist's Place, LLC to be formed through a filing with the California secretary

9  of state. On May 8, 2008, Falck caused My Artist's Place, LLC to change its name to Be., LLC.

10  Steinbeck was involved in obtaining additional funding for Be in 2008, with the intent to provide

11  Be with funds to expand and prolong its scheme into other locales and far past where DeSando

12  and Falck could have carried it on their own. As alleged in further detail below, Steinbeck

13  wrested control over Be in early 2009.

14      61.    In addition to the acts alleged above, Steinbeck, DeSando, and Falck's acts

15  alleged elsewhere in this Complaint reflect their personal involvement in Be's operations. As

16  Steinbeck, DeSando, and Falck controlled Be and formulated the policies and procedures alleged

17  herein, directly ordered, direct, authorized or participated in Be's acts alleged herein, Falck is

18  personally liable for such acts.

19      62.    **DeSando and Falck Controlled Dynamic Showcases:** DeSando and Falck are

20  personal liable for Dynamic Showcases's acts alleged herein. There was a newscast investigation

21  into Be Productions by the ABC affiliate station for San Francisco which aired August 23, 2008.

22  *See* KGO-TV, *Complaints over East Bay talent agency's business*, *at*

23  http://abclocal.go.com/kgo/story?section=news/7_on_your_side&id=6345835 (Aug. 23, 2008).

24  The KGO-TV newscast describes DeSando and Falck's relationship with Dynamic Showcases:

25          7 On Your Side investigated and found the showcase company that Be contracts
           with is Dynamic Showcases. *State records show Desando is the chief executive*
26          *officer of Dynamic Showcases and Be co-owner Barry Falck is a principal*
           *executive. We reached Desando by phone. He told us he did own Dynamic*
27          *Showcases, but in order to comply with Section 1701 he sold it to Barry Falck's*
           *son, Ryan Falck.* "When we discovered we couldn't own it, we sold it to Ryan,
28          but he didn't follow through with the correct state documents. We never made any

money on the company, but we made a deal," said Desando. Desando said he did not recall when the sale was made. We checked and found Ryan Falck's name was added to the corporate documents in June after 7 On Your Side began asking questions.

(A true and correct copy of a transcript of this newscast is attached as Exhibit 8.) On this information, DeSando and Falck are alleged to be Dynamic Showcases's managers until June 2008, and to have de facto control over Dynamic Showcases at all times. Given DeSando and Falck's knowledge of Dynamic Showcases's operations, and their apparent response to the KGO newscast investigation, it is apparent that DeSando and Falck controlled Dynamic Showcases and formulated the policies and procedures alleged herein, directly ordered, direct, authorized or participated in Dynamic Showcases' acts alleged herein. As such, Falck is personally liable for such acts.

63.     **Be Charged Advance Fees for Career Management:** Be fits neatly into the AFTSA definition of an advance-fee talent service because it charged advance fees for "[m]anaging or directing the development or advancement of the artist's career as an artist," and "[c]areer counseling, career consulting, . . . evaluation, or planning . . . relating to the preparation of the artist for employment as an artist." Cal. Lab. Code § 1701(b)(2), (3) (2009). Each of Be's contracts contain the following description of its services:

> We are an entertainment company that offers a membership comprised of a collection of resources, discounts and a support system designed to help individuals get started on a pathway to success.

(Exs. 1 and 4.) The disclaimer in each of Be's contracts eliminates any ambiguity about whether that "pathway to success" involved employment in the entertainment industry:

> Purchaser acknowledges and agrees that none of the offerings of be. [sic] include any promise or guarantee of employment in the entertainment industry, whether oral or written, expressed or implied.

(*Id.*) Even in its contracts, Be has marketed its services as facilitating the professional success of its clients in the entertainment industry ("a support system designed to help individuals get started on a pathway to success") (*Id.*)

64.     Gonnabe.com stated that Be gave "young artists the resources, services, experience and exposure that they need in order to succeed in the entertainment industry." (A true and correct copy of the foregoing webpage is attached as Exhibit 9.) Likewise,

1   Gonnabe.com stated that Be Productions is "a proven game plan in which the artist gets to work

2   with top entertainment pros that who will prepare them to be evaluated" by entertainment

3   industry professionals, and that if its customers "want[ed] to get their career launched in the

4   entertainment industry, you've come to THE right place." (A true and correct copy of the

5   foregoing webpage is attached as Exhibit 10.) "Remember there are a lot of things you will need

6   to prepare before you can get started in TV, film and commercials! Here at BE, we'll help you

7   with the details of everything you'll need to know." (*Id.*) These representations are clear

8   evidence that the "support system" which Be marketed and which Be members paid an advance

9   fee for included career management and/or career consulting in the entertainment industry. Be

10  falls under subsection 1701(b) for that reason alone.

11        65.    **Dynamic Showcases Charged Advance Fees for Auditions:** Dynamic

12  Showcases was an advance-fee talent service because it charged Be members for attending

13  auditions with talent agents, talent managers, and casting directors. *Cf.* Cal. Lab. Code §

14  1701(b)(1) (2009) (advance-fee talent service charges advances fees for "[p]rocuring, offering,

15  promising, or attempting to procure employment, engagements, or auditions for the artist"). In its

16  contracts, Be offered purported "discounts" on its service providers' fees, including "Talent

17  Showcases" from Dynamic Showcases. Be distributed instruction manuals to its members, which

18  clearly and unambiguously market the "Talent Showcases" as "real audition[s]":

> Agents, managers and casting directors are always looking for new talent. Talent
> showcases are your opportunity to interview with several of these professionals at
> once with the goal of gaining representation. Showcases give you a chance to
> experience a real audition. You will gain access to and benefit from the opinions
> of top industry professionals. Each showcase has a $25 registration fee. . . .
> DYNAMIC SHOWCASES wants every member to have a chance to acquire an
> agent! . . . DYNAMIC SHOWCASES works with top agents and managers,
> helping in the showcase process of thousands of kids in the industry.

24  (Exs. 2 and 5.) As the quotation above shows, Be's marketing indicated that Dynamic

25  Showcases charged an advance fee for these auditions. Dynamic Showcases was an advance-fee

26  talent service.

27        66.    **Be Marketed Its Services As Providing Access to Auditions and the Prospect**

28  **of Employment:** Be is also an advance-fee talent service because it marketed its services as

---

1  providing indirect access to Dynamic Showcases' auditions. *Cf.* Cal. Lab. Code § 1701(b) (2009)

2  (advance-fee talent service receives advance fee "in order to obtain" auditions, etc. "*from or*

3  *through the service*") (emphasis added). Although Dynamic Showcases actually charged the fee

4  specifically attributable to these auditions, the most significant part of Be's services (as

5  confirmed by its contracts and marketing) was access to the auditions. Plaintiffs and the other

6  Class members paid advance fees in order to obtain auditions through the Be's "support system."

7        67.    Be is also an advance-fee talent service because its members paid it advance fees

8  in order to obtain offers for, or attempts to procure, employment in the entertainment industry

9  through the Be LLC "support system." Each of Gonnabe.com's webpages explicitly solicited

10  talent agents to browse its member profiles for potential actors: "Are You an AGENT Looking

11  for Talent? Looking for talent for your next big production? CLICK HERE." (See, e.g., Exs. 9

12  and 10.) Gonnabe.com also devotes an entire webpage to soliciting entertainment industry

13  professionals to provide employment for Be Productions members. (A true and correct copy of

14  the foregoing webpage is attached as Exhibit 11.)

15        68.    Even where Be's "support system" offers the prospect of employment in the

16  entertainment industry indirectly – through auditions with Dynamic Showcases or through a

17  profile on Gonnabe.com, and then through representation with an agent, it falls within the broad

18  definition of an advance-fee talent service. *Cf.* Cal. Lab. Code § 1701(b)(1) (2009) (advance-fee

19  service includes person paid advance fee "in order to obtain . . . through the service . . .

20  [p]rocuring, offering, promising, or attempting to procure . . . engagements, or auditions for the

21  artist").

22        69.    **Be Marketed Its Services As Providing Access to Professional Evaluations:**

23  Be is also an advance-fee talent service because it marketed and charged an advance fee for its

24  members to obtain an "evaluation . . . relating to the preparation of the artist for employment as

25  an artist" through its "support system." Cal. Lab. Code § 1701(b)(3) (2009). These evaluations

26  were an integral part of Be's marketing its auditions and other services:

27                     Be. Provide's [sic] a proven game plan in which the artist gets to work with top

28                     entertainment pros that who will prepare them to be evaluated by top agents,
                   managers and casting directors in San Francisco and Hollywood.

(Ex. 10.) Likewise, Be's promotional pamphlets marketed its evaluations as "PRICELESS." (Ex. 6.) Per the instruction manuals, these evaluations were provided in connection with the Dynamic Showcases auditions:

> [The professionals participating in Dynamic Showcases' auditions will] complete a thorough evaluation of your child's talent and email it to you, stating your child's strengths and the actions that need to be taken in order to be presented up by a manager or agent. . . . Agents and managers will offer helpful tips for improvement via mail. You can take this valuable feedback to your ongoing classes with Rising Stars.

(Exs. 2 and 5.) The instruction manual explicitly described these evaluations as relating to the preparation of Be members for professional employment in the entertainment industry. Even though the actual evaluation was provided by third-party agents and managers, Be marketed the evaluation as part of its "support system." Be is an advance-fee talent service under Labor Code subsection 1701(b)(3).

70.   **Be's Contracts Violated AFTSA:** Labor Code section 1701.4 imposed specific requirements on advance-fee talent services' contracts with their customers. Cal. Lab. Code § 1701.4(a) (2009). Be's Contracts do not comply with the applicable version of section 1701.4. (Cf. Exs. 1 and 4.) Specifically, Be's Contracts do not identify "the representative executing the contract on behalf of the advance-fee talent service," "[a] description of the services to be performed, a statement when those services are to be provided," or the elaborate refund provision required by section 1701.4. Cal. Lab. Code § 1701.4(a)(1), (2), (4) (2009).

71.   Under the refund provision, if customer demands a refund because the advance-fee talent service does not provide the services required, and the customer does not receive the refund within 48 hours, "the advance-fee talent service shall pay the artist an additional sum equal to the amount of the fee." Cal. Lab. Code § 1701.4(e)(1) (2009). Where an advance-fee talent services' contract does not comply with Labor Code section 1701.4, it is "voidable at the election of the artist and, in that case, shall not be enforceable by the advance-fee talent service." Cal. Lab. Code § 1701.4(c) (2009).

72.   **Dynamic Showcases's Audition Fees Violated AFTSA:** Dynamic Showcases violated section 1701.12 by charging "an artist for providing auditions for the artist." Cal. Lab.

1  Code § 1701.12(i) (2009). Any advances fees Dynamic Showcases collected from Be members

2  for its auditions were in violation of subsection 1701.12(i).

3        73.    **Be's Referrals to Dynamic Showcases Violated AFTSA:** Subsections

4  1701.12(j) and (k) prohibited advance-fee talent services from referring customers to a third

5  party who charges for providing auditions, if the advance-fee talent service has a direct or

6  indirect financial interest in the third party, or accepts compensation for the referral from the

7  third party. Be referred Class members to Dynamic Showcases for auditions. On information and

8  belief, Be received compensation from Dynamic Showcases for these referrals, or maintains a

9  direct or indirect financial interest in Dynamic Showcases.

10                  **The Misrepresentations Related to Be's Services**

11        74.    The following paragraphs discuss five systematic misrepresentations and

12  fraudulent concealments ("Misrepresentations") common to each Be member. The

13  Misrepresentations were at the core of the Defendants' schemes to obtain a membership fee from

14  each Class member. The Defendants' perpetuated these schemes throughout Be's active

15  operations, from February 2006 until March 2009. The Misrepresentations included outright

16  fraud, deceitful statements of half-truths, and the fraudulent concealment of material information.

17        75.    The Defendants knew the Misrepresentations were false or misleading. In the

18  alternative, the Primary Defendants caused the Misrepresentations to be made with reckless

19  indifference to whether they were truthful or false and misleading.

20        76.    Defendants intended to obtain money from Class members by inducing them to

21  pay membership fees through the Misrepresentations. Because of the information they contained

22  and/or concealed, the Misrepresentations had a natural tendency to influence, and were capable

23  of influencing, Be members' decision to pay Be a membership fee.

24        77.    **Be Concealed Payments to Entertainment Professionals Who Attended Be's**

25  **Auditions:** Be paid large fees to lure entertainment professionals to its auditions. Be deliberately

26  and intentionally hid this information from Class members, which goes to the heart of what Class

27  members' reasonable expectations about what they get from a Be audition.

28        78.    As Be's marketing emphasized auditions as the gateway to professional

---

[Proposed] Second Amended Complaint        24        No. 09-3770 CRB

1    employment, the concealed information was material to Class members' decision to pay Be's

2    membership fee. The fact that the professionals might attend the audition solely to collect a fee

3    from Be is information that would have a natural tendency to influence, and was capable of

4    influencing, Class members' decision about whether it was worth paying Be several thousand

5    dollars to participate in Be's auditions. Likewise, the fact that Be paid professionals to attend its

6    auditions was material to Be's member's evaluation of their own marketability and of Be's

7    professional clout in the entertainment industry. The fact that Be had to pay to arrange the

8    audition indicated that Be membership did little to improve their marketability – which would

9    have a natural tendency to influence, and was capable of influencing, Class members' decision

10   about whether paying Be's membership fee was worthwhile. If Be's payment arrangements for

11   auditions were disclosed to Plaintiffs and the other Class members prior to agreeing to their

12   Contracts, they would not have agreed to their Contracts and would not have paid Be's fees.

13          79.     Paid auditions present a wide variety of opportunities for abuse and mislead

14   prospective artists about the intent of the parties attending the audition and arranging the

15   audition. It is notable that AFTSA banned "[c]harg[ing] . . . an artist for providing auditions for

16   the artist" altogether. Cal. Lab. Code § 1701.12(i) (2009). *See also* Cal. Lab. Code §§ 1702,

17   1702.1(a)(2) (2010) (prohibiting "[p]rocuring . . . an audition for an artist").

18          80.     **Be Concealed That Class Members Were Selected on the Basis of Their**

19   **Ability to Pay:** Be conducted a "screen test" prior to making its ultimate sales pitch. As part of

20   the sales pitch, Be indicated that the Class members were "selected" on the basis of talent and/or

21   marketability. Gonnabe.com reinforced the suggestion that an offer of Be membership was

22   exclusive:

23                  Are all the children selected from the screentest?
                    Unfortunately no. Only a small percentage of the children screened, meet the
24                  industry profile that top agents, talent managers and casting directors are looking
                    for.
25
     (A true and correct copy of the foregoing webpage is attached as Exhibit 12.) This purported
26
     selectivity contributed to Class members' estimation that they could be successful in the
27
     entertainment industry, and reasonably prompted them to invest more in their potential
28

1  entertainment career (and specifically on Be's services). In fact, the results of Be's "screen tests"

2  were not determined by the likelihood of professional success, but financial ability and

3  willingness to pay Be. One disgruntled Be Productions ex-employee posted the following in a

4  public Internet forum:

5
6
7
8

> Notice that letter they write at the top of your form then circle? That is a code
> letting the sales person a.k.a. "talent director" know how much money you make
> and what tactic of sale to use on you and your family. . . . They conduct at several
> 'callbacks' a day and break them down into small groups to make you feel like
> there was a cut and they conduct screen tests EVERY week! They call
> EVERYONE back as long as when you filled out the form at the screen test your
> income level fit the bill.

9  (A true and correct copy of the foregoing webpage is attached as Exhibit 13.) Be's suggestion

10  that Class members were "selected" on the basis of their financial ability and willingness to

11  finance Be's fees– rather than their likelihood of professional success (and its implication for

12  future income), had a natural tendency to influence, and was capable of influencing, Class

13  members' decision about purchasing Be membership. If Plaintiffs and the other Class members

14  were told that they were "selected" on the basis of their ability and willingness to finance Be's

15  membership fee, they would not have agreed to their Contracts or paid Be's fees.

16        81.    **Be Misrepresented the "Discounts" Available to Be Members:** Be's Contracts

17  with Class members purported to provide "discounts" on Be's service providers' fees, including

18  the "Showcase Registration Fee" on Dynamic Showcases' auditions and the acting lessons from

19  Rising Stars.

20        82.    In fact, the purported "discounts" on the "Showcase Registration Fee" and the

21  acting lessons were illusory. On information and belief, Rising Stars had essentially no other

22  clients besides Be members and those clients were generally charged the same rate as Be

23  members. Likewise, Dynamic Showcases exclusively arranged talent showcases for Be

24  members, and so the rates Dynamic Showcases charged were not actually discounted at all but

25  simply the rate Dynamic Showcases charged to all its clients. Be also indicated in its promotional

26  pamphlets that the market value of the Showcase Registration Fee was $6,500 and the market

27  value of the "boot camp" acting classes and the ongoing classes was $1,500 and $350,

28  respectively. (Ex. 6.)

83.     Be's misrepresentations that Be membership provided discounts on the rates service providers charged Class members had a natural tendency to influence, and was capable of influencing, Class members' decision about purchasing Be membership. If Class members were told that Be membership did not result in discounts on Rising Stars' acting lessons or Dynamic Showcase's registration fees, they would not have agreed to their Contracts or paid Be's fees.

84.     **Be Concealed That Dynamic Showcases' Fees Were Illegal:** Any person who charged an advance fee to participate in an audition with an entertainment industry professional was an advance-fee talent service under the 2009 version of AFTSA. *Cf.* Cal. Lab. Code § 1701(b)(1) (2009) (advance-fee talent service charges advances fees for "[p]rocuring, offering, promising, or attempting to procure employment, engagements, or auditions for the artist"). Further, the act of charging advance fees to participate in an audition was a violation of AFTSA. Cal. Lab. Code § 1701.12(i) (2009). Dynamic Showcases violated subsection 1701.12(i) by collecting and charging "Showcase Registration Fees" from Be members.

85.     Be's concealment that AFTSA prohibited Dynamic Showcases from collecting and charging "Showcase Registration Fees" had a natural tendency to influence, and was capable of influencing, Class members' decision about purchasing Be membership. If Class members were told that Dynamic Showcases could not legally charge them to participate in its auditions, they would have sought to cancel their contracts and demanded refunds from Be.

86.     **Be Concealed Right to Cancel the Contracts and Demand a Refund of Be's Fees:** As an advance-fee talent service, Be had an obligation to include the following language in the Contracts:

RIGHT TO REFUND

If you pay all or any portion of a fee and you fail to receive the services promised or that you were led to believe would be performed, then [Be., LLC] shall, upon your request, return the amount paid by you within 48 hours of your request for a refund. If the refund is not made within 48 hours, then [Be., LLC] shall, in addition, pay you a sum equal to the amount of the refund.

YOUR RIGHT TO CANCEL
(enter date of transaction)

> You may cancel this contract for advance-fee talent services, without any penalty or obligation, if notice of cancellation is given, in writing, within 10 business days from the above date. To cancel this contract, mail or deliver a signed and dated copy of the following cancellation notice or any other written notice of cancellation, or send a telegram containing a notice of cancellation to [Be., LLC] at (address of its place of business), NOT LATER THAN MIDNIGHT OF (date).

Cal. Lab. Code § 1701.4(a) (2009). None of Be's Contracts contained this statutorily-required language. Instead, Be's Contracts affirmatively misrepresented that Class members only had a three day period to cancel, and had to comply with certain requirements that were inconsistent with AFTSA before they could cancel. Be's Contracts concealed Class members' right of refund under AFTSA.

87.     Be's concealment of Class members' rights to cancellation and refund under AFTSA – despite a statutory duty to disclose the same – had a natural tendency to influence, and was capable of influencing, Class members' decision about whether to cancel their Contract with Be and demand a refund under the AFTSA refund provision. If Class members were told about their rights to cancellation and refund under AFTSA, they would have sought to cancel their contracts and demanded refunds from Be.

88.     If the legality of Dynamic Showcases' fees and Dynamic Showcases' relationship with the other Defendants were accurately disclosed to Plaintiffs and the other Class members, they would not have agreed to their Contracts or paid Be's fees.

89.     **The Foregoing Misrepresentations and Fraudulent Concealments Violated AFTSA:** Subsection 1701.12(b) prohibits advance-fee talent services from publishing or causing to be published any false, fraudulent, or misleading information, representation, notice, or advertisement. Be violated subsection 1701.12(b) through the Misrepresentations. The other Primary Defendants' violated subsection 1701.12(b) by controlling Be and their personal participation in the Misrepresentations.

### Allegations Regarding Be's Operations

90.     **Be Begins Operating:** Be began to operate the scheme when My Artist's Place, LLC (Be's predecessor) was formed in February 2006. In November 2006, Be leased computers from Dell Financing, L.P. (a Texas limited partnership headquartered at 2234 North IH 35 Southbound, Plaza 35 A and B, Austin, Texas 78753-1705).

91.     Prior to 2007, Falck insisted that Rising Stars provide kickbacks on its acting lesson fees to Be. This practice violated AFTSA. *Cf.* Cal. Lab. Code § 1701.12(k) (2009) (prohibiting advance talent fee service from accepting "any compensation for referring an artist to any person charging the artist a fee" for, e.g., lessons, coaching, or similar training for the artist). Beginning in 2007, Be stopped receiving these kickbacks when Falck and DeSando became aware of AFTSA and specifically that these kickbacks were a blatant, easily-exposed violation of AFTSA.

92.     In or about January 2007, Be opened its main office in Emeryville to expand the scheme. Rising Stars soon began operating in Emeryville to provide acting lessons to Be's members who were located in or near Emeryville. In or about February 2007, Be opened its San Jose office. Rising Stars followed Be and began to provide acting lessons in San Jose shortly thereafter. In early February 2007, Be began using the "gonnabe.com" domain name. Be also leased more computers from Dell Financing, L.P. in February 2007 and in late March 2007.

93.     **Monterey Becomes Involved in Be's Operations:** In early 2008, Be expanded operations by opening offices in San Diego, Sacramento, and Hollywood. Rising Stars followed Be into these new markets and began to provide acting lessons to Be members, recruiting supposed acting instructors from craigslist, in those markets as well. Throughout this time, Falck (as well as DeSando and Martha Brown (Be's VP of Operations)) pressured Rising Stars to "upsell" Be members attending Rising Stars classes, i.e., to convince Be members to purchase Be's more expensive packages.

94.     Be also began producing its infomercial programming in late 2007 (and continued into late 2008). Be's expansion and the costs of producing its television programming created financial strains. To address these financial strains, Be began to use Monterey as a finance company in 2008. As Be's finance company, Monterey loaned significant sums of money to Be and Be assigned its account receivables to Monterey. Monterey provided Be with its own contracts which specifically discussed Be members' purported obligation to make payments to Monterey for Be's services, such that Monterey itself knowingly received advance fees.

95.     Under Monterey's agreement with Be, Monterey began to collect unpaid balances on Be Contracts from Class members. Monterey markets itself as a debt collector to clients like Be, employs experienced debt collectors to negotiate collection from unpaid accounts, and offers its clients skip tracing, letter series, unlimited phone calls, credit reporting, and other services.

96.     By early 2008, the Los Angeles branch of the Better Business Bureau began to receive complaints about Be and Monterey's collection of Be accounts. By sometime in early 2008, the BBB's public report on Be specifically indicated specific AFTSA provisions violated by Be (although the BBB report referenced "California law," not AFTSA).

97.     Monterey is a member of the BBB's San Diego branch. As a BBB member, the BBB alerted Monterey to complaints the BBB received regarding Monterey's collection of consumer debts so that Monterey could attempt to resolve those complaints. Through its BBB membership, Monterey received notification of consumer complaints arising from its collection of unpaid Be accounts. Some of these complaints explicitly indicated that Be did not comply with AFTSA. Other complaints indicated that Be's Misrepresentations were false and misleading. After its communications with the BBB, Monterey had actual knowledge that Be's operations and collection of the advance fees violated AFTSA and that the Misrepresentations were false or misleading. Despite such express and implied knowledge of the illegality of such fees and contracts – despite even the filing of this class action lawsuit, Monterey has continued to attempt to collect on accounts concerning Be. Subclass members have informed Plaintiffs' counsel that Monterey has continued to dun them for unpaid balances on Be Contracts and to threaten to report the unpaid balances to credit reporting agencies.

98.     As part of Monterey's agreement with Be, Steinbeck, DeSando, and Falck were required to give personal guarantees on the sums loaned by Monterey to Be. Additionally, Monterey's agreement contained provisions that required Be to make detailed disclosures and warranties about its operations, which included disclosure of any information that Be's operations were illegal. By April 2008, at least one Be member communicated to DeSando and other Be agents that Be was violating AFTSA. In May 2008, a Better Business Bureau

representative spoke with Martha Brown, informed her that Be's operations violated AFTSA, and sent her a copy of AFTSA. Under Be's agreement with Monterey, Be was required to notify Monterey of the Be members' April emails (as well as his counsel's April 28, 2008 letter to the same effect), and the BBB's May 2008 letter. Be notified Monterey of these letters. After this notification, Monterey had actual knowledge that Be's operations violated AFTSA.

99.     In the course of conducting due diligence on its agreement with Be, Monterey reviewed the BBB's public record on Be. Monterey knew that Be did not disclose that its members were selected on the basis of their ability and willingness to finance Be's membership fee from conducting due diligence with its agreement with Be. Monterey directly provided financing to Be members, so it knew that Be's "selection" of its members did not involve an evaluation of their talents or marketability as an artist. From these activities, Monterey learned that Be was involved in activities of recruiting the parents of children to pay advance fees, that Monterey was acting to collect and receive such fees for activities which did not comply with AFTSA, and that the Misrepresentations of Be had been and were false or misleading.

100.     Monterey also learned that the Misrepresentations were false and misleading from its debt collection efforts against Be members. When Monterey called Be members to dun them for unpaid balances of Be's membership fees, they complained about Be's wrongful conduct. Some Be members complained that they had not received the promised services, that the Misrepresentations were false and misleading, and some complained that Be did not comply with AFTSA. After these communications with Be members, Monterey had actual knowledge that Be's operations violated AFTSA and that the Misrepresentations were false or misleading.

101.     Despite Monterey's knowledge that Be violated AFTSA and that the Misrepresentations were false and misleading, Monterey continued to provide contracts for Be to use in selling to class members, continued to advance money to Be (which enabled Be to continue and expand its illegal operations) and continued to collect unpaid balances on Be Contracts.

102.     **Be's Financial Situation Begins to Decline:** In April 2008, there was a meeting between Be and its vendors (including Rising Stars and Be's photography vendor). Be's

1   representatives included Falck and DeSando, as well as the head from each of Be's offices. At

2   the April 2008 meeting, Be's representatives discussed that Monterey used certain abusive

3   collection practices that were creating resistance and discontent among class members. From the

4   context of the disclosure, it was apparent that Be and Monterey collaborated extensively on

5   collection of unpaid balances from Be members, and that Monterey used continuing access to

6   Be's services and "discounts" as leverage to collect these balances: if Monterey was not paid, it

7   would have Be tell supposedly independent service providers, e.g., Rising Stars, to bar that Be

8   member from further classes until Monterey was paid.

9       103.    Be continued to expand. In or about June 2008, Be opened offices in Santa Ana

10  and Fresno. In June 6, 2008, Be changed its name to "Be., LLC" from "My Artist's Place, LLC."

11  Be leased additional computers from Dell Financing, L.P. on or about June 30, 2008.

12      104.    In August 2008, Be's flagrant violations of the law finally came to light to the

13  general public. On August 7, 2008, a local NBC affiliate broadcast its investigation into Be's

14  practices. Below is a partial transcript of this broadcast:

15          "Its deceitful, its lying. The ad's a lie, you know?" Mila May is a former talent
            scout for United Marketing Group, an agency used by Be Productions. She says
16          scouts were instructed to go up to families with children between the ages of 5
            and 17 and invite them to a screen test. She says she was given a script to read
17          from, asking kids what stars they wanted to meet. "Its a children's entertainment
            scam. That's what its all about. You know, when you first go in there, you're like,
18          'oh yeah I'm helping kids.' In reality, that's – its like a psychological game, just
            to make money." . . . DeSando says the children do in fact have an opportunity to
19          be a television show. Be Productions produces two of them, "Say What?" and
            "Kids Unlimited." All Be members are promised an appearance. After all, a
20          portion of their membership fees are spent on producing the shows. . . . Be
            Productions pays the G4 network to broadcast "Say What?" and "Kids Unlimited"
21          during their paid programming hour. Its a far cry from the popular Disney shows
            these kids say they thought they were going to be on.
22
23  The video of this newscast shows what appears to be standardized sales script on United

24  Marketing Group letterhead. Anyone who saw this NBC broadcast knew that Be's

25  Misrepresentation about the selection of Be members was misleading.

26      105.    On August 23, 2008, the local ABC affiliate broadcast a more detailed

27  investigation into Be's operations. In the broadcast, Be's denial that AFTSA applied to its

28  Contracts was directly and explicitly contradicted by the California state senator who wrote

---

1  AFTSA:

[California State Senator Sheila Kuehl] wrote a powerful state law to regulate [these types of talent companies.] The law is Section 1701 of the California Labor Code. It says talent companies that charge an advance fee must follow lots of rules . . . "We are not governed by 1701," says Be Productions owner Erik Desando. Desando says Be Productions, formerly known as My Artist's Place, does charge fees up front and does help kids get into show business, but it is not an advance fee talent service. . . . "Those things you're talking about, they're being done, but they're being done by outside companies, not ours. So, in other words, (if) you want to meet an agent through us, you can't meet an agent through us. You have to meet an agent through the showcase company we contract with," says Desando. . . . ABC7 legal analyst Dean Johnson says using outside vendors would not exempt Be from the law . . . "They take an advance fee and for that fee you get access to essentially everything that an artist would want to develop his or her career," says Johnson. "That is the kind of service that is exactly what the authors of the talent service agencies statute intended to cover." The author [of AFTSA] agrees. "They do fall under the definition of advance-fee talent agencies, so in and of itself, by not posting a bond they are violating the law," says State Sen. Kuehl. "We made the law very broad in order to snare these kinds of folks." We asked Desando if he could see why someone would think he would fall under 1701. "Nope, not if they know our business," says Desando. "I've got our own high priced attorneys there telling us, you're not, we don't sell talent services." . . . "This really smacks right into the advance fee talent services because it is indirectly providing service to the talent," says Dean Fryer with the Labor Commission. Still, Desando says, not me. . . .

(Ex. 8) (emphasis added). Anyone who saw this ABC broadcast knew that Be's Misrepresentations about the legality of Dynamic Showcases' audition fees and the cancellation and refund of Be's membership fee was misleading.

106.   These broadcasts had a wide distribution – not only to TV audiences in the Bay Area and beyond – but also people who investigated Be on the Internet. These broadcasts had a profound impact on Be's business and ultimately led to Be's shutdown and subsequent consolidation. Moreover, Monterey, Steinbeck, MTS, Rashkovan and 1901 Co. had actual knowledge of these broadcasts and their effect on Be.

107.   **Be Stops Providing "Services":** By September 2008, the financial impact of the NBC and ABC news broadcasts was evident to anyone with a financial interest in Be. Because Be had so much more difficulty locating new victims and obtaining new membership fees, it had difficulty making payments to its lenders.

108.   By approximately January 2009, Be was effectively not providing member "services" any more (although it continued to pursue new members like Tanner and DuFour).

Be's talent directors were no longer answering their telephones, so many Be members stopped making payments to Monterey. Be's failure to make payments and its failure to "service" Be members set off alarm bells at Monterey.

109.    Monterey investigated Be's financial decline and its failure to provide its "services" to Be members. Even a cursory investigation into Be's financial decline at this point would reveal the NBC and ABC newscasts, which in turn would reveal that Misrepresentations were false and misleading, and that Be's operations violated AFTSA.

110.    Monterey's investigation concluded that Be did in fact stop "servicing" its members, because Monterey took corrective action. Monterey demanded that Be resume "servicing" its members, so that Monterey could continue to collect money from Be members to recoup its loans to Be. As alleged above, Be's "services" were totally illusory and its provision of any "services" served merely to lull Class members into not contesting Monterey's charges, pursuing refunds, or filing chargebacks with their credit card company.

111.    In April 2009, Be announced to its members that it was consolidating its offices – effectively closing down all of the offices outside of Tarzana. By April 2009, Be employees would tell third party vendors that Steinbeck had closed down all of Be's offices except Tarzana, frozen everything (including Be's financial accounts), had to personally approve most expenses, and otherwise ran the show.

112.    **Be UK:** As a result of either the consolidation or Be's mounting failure to "service" its members, Be members began to file chargebacks against Be's credit card charges. As a result, Be's merchant credit card bank flagged Be's account and ultimately placed Be on the MATCH list. The MATCH list is essentially a credit report on merchants for credit card processors. Once a merchant is on the MATCH list, it is very difficult for the merchant to obtain credit card processing services. To circumvent the MATCH list, Steinbeck caused Be UK to be formed in April 29, 2009. As an English company, Be UK appeared to be separate from Be. Be used Be UK as a vehicle to regain access to the credit card payment system again.

113.    Until Gonnabe.com was shut down in January 2010 (at Vitaly Rashkovan's order), Be UK purported to operate Gonnabe.com.  Be UK also shared an Easy Bay-area code

1  fax number ((510) 899-6797) with Be, which Be UK used as the number for its agent for service

2  of copyright-related complaints, as well as the Gonnabe.com domain name, web hosting, and

3  email server. (A true and correct copy of the relevant webpage from Gonnabe.com is attached as

4  Exhibit 14.)

5        114.    Be's scheme changed in January 2009. Be's ability to solicit new victims grew

6  weaker and weaker because of its financial condition and the widespread knowledge about its

7  predatory business practices from the ABC and NBC newscasts. However, Be still had millions

8  of dollars of unpaid balances on Be membership fees – and Monterey and other persons wanted

9  that money. Monterey shifted their focus to monetizing those unpaid balances. Monterey

10 continued to collect membership fees from Class members by dunning them for unpaid balances,

11 and reporting these balances as legitimate debts to credit reporting agencies.

12       115.    By providing Be "services," MTS participated in a classic lulling fraud by

13 creating the perception that membership in Be provided something of real value (even if any

14 particular Be member had not become become professionally successful yet). MTS's supposed

15 provision of services reinforced the underlying Misrepresentations that (1) Be's auditions were

16 legitimate and worthwhile; (2) Be members were selected on something other than their ability to

17 finance a membership fee; (3) Be membership provided discounts from third parties; (4) Be's

18 audition fees were legal; and (5) Be members' right to cancellation and refund was limited to

19 three days after signing the Contract.

20                           **The Defendants Conspired Together**

21       116.    Each of the Defendants is linked to each other, directly or indirectly, through a

22 series of formal and informal agreements. At the root of each of these agreements is a tacit

23 understanding on the part of each Defendant that Be would continue to operate the schemes

24 alleged above (and specifically would continue to sign up obtain Be membership fees through

25 the use of the Misrepresentations and in violation of AFTSA). All of the Defendants knew that

26 these schemes were Be's only business, and that Be had no other business or any other source of

27 revenue besides the schemes. Nonetheless, each Defendant knowingly agreed to facilitate the

28 schemes in various ways detailed below.

117.    DeSando, Falck, and Steinbeck were Be's managers or members, and they agreed how to operate Be in Be's operating agreement. The terms of this operating agreement tacitly (or explicitly) provided that DeSando, Falck, and Steinbeck would operate Be to generate revenue by using the Misrepresentations to obtain membership fees from Class members and otherwise violating AFTSA.

118.    DeSando and Falck were Dynamic Showcases's managers or members, and they agreed how to operate Dynamic Showcases in its operating agreement. DeSando, Falck, Dynamic Showcases, and Be agreed tacitly (or explicitly) that (1) Be would refer members to Dynamic Showcases for auditions; and (2) Dynamic Showcases would purport to provide these auditions; so that (3) DeSando and Falck could continue to generate revenue from Be by using the Misrepresentations to obtain membership fees from Class members and otherwise violating AFTSA.

119.    Monterey loaned money to Be in exchange for a formal assignment of Be's account receivables, as well as personal guarantees from Be's owners (DeSando, Falck, and Steinbeck). Under the terms of this loan/assignment, Be and its owners agreed to pay Monterey this loan back with interest. This loan/assignment contained the tacit (or explicit) agreement that (1) Steinbeck, DeSando, and Falck would generate revenue from Be by using the Misrepresentations to obtain membership fees from Class members and otherwise violating AFTSA; and (2) Monterey would collect unpaid balances from Subclass members to generate revenue for itself and to increase the amount that Monterey could or would lend Be later on.

**FIRST CAUSE OF ACTION: Deceit Against All Defendants,**
**by Plaintiffs Individually and on Behalf of the Class**

120.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

121.    California codified the common law tort of deceit at California Civil Code § 1710. Deceit consists of "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true" and "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want

of communication of that fact[.]" Cal. Civ. Code § 1710(2), (3) (2010).

122. As alleged in greater detail above, the Misrepresentations were false statements or misleading omissions, which Be knew to be false or misleading and nonetheless made with the intent to induce reliance (or made without a reasonable basis therefore), causing the Class members to justifiably rely on the Misrepresentations, and sustain damage by paying Be's membership fees when they would not have paid if they had known the truth.

123. Falck is personally liable for Be's deceit through his control of Be and his direct involvement and personal participation in that deceit.

124. Dynamic Showcases is jointly and severally liable to Plaintiffs and the other Class members for Be's deceit because (1) it had actual knowledge of Be's deceit (imputed through its owners and agents DeSando and Falck); (2) it agreed to assist Be in that deceit by arranging auditions, failing to disclose that the entertainment professionals were paid to attend the auditions, accepting fees from Class members for the auditions, and passing those fees back to Be and its owners; and (3) provided Be substantial assistance in the deceit by doing so. Dynamic Showcases is jointly and severally liable to Plaintiffs and the other Class members for aiding and abetting and civil conspiracy to commit Be's deceit.

125. Dynamic Showcases is also liable for Be's deceit under an alter ego theory.

126. Monterey is jointly and severally liable to Plaintiffs and the other Class members for Be's deceit because (1) it had actual knowledge of Be's deceit (through, e.g., its due diligence prior to lending money to Be, its involvement in financing Be membership fees, and the complaints it received directly from Be members and through received through the BBB); (2) it agreed to assist Be in that deceit by lending Be money to continue and expand its operations and collecting unpaid balances from Subclass members; and (3) it provided Be substantial assistance in its deceit by doing so. Monterey is jointly and severally liable to Plaintiffs and the other Class members for aiding and abetting Be's deceit and civil conspiracy.

127. Be UK is jointly and severally liable to Plaintiffs and the other Class members for Be's breach of fiduciary duty because (1) it had actual knowledge of Be's deceit (imputed through the individuals who knew Be had generated a significant amount of chargebacks and set

it up to assist Be in circumventing the MATCH list); (2) it agreed to assist Be in that deceit by providing an instrumentality for Be to continue processing credit card payments while circumventing the MATCH list; and (3) it provided Be substantial assistance in its deceit by doing so. Be UK is jointly and severally liable to Plaintiffs and the other Class members for aiding and abetting and civil conspiracy to commit Be's breach of fiduciary duty.

128.     Plaintiffs, on their own behalf, and behalf of the other Class members, seek to damages, including punitive damages, in an amount to be determined at trial, as well as punitive damages, as well as equitable relief for the deceit alleged herein.

**SECOND CAUSE OF ACTION: Violation of AFTSA Against Be and Dynamic Showcases by Plaintiffs Individually and on Behalf of the Class**

129.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

130.     As alleged in greater detail above, Be's Contracts violated AFTSA. Cal. Lab. Code § 1701.4(a) (2009). Dynamic Showcases violated AFTSA by charging "an artist for providing auditions for the artist." Cal. Lab. Code § 1701.12(i) (2009). Be violated AFTSA by referring Class members to Dynamic Showcases for an audition, when Be had an indirect financial interest in, or otherwise received compensation from, Dynamic Showcases. Cal. Lab. Code § 1701.12(j), (k) (2009). Finally, Be violated AFTSA by making the Misrepresentations. Cal. Lab. Code § 1701.12(b) (2009). (Plaintiffs do not allege any claim against firms or individuals other than Be or Dynamic Showcases because such claims are inconsistent with the Court's last order on the Defendants' motions to dismiss.)

131.     The violations of section 1701.12 of the California Labor Code alleged above have caused Class members damages. These damages include fees and charges which Class members would not have paid absent the violations alleged above.

132.     The violations of section 1701.12 of the California Labor Code alleged above have caused Plaintiffs and/or the other members of the Class damages. These damages include fees and charges which Class members would not have paid absent the violations alleged above.

133.     Plaintiffs, on their own behalf, and behalf of the other Class members, seek to

1    recover statutory damages, which "may be up to three times the damages actually incurred, but

2    not less than the amount paid by the artist to the advance-fee talent service," in an amount to be

3    determined at trial, as well as punitive damages, injunctive and equitable relief, and reasonable

4    attorney's fees and costs under Cal. Lab. Code § 1701.16 against Be and Dynamic Showcases.

**THIRD CAUSE OF ACTION: Violation of the UCL Against Be and Dynamic Showcases by Plaintiffs Individually and on Behalf of the Class**

6    134.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

7    herein.

8    135.    The conduct of Be and Dynamic Showcases alleged above violates of California

9    Labor Code sections 1701.4 and 1701.12 and is unlawful and unfair. Be and Dynamic

10   Showcases' conduct violated Cal. Bus. & Prof. Code § 17200.

11   136.    Plaintiffs and/or the other Class members have been injured and have lost money

12   and property as a result of Be and Dynamic Showcases' violations of Cal. Bus. & Prof. Code §

13   17200. These injuries include fees paid towards Be and Dynamic Showcases.

14   137.    Plaintiffs, on their own behalf, and behalf of the other Class members, seek

15   restitution, injunctive and equitable relief including a constructive trust under Cal. Bus. & Prof.

16   Code § 17203, and the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc.

17   § 1021.5, against Be and Dynamic Showcases.

**FOURTH CAUSE OF ACTION: Secondary Liability for UCL Violations Against Falck, Monterey, and Be UK by Plaintiffs Individually and on Behalf of the Class**

20   138.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

21   herein.

22   139.    As alleged above, the conduct of Be and Dynamic Showcases violated of

23   California Labor Code sections 1701.4 and 1701.12 and is unlawful and unfair. Be and Dynamic

24   Showcases' conduct violated Cal. Bus. & Prof. Code § 17200.

25   140.    Falck is jointly and severally liable to Plaintiffs and the other Class members for

26   the UCL violations of Be and Dynamic Showcases because he controlled Be and Dynamic

27   Showcases and was directly involved and personally participated in those violations.

28   141.    Monterey is jointly and severally liable to Plaintiffs and the other Class members

for Be's UCL violations because (1) it had actual knowledge of Be's UCL violations (through, e.g., its due diligence prior to lending money to Be, its involvement in financing Be membership fees, and the complaints it received directly from Be members and through received through the BBB); (2) it agreed to assist Be with those UCL violations by lending Be money to continue and expand its operations and collecting unpaid balances from Subclass members; and (3) it provided substantial assistance to Be's UCL violations by doing so. Monterey is jointly and severally liable to Plaintiffs and the other Class members for aiding and abetting Be's UCL violations and civil conspiracy.

142.    Be UK is jointly and severally liable to Plaintiffs and the other Class members for Be's UCL violations because (1) it had actual knowledge of Be's UCL violations (imputed through the individuals who knew Be had generated a significant amount of chargebacks and set up Be UK to assist Be in circumventing the MATCH list); (2) it agreed to assist Be with those UCL violations by providing an instrumentality for Be to continue processing credit card payments while circumventing the MATCH list; and (3) it provided Be substantial assistance with the UCL violations by doing so. Be UK is jointly and severally liable to Plaintiffs and the other Class members for aiding and abetting Be's AFTSA violations and civil conspiracy.

143.    Plaintiffs and/or the other Class members have been injured and have lost money and property as a result of Monterey, Be UK, MTS, and Rashkovan's violations of Cal. Bus. & Prof. Code § 17200. These injuries include fees paid towards Be and Dynamic Showcases.

144.    Plaintiffs, on their own behalf, and behalf of the other Class members, seek restitution, injunctive and equitable relief including a constructive trust under Cal. Bus. & Prof. Code § 17203, and the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5, against 1901 Co., Monterey, Be UK, MTS, and Rashkovan.

### FIFTH CAUSE OF ACTION: Violation of 18 U.S.C. § 1962(c) Against All Defendants by Plaintiffs Individually and on Behalf of the Class

145.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

146.    Be is an enterprise operating in interstate commerce. As alleged above, Be

operated in interstate commerce from the very beginning of its existence. (In the addition or the alternative, Plaintiffs allege an association-in-fact consisting of Be, Monterey, and Be UK. The foregoing entities had a common purpose of collecting outstanding Be membership fees from Be members. The foregoing entities had an ongoing organization where Be held the Contracts to the fees, Be UK processed credit card payments, and Monterey sought to collect unpaid fees from Be members. These entities functioned as a continuing unit since at least from when Be began to falter in January 2009.)

147.    The Misrepresentations were at the core of the Be's schemes to obtain a membership fee from each Class member. Be made the Misrepresentations to Class members in the course of soliciting their assent to the Contracts. Be used the Misrepresentations to obtain money from Class members. Be knew the Misrepresentations were false or misleading. In the alternative, Be caused the Misrepresentations to be made with reckless indifference to whether they were truthful or false and misleading. In either event, Be intended that Class members would rely on them when deciding whether to pay Be a membership fee.

148.    In each scheme against each Class members, the use of the interstate wires was incident to essential parts of the scheme. The "gonnabe.com" domain name was used in every email Be sent or received and every time the Gonnabe.com website was used. Since January 22, 2008, Be used GoDaddy, Inc. as its domain name service. GoDaddy, Inc. is headquartered in 14455 North Hayden Road, Scottsdale, Arizona, 85260. From January 27, 2008 to December 3, 2009, Be hosted the Gonnabe.com site hosted at Layered Technologies, Inc., which is headquartered at 5085 West Park Boulevard, Suite 700, Plano, Texas 75093-2532. Be used its Gonnabe.com website to communicate the Misrepresentations in its online marketing material to the Class. Be used interstate wires to send internal communications and to communicate "class lists" to identify Be members to service providers, so they could receive services. These internal communications and communications to its vendors were all incident to reinforcing the Misrepresentation's misleading effects, and specifically to foster the impression that its services were valuable so Be could delay members becoming dissatisfied and seeking refunds.

149.    Each scheme where Be successfully obtained a membership fee from a Class

member violated 18 U.S.C. § 1343 (the wire fraud statute). There were approximately between 5,000 and 7,000 members, and the schemes continued from at least the beginning of 2007 through April 2009. The completion of these schemes shared common purposes, results, and a method of commission, and their involvement in the schemes ran from January 2007 to May 2009. In sum, the schemes from which the Misrepresentations arose were a pattern of racketeering activity.

150.    Falck, DeSando, and Steinbeck participated in the operation and management of Be in their formal position as managers of Be through the pattern of racketeering activity alleged above. Falck, DeSando, and Steinbeck were personally involved in Be's communication of the Misrepresentations to the Class. Steinbeck participated in the operation and management of Be as secured creditors who came to control Be and to exclude Falck and DeSando from the management of Be.

151.    Monterey participated in the operation and management of Be as a creditor who was deeply involved in Be's finances and accounting, and who came to control Be. Monterey participated in Be's management and operations by continuing to carry out the schemes alleged above with respect to Contracts which Class members entered into due to the Misrepresentations. Monterey sought to collect unpaid balances on such Contracts.

152.    Monterey, Dynamic Showcases, and Be UK were co-schemers with Falck and Be under 18 U.S.C. § 1343. They willfully completed the schemes alleged above, knowing that the Misrepresentations were false and misleading. Monterey, Falck, and Be UK intended to extract additional money from Class members and/or to prevent, delay, and frustrate Class members from successfully charging membership fees paid via credit card back. Monterey was a co-schemer with the Primary Defendants under 18 U.S.C. § 1343. It participated in the schemes above by collecting unpaid Be membership fees, and willfully completed those schemes knowing that the Misrepresentations were false and misleading and intending to extract additional money from Class members.

153.    Monterey, Dynamic Showcases, and Be UK also made use of the interstate wires incident to the essential parts of their involvement in the scheme. Monterey used the mails to

1    send dunning letters to Subclass members (in violation of 18 U.S.C. § 1341). Monterey also used

2    interstate wires to report supposed debts to CRAs, including Equifax, Inc. (headquartered at 1550

3    Peachtree Street, N.W., Atlanta, Georgia 30309) and TransUnion (headquartered at 555 West

4    Adams Street, Chicago, Illinois 60661). Be UK used the interstate wires to processing credit card

5    transactions from overseas. Dynamic Showcases used interstate emails to conduct business with

6    Be.

7        154.    Monterey, Dynamic Showcases, and Be UK continued and furthered the schemes

8    each time they successfully obtained additional membership fees from a Class member or

9    prevented a charge back. This conduct violated 18 U.S.C. §§ 1341, 1343 (mail fraud and wire

10   fraud). Monterey, Dynamic Showcases, and Be UK collectively completed hundreds or

11   thousands of the schemes alleged above. The completion of these schemes shared common

12   purposes, results, and a method of commission, and there is a specific threat that the schemes

13   will extend indefinitely into the future if Monterey and the other Defendants continue to collect

14   payments from Be customers. In sum, the schemes from which the Misrepresentations arose

15   were a pattern of racketeering activity.

16       155.    Be, Falck, Monterey, Dynamic Showcases, and Be UK violated 18 U.S.C. §

17   1962(c) as alleged above. Plaintiffs and the other Class members have been injured in their

18   property by the violation of 18 U.S.C. § 1962(c) alleged above. This injury consists of the

19   membership dues paid to Be and the other Defendants.

20       156.    Plaintiffs, on their own behalf, and behalf of the other Class members, seek to

21   recover treble damages, in an amount to be determined at trial, and reasonable attorney's fees

22   and costs under 18 U.S.C. § 1964(c) from Be, Falck, Monterey, Dynamic Showcases, and Be

23   UK.

24           **SIXTH CAUSE OF ACTION: Violation of 18 U.S.C. § 1962(d) Against**
             **All Defendants by Plaintiffs Individually and on Behalf of the Class**
25

26       157.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

     herein.

27

28       158.    Be, Dynamic Showcases, Falck, Monterey, and Be UK violated 18 U.S.C. §

---

1962(c) by participating in the operation and management of Be through the pattern of racketeering activity alleged above. Plaintiffs and the other Class members have been injured in their property by the violation of 18 U.S.C. § 1962(c) alleged above. This injury consists of the membership dues paid to Be and the other Defendants.

159.     Be, Dynamic Showcases, Falck, Monterey, and Be UK made agreements between and with certain each other with the intent to facilitate the execution and completion of the pattern of racketeering activity alleged above – to wit, the operation of Be to initiate and complete the schemes alleged above to use the Misrepresentations and to violate AFTSA to obtain membership fees from Class members. The specific agreements and the divisions of work between the Defendants are alleged above.

160.     Plaintiffs, on their own behalf, and behalf of the other Class members, seek to recover treble damages, in an amount to be determined at trial, and reasonable attorney's fees and costs under 18 U.S.C. § 1964(c) from Be, Dynamic Showcases, Falck, Monterey, and Be UK.

**SEVENTH CAUSE OF ACTION: Declaratory Judgment Under 28 U.S.C. § 2201 Against Monterey and Be, by Plaintiffs Individually and on Behalf of the Class**

161.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

162.     Be LLC is an advance-fee talent service, which charged and received advance fees from Class members under the definitions of AFTSA.

163.     Subsection 1701.4(a) of the California Labor Code requires contracts between advance-fee talent services and their customers to be in writing and to contain various elements. These elements include statements describing the services to be performed, when those services will be performed, and detailed, statutorily-mandated provisions regarding refunds and cancellation options. *Cf.* Cal. Lab. Code § 1701.4(a) (2009). Be's Contracts with the Class members do not contain the elements required by subsection 1701.4(a) above.

164.     Be's Contracts are illegal, invalid, and void as contrary to public policy. When Subclass members signed their Contracts with Be, they made an initial payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned its rights under these financing provisions to Monterey. Monterey has collected a portion of the remaining balances on the Contracts from Subclass members and has sought to collect more.

165.     Both Be and Monterey have claimed that the Contracts are enforceable. Monterey has dunned Plaintiffs for payment on their Contracts, placed derogatory information on their credit reports, and has declined to admit that the Contracts were unenforceable in discovery. The actual and attempted enforcement of Be's Contracts have caused Plaintiffs and the other Class members concrete, actual harm. Defendants and the Class have adverse legal interests, and there is a substantial controversy between the Class and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Be Productions' contracts are voidable at the Class members' options.

166.     Plaintiffs, on their own behalf, and behalf of the other Class members, seek a declaratory judgment under 28 U.S.C. § 2201 that Be's Contracts are invalid, void and unenforceable, and to recover the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5.

167.     Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek a declaratory judgment under 28 U.S.C. § 2201 that the Contracts Be assigned to Monterey are invalid, void and unenforceable, and to recover the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5.

**EIGHTH CAUSE OF ACTION: Violation of the Rosenthal Fair Debt Collection Practices Act Against Monterey by Plaintiffs Individually and on Behalf of the Subclass**

168.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

169.     When Subclass members signed their Contracts with Be, they made an initial

payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned its rights under these financing provisions to Monterey. Monterey has collected a portion of the remaining balances on the Contracts from Subclass members and has sought to collect more.

170.   Monterey is "debt collector" under the definition of the Rosenthal Fair Debt Collection Practices Act because it, "in the ordinary course of business, regularly, on behalf of [itself] or others, engages in debt collection." Cal. Civ. § 1788.2(c).

171.   California Civil Code section 1788.17 incorporates sections 1692b to 1692j and the remedies under section 1692k of the federal Fair Debt Collections Practices Act and applies them against RFDPCA's broader definition of debt collectors. Monterey has violated certain of these provisions included under the FDCPA.

172.   The unpaid balances under the Contract are unenforceable debts. The FDCPA prohibits "conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. The FDCPA also prohibits false representations about "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(B). Monterey's collection of the unpaid balance of the Contracts violates both of these provisions.

173.   Plaintiffs and the other members of the Subclass have incurred actual damages as a result of the foregoing RFDCPA violations. These damages include amounts paid to Monterey under the Contracts.

174.   Additionally, Monterey should have known that all of the purported debts under Be's Contracts are invalid and unenforceable. Monterey has nonetheless threatened to report those purported debts as valid debts to the CRAs. The FDCPA prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false . . ." 15 U.S.C. § 1692e(8). Monterey's threats to communicate information it should know to be false to the CRAs regarding the Subclass members is a false, deceptive, and misleading means of debt collection, and violates 15 U.S.C. § 1692e(8). Monterey has threatened to report Plaintiffs' unpaid balance to the CRAs as a delinquent account in or about June and July 2009. Monterey has communicated with Plaintiffs and the other Subclass members, but has

failed to provide, within five days of such communication, written notice as required under 15 U.S.C. § 1692g(a). Such written notice must include

      a.    the amount of the debt;

      b.    the name of the creditor to whom the debt is owed;

      c.    a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

      d.    a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

      e.    a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

175.    Plaintiffs and other members of the Subclass did not receive written notice from Monterey consistent with 15 U.S.C. § 1692g(a) within five days of Monterey's initial communications with them. Monterey's communications to the Subclass members without the above written notice violated 15 U.S.C. § 1692g(a).

176.    By violating the foregoing sections of the FDCPA, Monterey violated California Civil Code section 1788.17. Monterey does not have a reasonable system in place to ensure that it avoids the foregoing RFDCPA violations. Monterey's actions were not the result of a *bona fide* error and it failed to maintain reasonable procedures adapted to avoid such errors. Mistakes of law cannot constitute the basis for a *bona fide* error defense.

177.    Plaintiffs and the other members of the Subclass have suffered actual injury as a result of Monterey's RFDCPA violations. These injuries include declined and reduced credit, forced purchase of credit reports and credit monitoring, postage and private courier costs, mileage, long-distance telephone charges, lost cell phone airtime, emotional distress, increased credit costs, and amounts paid to settle fraudulent debts.

178.    Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek to recover from Monterey actual damages (in an amount of the sum collected by Monterey under Be's Contracts) for the foregoing violations under FDCPA sections 1692d and 1692e(2)(B) and

statutory damages for all RFDCPA violations, in an amount to be determined at trial, and the costs of the action (including attorneys' fees) under Cal. Civ. Code §§ 1788.17, 1788.30.

### NINTH CAUSE OF ACTION: Restitution/Unjust Enrichment Against Monterey by Plaintiffs Individually and on Behalf of the Subclass

179.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

180.    When Subclass members signed their Contracts with Be, they made an initial payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned its rights under these financing provisions to Monterey.

181.    Monterey has collected a portion of the remaining balances on the Contracts from Subclass members and has sought to collect more. Subclass members' payments constitute a benefit to Monterey. Monterey has retained those payments at the expense of the Subclass members.

182.    The circumstances are such that it would be unjust for Monterey to retain the Subclass members' payments. The Contracts are invalid, void and unenforceable. Moreover, Be has stopped performing under the Contracts. The Subclass members are unsophisticated consumers, and Monterey is a sophisticated financing company that is far better suited to absorb the risks of Be's insolvency and/or violation of the law than the Subclass members. As a matter of California public policy, it is unjust for Monterey to retain the Subclass members' payments. AFTSA was enacted to protect Subclass members, and it is unjust that they would lose that protection by the artifice of the financing arrangement alleged above.

183.    Plaintiffs allege that Monterey had constructive knowledge of the foregoing circumstances – that Monterey had sufficient knowledge of the facts (or was willfully blind to such facts) that it should have known that, e.g., the Contracts were illegal and that Be had violated the law.

184.    Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek

restitution of the monies collected by Monterey under Be's Contracts, imposition of a constructive trust, and to recover the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5.

**TENTH CAUSE OF ACTION: Rescission Against Monterey by
Plaintiffs Individually and on Behalf of the Subclass**

185.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

186.     In the alternative to their ninth cause of action for restitution/unjust enrichment, Plaintiffs petition the Court to unilaterally rescind the Contracts based on Be's fraud, failure of consideration, the Contract's illegality, and prejudice to the public interest if the Contracts remain intact.

187.     Be's Contracts are illegal, invalid, and void as contrary to public policy. Plaintiffs have not received anything of value under the Contracts because Be's consideration and performance under the Contracts were illegal and violated AFTSA. Finally, Be has stopped performing under the Contracts.

188.     Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek restitution of the monies collected by Monterey under Be's Contracts and consequential damages, as well as to recover the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5.

**ELEVENTH CAUSE OF ACTION: Violation of Consumer Legal Remedies Act Against
Monterey by Plaintiffs Individually and on Behalf of the Subclass**

189.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

190.     Plaintiffs are "consumers" with respect to the Contracts under the meaning of the Consumer Legal Remedies Act ("CLRA"). *See* Cal. Civ. Code § 1761(d).

191.    When Subclass members signed their Contracts with Be, they made an initial payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned its rights under these financing provisions to Monterey. Monterey has collected a portion of the remaining balances on the Contracts from Subclass members and has sought to collect more.

192.    Monterey directly participated in the making of the Contracts between Subclass members and Be. Monterey provided Be with access to an online interface with which Subclass members provided Monterey with credit information and authorized Monterey to check Subclass members' credit reports.

193.    Be used this interface with marketing its service under the Contracts to the Subclass members. Monterey checked Subclass members' credit reports before it agreed with Be that it would finance Subclass members' Contracts.

194.    Monterey also provided Be with the financing forms that were incorporated into the Contracts. Monterey did not purchase the account receivable under any Contract, unless such Contract contained the language provided by Monterey. Monterey's forms stated: "CANCELLATION: YOU THE BUYER MAY CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS AGREEMENT, EXCLUDING SUNDAYS AND HOLIDAYS." Monterey's forms also stated that Subclass members who did "not make a payment when due [would] be in default", and that in the event of default Monterey could accelerate the remaining balance of Contracts (requiring Subclass members to "immediately repay the entire unpaid balance of" the Contracts) and that Monterey would earn interest on the unpaid balance.

195.    Moreover, Monterey has directly contracted with Plaintiffs and other members of the Subclass to authorize Monterey to directly withdraw money from credit card, debit cards, and bank accounts.

196.    Further, Monterey has directly dunned Subclass members who have failed to pay Monterey the complete remaining balances on the Contracts. Monterey has sent letters to Plaintiffs and the other members of the Subclass which state in relevant part: "Ignoring our requests for payment will force us to declare the unpaid balance due immediately and/or

1   placement of your account with a collection agency. . . . Contact this office within (48) hours

2   from receipt of this letter to discuss your seriously delinquent account and possible payment

3   options."

4       197.    Plaintiffs' actual rights under AFTSA are contrary to Monterey's representations

5   above. Under AFTSA, Plaintiffs and the other members of the Subclass had a right to cancel the

6   Contracts without cause for ten (10) days after the date of transaction. Cal. Lab. Code §

7   1701.4(a) (2009). Moreover, Plaintiffs had a right to a refund any sums paid to Monterey or Be

8   because they did not receive the services Be promised or that they were led to believe Be would

9   perform. *Id*. Because the Contracts did not comply with AFTSA, the Contracts were illegal and

10  prohibited by law. Cal. Lab. Code § 1701.4(d) (2009).

11      198.    The Subclass members' agreement to financing provisions in the Contract, their

12  payments to Monterey under such provisions, and Monterey's collection of such payments, all

13  constituted "transactions" under the CLRA. *See* Cal. Civ. Code § 1761(e) ("an agreement

14  between a consumer and any other person, whether or not the agreement is a contract enforceable

15  by action, and includes the making of, and the performance pursuant to, that agreement").

16      199.    Monterey's representations and acts above were likely to mislead reasonable

17  consumers into believing that Be's Contracts conferred rights and obligations which they did not

18  involve (namely that the Contracts were valid and enforceable, and the remaining balances on

19  the Contracts were valid debts). Monterey violated Cal. Civ. Code § 1770(a)(14).

20      200.    Monterey also violated Cal. Civ. Code § 1770(a)(14) because Monterey made

21  representations about the obligations under the Contracts, when in fact the Contracts were

22  "prohibited by law" (namely, AFTSA).

23      201.    Plaintiffs and the other members of the Subclass incurred damages because of

24  Monterey's violations of Cal. Civ. Code § 1770(a)(14). Plaintiffs and the other members of the

25  Subclass would not have agreed to the Contracts and would not have paid Monterey any money

26  under the Contracts if they had known that the Contracts were illegal, invalid, and unenforceable.

27      202.    Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek an

28  order enjoining the CLRA violations alleged herein, restitution of property gained by the

foregoing CLRA violations, and court costs and attorney's fees under Cal. Civ. Code § 1780(d). Plaintiffs expressly disavow any prayer for damages under their CLRA claim at this time.

**THIRTEENTH CAUSE OF ACTION: Remedies under the Unruh Act Against Monterey by Plaintiffs Individually and on Behalf of the Subclass**

203.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

204.    When Subclass members signed their Contracts with Be, they made an initial payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned its rights under these financing provisions to Monterey. Monterey has collected a portion of the remaining balances on the Contracts from Subclass members and has sought to collect more.

205.    The financing provisions of Be's Contracts with the Subclass provided for Subclass members to pay the remaining balance in multiple installments. Be's Contracts with the Subclass members were "contracts" under Cal. Civ. Code § 1802.6.

206.    Be was a "seller" under the meaning of Cal. Civ. Code § 1802.3.

207.    Plaintiffs and the other Subclass members were "buyers" under the meaning of Cal. Civ. Code § 1802.4.

208.    Monterey is an assignee of Be's rights under the Contracts. Under the Unruh Act, Monterey is "subject to all equities and defenses of the buyer against the seller arising out of the sale, notwithstanding an agreement to the contrary, but [its] liability may not exceed the amount of the debt owing to the assignee at the time of the assignment." Cal. Civ. Code § 1804.2.

209.    Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek equitable remedies (including restitution and rescission) against Monterey for an amount equal to "the debt owing to [Monterey] at the time of the assignment," as well as to recover the costs of the action (including attorneys' fees) under Cal. Code Civ. Proc. § 1021.5.

**FOURTEENTH CAUSE OF ACTION: Violation of the CCRAA Against Monterey by Plaintiffs Individually and on Behalf of the Subclass**

210.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim.

211.    The CCRAA prohibits persons from furnishing information on specific transactions "to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

212.    Monterey should know that all of the purported debts under Be's Contracts are invalid and that the Contracts are illegal, invalid, void, and unenforceable under AFTSA. Monterey has nonetheless threatened to report and has reported those purported debts as valid debts to CRAs (i.e., TransUnion, Experian, and Equifax), which it should know to be false information.

213.    Monterey furnished information it should have known to be incomplete and inaccurate to the CRAs and thereby violated Cal. Civ. Code § 1785.25(a). Monterey willfully furnished incomplete and inaccurate information, such that it is liable for punitive damages under Cal. Civ. Code § 1785.31(c).

214.    Plaintiffs and the other members of the Subclass have suffered actual injury as a result of Monterey's actual and threatened violations of Cal. Civ. Code § 1785.25(a). These injuries include payments to Monterey under the Contracts, declined and reduced credit, forced purchase of credit reports and credit monitoring, postage and private courier costs, mileage, long-distance telephone charges, lost cell phone airtime, and increased credit costs.

215.    Plaintiffs and the other members of the Subclass seek to recover actual and statutory punitive damages, in an amount to be determined at trial, injunctive and equitable relief, and the costs of the action (including attorneys' fees) under Cal. Civ. Code § 1785.31 against Monterey.

**FOURTEENTH CAUSE OF ACTION: Direct Liability for UCL Violations Against Monterey by Plaintiffs Individually and on Behalf of the Subclass**

216.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. Notwithstanding the foregoing allegations, this cause of action expressly omits any

allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs

allege, in the alternative, that no such knowledge is required to prove this claim.

217.    When Subclass members signed their Contracts with Be, they made an initial

payment to Be and signed a form to finance the remaining balance of the Contract. Be assigned

its rights under these financing provisions to Monterey. Monterey has collected a portion of the

remaining balances on the Contracts from Subclass members.

218.    As alleged in more detail in the claims stated above, this conduct violates the

following laws: Cal. Civ. Code §§ 1770(a)(14), 1785.25(a), 1788.17 and 15 U.S.C. §§ 1692d,

1692e(2)(B). Monterey's conduct alleged above is unlawful and violates Cal. Bus. & Prof. Code

§ 17200.

219.    In the alternative, Monterey's conduct alleged above is unfair and violates Cal.

Bus. & Prof. Code § 17200. Be's Contracts, and the operation of the rest of its business, violated

AFTSA and the CLRA on a massive scale. Be sold the illegal and invalid Contracts to Monterey,

and Monterey proceeded to collect on those Contracts. Be now appears to be defunct. If the

Subclass were unable to receive restitution from Monterey for the sums paid under the Contracts,

it would harm the interests the California legislature sought to protect in enacting AFTSA and

the CLRA.

220.    Monterey's conduct is unfair because it caused a substantial injury to consumers

and competition that outweighed any countervailing benefits to consumers or to competition and

was not an injury the consumers themselves could reasonably have avoided. Monterey's conduct

violates the policy or spirit of AFTSA and the other laws cited above, because its effects are

comparable to or the same as a violation of the law, and otherwise significantly threatens or

harms the interests the California legislature intended to protect under AFTSA, the CLRA,

RFDCPA, and the CCRAA.

221.    Plaintiffs and the other Subclass members have been injured and have lost money

and property as a result of Monterey's violations of Cal. Bus. & Prof. Code § 17200. These

injuries include payments to Monterey under the Contracts, declined and reduced credit, forced

purchase of credit reports and credit monitoring, postage and private courier costs, mileage, long-

1 | distance telephone charges, lost cell phone airtime, and increased credit costs.

2 |     222.    Plaintiffs, on their own behalf, and behalf of the other Subclass members, seek to

3 | recover restitution, injunctive and equitable relief including a constructive trust under Cal. Bus.

4 | & Prof. Code § 17203, and to recover the costs of the action (including attorneys' fees) under

5 | Cal. Code Civ. Proc. § 1021.5.

6 |     WHEREFORE, Plaintiffs Timothy DuFour and Kenneth Tanner pray that the Court enter

7 | judgment and orders in their favor and against Be., LLC, Dynamic Showcases, LLC, Be

8 | Marketing Ltd., Monterey Financial Services, Inc., Barry Falck, and Does 1 to 100 as follows:

9 |     (a)    An order certifying the Class, directing that this case proceed as a class action, and appointing DuFour and Tanner and their counsel to represent the Class;

11 |     (b)    An order certifying the Subclass, and appointing DuFour and Tanner and their counsel to represent the Subclass;

13 |     (c)    Damages in an amount to be proved at trial (but not less than $5 million) against Defendants consistent with the common law claims and statutory remedies as alleged above;

15 |     (d)    Equitable and injunctive relief providing for a constructive trust and prohibiting Defendants from continuing the statutory violations alleged above;

17 |     (e)    Statutory damages against Monterey pursuant to the RFDCPA and CCRAA in favor of the Subclass;

18 |     (g)    An order granting costs and attorneys' fees; and

19 |     (h)    Such other and further relief as this Court may deem appropriate.

21 | Dated: December 17, 2010    By: _____

Ethan Preston (263295)
PRESTON LAW OFFICES
21001 N. Tatum Blvd., Ste. 1630-430
Phoenix, Arizona 85050
(480) 269-9540 (telephone)
(866-509-1197 (facsimile)
ep@eplaw.us

Robert M. Bramson (102006)
Michael S. Strimling (96135)
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
(925) 945-0200 (telephone)

1

(925) 945-8792 (facsimile)
rbramson@bramsonplutzik.com
mstrimling@bramsonplutzik.com

2

3

David C. Parisi (162248)
Suzanne Havens Beckman (188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
(818) 990-1299 (telephone)
(818) 501-7852 (facsimile)
dcparisi@parisihavens.com
shavens@parisihavens.com

4

5

6

7

*Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28