IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TIMOTHY DUFOUR, et al.,

    Plaintiffs,

v.

BE LLC et al.,

    Defendants.

No. C 09-3770 CRB

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION**

Plaintiffs in this contract case, parties to form contracts with a defunct talent agency, Be., LLC ("Be"),[1] move for class certification. See dkt. 187. The Court GRANTS the motion in part and DENIES it in part.

## I. BACKGROUND

Plaintiffs say that Be, using a manipulative sales pitch designed to convince parents that their children displayed uncommon potential to succeed in the entertainment industry, entered into form contracts with Plaintiffs for talent-related training and services. According to Plaintiffs, Be actually selected children based not on their demonstrated acting potential, but on their families' ability to pay Be's fees. SAC (dkt. 128) ¶¶ 16-20; DeSando Decl. (dkt. 187-1) ¶¶ 4-22. And, the contracts failed to include certain terms required by California's

---

[1] Be was formerly named My Artist's Place, LLC, until May 2008. DeSando Decl. (dkt. 187-1) ¶ 2.

Advance Fee Talent Services Act, Cal. Labor Code § 1701.1, et seq.,[2] rendering them "voidable at the election of the artist." Id. § 1701.4(d).

Be's business suffered, and it eventually stopped providing services some time in early- or mid-2009. SAC ¶¶ 107-115. Be's insolvency makes it an impractical target for Plaintiffs, and so this litigation has proceeded based on theories of liability directed not at Be, but at Monterey Financial Services ("Monterey"), a company that worked with Be.

Plaintiffs say that Monterey functioned–initially–as a finance company and debt collector for Be. Monterey loaned "significant sums of money" to Be in exchange for Be assigning its accounts receivable to Monterey; and, for Be customers that could not afford to pay Be's fees in cash, Monterey supplied Be with financing contracts obligating the customers to pay Monterey over time for Be's services. SAC ¶¶ 19, 94. Under that arrangement, Be "transmit[ted] its clients' contracts to Monterey immediately after they were signed." DeSando Decl. ¶ 26.

Monterey also marketed itself, and served as, a debt collector for Be's accounts. SAC ¶ 95; DeSando Decl. ¶ 27. Monterey and Be "collaborated extensively on collection of unpaid balances from Be members," and Monterey "used continuing access to Be's services and 'discounts' as leverage to collect." SAC ¶ 102. If Monterey was not paid, it "would have Be tell supposedly independent service providers . . . to bar that Be member from further classes until Monterey was paid." Id.

Plaintiffs say that as a result of Monterey's close working relationship with Be, Monterey was aware that Be's operations violated the AFTSA.[3] Complaints mentioning Be's AFTSA violations made their way to Monterey through the Better Business Bureau, Id. ¶ 97, and some Be customers complained directly to Monterey about Be's AFTSA violations when Monterey attempted to collect money on unpaid balances. Id. ¶ 100. Also, some

---

[2]California Labor Code sections 1701.1 to 1701.20 were repealed, modified, and reenacted in 2009, effective January 1, 2010, as sections 1701 to 1705.3. See 2009 Cal. Legis. Serv. ch. 286 (A.B. 1319). The parties do not dispute that the former sections control this litigation.

[3]Plaintiffs do not allege that Monterey had any role in drafting the contracts that violated the AFTSA.

internal discussion of Be's AFTSA violations was forwarded to Monterey around May 2008. Id. ¶ 98. Plaintiffs also allege that Be learned about the violations "in the course of conducting due diligence on its agreement with Be." Id. ¶ 99.

According to Plaintiffs, as Be's financial condition deteriorated, Monterey took on a more active role in Be's operations. See SAC ¶¶ 109-111. When Monterey learned that Be was failing, Monterey "took corrective action" by "demand[ing] that Be resume 'servicing' its members, so that Monterey could continue to collect money from Be members to recoup its loans to Be." Id. ¶ 110. And, when Be's credit card processor discontinued its relationship with Be around December 2008, "Monterey became much more involved in Be's business operations." DeSando Decl. ¶ 28. Indeed, Plaintiffs go so far as to allege that Monterey "came to control Be." SAC ¶ 151.

Plaintiffs filed suit in August 2009. This Court granted a preliminary injunction imposing a constructive trust on money paid by Plaintiffs to Be under their contracts, see dkt. 26, and several motions to dismiss and amendments to the complaint followed, narrowing the claims and parties in the case. See dkts. 44, 93, 134. The case was delayed for almost a year while the parties arbitrated the claims of Plaintiff Tanner. See dkts. 158, 162. Plaintiffs Timothy and Jeanne DuFour now move for class certification. Dkt. 187.

## II. LEGAL STANDARD

Plaintiffs bear the burden of proving that certification is appropriate. See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). Rule 23 "does not set forth a mere pleading standard." Id. Rather, the "party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id. District courts are to rigorously analyze whether Rule 23 has been satisfied. Mazza v. Am. Honda Motor Corp., 666 F.3d 581, 599 (9th Cir. 2012).

In formulating this judgment, the Court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties." In re Citric Acid Antitrust Litig., No. 95-1092, C-95-2963, 1996 WL 655791, at *2 (N.D. Cal.

3

Oct. 2, 1996) (citing Blackie v. Barrack, 524 F.2d 891, 900-01 & n.17 (9th Cir. 1975)). A court's "rigorous analysis" on class certification will frequently "entail some overlap with the merits of the plaintiff's underlying claim." Dukes, 131 S. Ct. at 2551.

Federal Rule of Civil Procedure 23 establishes a two-step procedure for analyzing class certification. Initially, the following four requirements of Rule 23(a) must be satisfied: (1) numerosity, (2) common questions of law or fact, (3) typicality, and (4) adequate representation. Once those four requirements are met, plaintiffs must show that the lawsuit qualifies for class action status under Rule 23(b).

The class must be so numerous that joinder of all members individually would be impracticable. See Fed. R. Civ. P. 23(a)(1); Staton v. Boeing, 327 F.3d 938, 953 (9th Cir. 2003). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." See Krzesniak v. Cendant Corp., No. 05-05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).

Second, the requirement of commonality demands that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A "single significant question of law or fact" is sufficient. Mazza, 666 F.3d at 589. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Dukes, 131 S. Ct. at 2551 (internal quotation marks omitted).

Third, the requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

Fourth, the requirement of adequate representation asks whether the representative "will fairly and adequately protect the interests of the class." See Fed. R. Civ. P. 23(a)(4). Courts are to inquire (1) whether the named plaintiffs and counsel have any conflicts of

4

interest with the rest of the class and (2) whether the named plaintiff and counsel will prosecute the action vigorously for the class. See Hanlon, 150 F.3d at 1020.

In addition to the elements of Rule 23(a), a plaintiff must also demonstrate that the action can be appropriately certified under Rules 23(b)(1), (b)(2), or (b)(3). Rule 23(b)(1) provides that a class may be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either "(A) inconsistent or varying adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Rule 23(b)(3) provides that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." See also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (holding Rule 23(b)(3) satisfied where "[i]ndividualized issues [were] few, and most of them [were] likely to be relatively easy").

**III. DISCUSSION[4]**

Plaintiffs' remaining claims cluster around three basic theories: (1) Be breached its contracts when it stopped providing services (and went out of business); (2) Be's contracts violated the AFTSA; and (3) Be fraudulently induced its customers into contracting with Be. Plaintiffs seek to collect from Monterey under all three theories, arguing that, respectively, (1) Monterey, as assignee of Be's rights under the contracts, is subject to an action for

---

[4] Monterey submitted some twenty-pages of separately-filed evidentiary objections, see dkts. 200-202, in violation of Civil Local Rule 7-3(a), which required Monterey to incorporate any objections it wished to make into its opposition brief. The Court STRIKES those objections as improperly filed and declines to consider them in ruling on the motion.

5

equitable relief based on Be's breach under, inter alia, California Civil Code § 1804.2; (2) Monterey's efforts to collect on Be's void contracts violated various laws; and (3) Monterey was so closely involved with Be that it is liable as an aider and abettor of Be's deceit.

### A. Class Definition

In their motion for class certification, Plaintiffs propose to certify the following class:

> all persons listed in the Excel spreadsheet titled "DuFour-Tanner Discovery Spreadsheet (08.22.11).xls.XLS" ("Spreadsheet") which was produced to Plaintiff's counsel by Monterey Financial Services, Inc. on or about August 22, 2011, listed as having signed a type 2 contract.

Mot. at 3. According to Plaintiffs, the Spreadsheet has information about "consumers whose contracts with Be., LLC were purchased by Monterey and from whom Monterey collected or sought to collect money." Preston Decl. ¶ 3; see also id. ¶ 4 (explaining that "Type 2" contracts were contracts prepared by Be that did not contain arbitration clauses).

Plaintiffs must define a class that is "precise, objective, and presently ascertainable." Gray v. Golden Gate Nat'l Recreational Area, 279 F.R.D. 501, 508 (N.D. Cal. 2011). Monterey does not argue that the "Spreadsheet" definition technically fails any of those tests, but it complains that the definition is "awkward and unusual." The Court agrees, and is not inclined to unnecessarily use a class definition that does not on its face inform potential class members whether they are members of the class. Plaintiffs description of the Spreadsheet contents, however, will suffice:

> Consumers (1) whose contracts with Be., LLC were purchased by Monterey and (2) from whom Monterey collected or sought to collect money, and (3) whose contracts were prepared by Be., LLC and did not contain an arbitration clause.

### B. Be's Breach By Going Out of Business

#### 1. Rule 23(a)(2): Commonality

Plaintiffs say that Be breached its contracts with class members by failing to provide services for the full contract term. In Plaintiffs' view, the date that Be stopped providing services is common to everyone under contract with Be when Be went out of business, presenting a common issue suitable for classwide resolution. Monterey focuses its Rule 23(a) attack on the commonality element, responding that Plaintiffs "fail to present any

6

evidence that Be members where [sic] treated in a uniform manner," have "not established that the contract of the class members were identical as to the amounts charged or the duration of the contract, or that class members were uniformly denied services under the contracts." Opp'n at 16.

Plaintiffs have, however, identified relevant uniform treatment of class members: the denial of services as of whatever date Be went out of business. Monterey is correct that Plaintiffs have not established uniformity in other features of the contract, such as the price and duration terms. See DeSando Decl. Exs. C, D, DD; Am. DeSando Decl. (dkt. 187-10) Ex. DD (two of the three form contracts have spaces for a handwritten specification of the contract term, while the third has a typewritten provision designating a term of five years).

But that is beside the point; Plaintiffs have identified a common question of fact central to the resolution of their claims, which is all that is necessary to satisfy Rule 23(a). See Mazza, 666 F.3d at 589. Variations in the other facts Monterey highlights might affect the amount of money each plaintiff is entitled to recover, but they would not preclude a finding of breach and liability. To the extent Monterey suggests that the other, individualized questions will overwhelm the common question identified by Plaintiffs, its arguments are more appropriately addressed to Rule 23(b)'s requirements, discussed below. See Part III.B.3.

### 2. The Rest of Rule 23(a): Numerosity, Typicality, and Adequacy of Representation

Numerosity: Monterey says that the class definition is overbroad, i.e., not everyone who paid Monterey money or received communications from Monterey necessarily has a breach of contract claim; for example, a Be customer could have had a two-year contract that expired before Be went out of business. In Monterey's view, Plaintiffs have thus failed to meet their burden of establishing numerosity, because it is unclear what percentage of the people listed in the spreadsheet have breach of contract claims.

It is a fair inference from Plaintiffs' allegations that "Be still had million of dollars of unpaid balances on Be membership fees" as it went out of business that at least hundreds of contracts called for services and payments well after Be stopped operating. SAC ¶ 114. The

7

Court accordingly concludes that Plaintiffs have met their low burden of establishing numerosity.

Typicality: Monterey–citing nothing–says DuFour's claim is not typical because "she received everything she bargained for." In fact, however, DuFour has submitted evidence that her contract was not supposed to expire until 2014, see dkt 7-2 at 6, making DuFour typical of other class members who were deprived of Be's services for the full terms of their contracts. Monterey also suggests that DuFour is atypical because she alleges that most Be members never received any meaningful work, whereas her daughter actually received work in a Be production.

The typicality requirement is "permissive" and satisfied where representative's claims "are reasonably coextensive with those of absent class members." Rodriguez v. Hayes, 591 F.3d 1105, 1124 (9th Cir. 2009). That DuFour's daughter may have had more success than other class members does not make her claim so different as to be atypical within the meaning of Rule 23.

Adequacy of Representation: Monterey faults DuFour for her "general lack of knowledge about the experiences of putative class members," her lack of knowledge "of what benefits other Be members received", and her lack of knowledge of "what representations were made to . . . other Be customers at any of the other Be offices throughout the duration of Be's operations." Opp'n at 19.

The threshold knowledge required of the class representatives is low. "[A] party must be familiar with the basic elements of her claim, and will be deemed inadequate only if she is startlingly unfamiliar with the case. It is not necessary that a representative be intimately familiar with every factual and legal issue in the case." Moeller v. Taco Bell Corp., 220 F.R.D. 604, 611 (N.D. Cal. 2004) (internal quotation marks and citations omitted). Even if true, Monterey's criticisms do not suggest that DuFour was so unfamiliar with the case as to be an inadequate class representative.

//

//

8

### 3. Rule 23(b)

Plaintiffs concede that (b)(2) certification is inappropriate for these rescission claims requesting individualized monetary restitution for each class member, see Dukes, 131 S. Ct. at 2557; Reply at 15, and argue certification is appropriate under Rule 23(b)(3).

Monterey says that common issues would not predominate because numerous thorny individualized questions would have to be answered to fully resolve the claims. Specifically, Monterey says that "[i]nquiry will need to be made as to when each class member contracted, what services each was offered, [and] what services they received," as well as "what payments were made[ and] what payments were missed," and whether "the member obtained an agent[ or] employment." Opp'n at 22-23. Those issues all appear to go to the specific amount of relief for each plaintiff.

Plaintiffs respond that some of those inquiries are unnecessary, and the ones that are material would be "easy to administer" by reference to records already compiled. At the hearing on this motion, the Court invited Monterey to explain exactly which questions would not be easy to resolve based on the available records, and Monterey identified none. The Court is thus satisfied that the common questions would predominate over the individualized inquiries.

Accordingly, the Court GRANTS class certification for the equitable claims against Monterey premised on Be's failure to provide services for the full term of the contracts.

### C. Be's Contracts Violated the AFTSA[5]

#### 1. Void vs. Voidable

The AFTSA imposes various requirements on the content of contracts between advance-fee talent services and their customers. See Cal. Labor Code § 1701.4 (requiring, inter alia, "a description of the services to be performed," and specific statements about

---

[5]The Court's analysis in this section turns both on whether class treatment for the claims is appropriate and on whether Plaintiffs have stated a claim at all. Normally the latter issues are disposed of in connection with a motion to dismiss, and here Monterey raised them in such a motion. See dkt. 129. The Court denied that motion, see dkt. 134, explaining that Plaintiffs had stated at least some claims as to their individual case, but that the Court would revisit whether the claims failed as a matter of law after Plaintiffs had an opportunity to develop the record. See Hr'g Tr., dkt. 136, at 12.

9

consumers' rights to refunds and to cancel). Plaintiffs allege, and Monterey does not dispute, that Be's contracts failed to comply with those requirements. See SAC ¶ 163; Opp'n at 22. The parties disagree, however, on the legal consequences of that failure.

Section 1701.4(d) provides that "[a]ny contract subject to this section that does not comply . . . shall be voidable at the election of the artist and, in that case, shall not be enforceable by the advance-fee talent service." The distinction between a "void" and a "voidable" contract is well-established: a "void" contract "is no contract at all; it binds no one and is a mere nullity." Guthman v. Moss, 150 Cal. App. 3d 501, 507 (Ct. App. 1984). In contrast, a "voidable" contract "is one which may be rendered null at the option of one of the parties, but it is not void until so rendered." Id. at 509-10.

Plaintiffs bring a host of claims premised on the notion that–contrary to the plain language of the statute–Be's contracts were void, not voidable, and therefore Monterey's efforts to collect on unenforceable contracts were illegal under various statutes and common law causes of action. In support of that theory, Plaintiffs cite several California cases concluding that contracts in violation of other statutes were void. E.g., Eden Twp. Healthcare Dist. v. Sutter Health, 202 Cal. App. 4th 208, 219 (Ct. App. 2011); Duffens v. Valenti, 161 Cal. App. 4th 434, 454-55 (Ct. App. 2008).

But none of the statutes involved in those cases expressly provided that a contract in violation of the statute was "voidable at the election" of a specified party. Plaintiffs provide no good reason to disregard the plain language of the statute, nor have they cited any authority suggesting that doing so would be consistent with California law. The Court therefore concludes that the omission of certain required information in Be's contracts rendered them voidable under the AFTSA.

Accordingly, Plaintiffs' claims asserting that Monterey collected on void contracts are not suitable for classwide adjudication; the contracts were not universally void, which was the critical common issue Plaintiffs say tied the claims of class members together.

//

//

## 2. The UCL

Plaintiffs argue that even if the contracts were voidable instead of void, their UCL claims against Monterey survive. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Because the framers of the UCL expressed the three categories of unfair competition in the disjunctive, "each prong of the UCL is a separate and distinct theory of liability" offering "an independent basis for relief." Kearns v. Ford Motor Co., 567 F.3d 1120, 1127 (9th Cir. 2009).

The "unlawful" prong of the UCL requires a plaintiff to demonstrate that the defendant's conduct violated some other law. Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). In effect, Section 17200 "borrows" violations of federal, state, or local law and makes them independently actionable. Id.

The California Supreme Court has yet to establish a definitive test that may be used in consumer cases to determine whether a particular business act or practice is "unfair" for the purposes of the UCL. Drum v. San Fernando Valley Bar Ass'n, 182 Cal. App. 4th 247 (2010) (citing Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 187 n. 12 (1999). As a result, three tests have developed among state and federal courts. See Vogan v. Wells Fargo Bank, N.A., No. 11-02098, 2011 WL 5826016, at *6 (E.D. Cal. Nov. 17, 2011); Davis v. Ford Motor Credit Co., 179 Cal. App. 4th 581, 593-97 (2009) (detailing the split in authority in handling consumer UCL cases).

One test, which has garnered the most attention from the Ninth Circuit, limits unfair conduct to that which "offends an established public policy" and is "tethered to specific constitutional, statutory, or regulatory provisions." Davis, 179 Cal. App. 4th at 595; Lozano v. AT&T Wireless Servs., 504 F.3d 718, 736 (9th Cir. 2007) (holding that unfairness must be tied to a "legislatively declared" policy).

The second test contemplates whether the alleged business practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Davis, 179 Cal. App. 4th at 594-95; McDonald, 543 F.3d at 506; Kowalsky

11

v. Hewlett-Packard Co., No. 10-02176, 2010 U.S. Dist. LEXIS 131711, at *31-*32 (N.D. Cal. Dec 13, 2010).

The third test, which borrows the definition of "unfair" from the Federal Trade Commission Act, requires that "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." Davis, 179 Cal. App. 4th at 597.

Under the UCL's third prong, "[f]raudulent acts are ones where members of the public are likely to be deceived." Sybersound Records, Inc. v. UAV Corp, 517 F.3d 1137, 1151-52 (9th Cir. 2008). A UCL claim under the "fraudulent prong" requires the plaintiff to have "actually relied" on the alleged misrepresentation to his detriment. In re Tobacco II Cases, 46 Cal.4th at 326 (2009).

Plaintiffs assert one UCL theory under each of the three prongs in their motion for class certification: (1) Be's contracts were "illegal" and so Monterey's efforts to collect on the contracts were "unlawful"; and (2) even if not technically illegal, Be's contracts violated the policy and spirit of the AFTSA and so Monterey's efforts to collect on them were "unfair"; and (3) Monterey's failure to inform class members that they could void their contracts was "misleading" to the point of being "fraudulent."[6]

Unlawful: As already discussed, Be's contracts were enforceable until the consumer elected to void them, and so Monterey's efforts to enforce them prior to such election were not per se unlawful.

Unfair: Plaintiffs say that Monterey's actions were unfair because they violated "the policy or spirit" of the AFTSA. See Mot. at 12. Apparently attempting to bolster the suitability of their claims for classwide resolution, Plaintiffs expressly disavow any reliance

---

[6]Plaintiffs say this also states a claim under the Consumer Legal Remedies Act, Cal. Civil Code § 1750, et seq.; specifically, the statute's prohibition under section 1770(a)(14) of "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Plaintiffs' complaint expressly limits this claim to the theory that Monterey misled consumers into believing that Be's contracts were enforceable, SAC ¶¶ 199-200, which, as discussed above, is not a viable claim because the contracts were enforceable until the consumer elected to void them.

12

on Monterey's knowledge that the contracts were voidable, or even knowledge of the facts that could have put them on notice of the contracts' voidability (i.e., the precise content of Be's contracts). See SAC ¶ 210 ("[T]his cause of action expressly omits any allegation that Monterey had actual knowledge of Be's misconduct alleged herein. Plaintiffs allege, in the alternative, that no such knowledge is required to prove this claim."). Plaintiffs reiterated at the hearing on this motion that Monterey's knowledge was immaterial to its UCL claim, referring to state case law stating that the UCL imposes "strict liability." E.g., Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 181 (2000).

But the case law is more nuanced than that. Certain kinds of UCL claims require at least a showing that the defendant knew the facts that rendered its business practices unfair. See Kowalsky v. Hewlett-Packard Co., 771 F. Supp. 2d 1138, 1150 (N.D. Cal. 2010), abrogated on other grounds by 771 F. Supp. 2d 1156 (N.D. Cal. 2011); cf. id. at 1161-61. To hold Monterey liable for "unfair" business practices regardless of its knowledge of the contracts' voidability would be to impose a de facto pre-collection requirement on debt collection agencies to review the contracts underlying every collection account and to canvass the civil law for provisions that might render it voidable.

Plaintiffs do not point to any provision in the extensive regulatory framework governing the business of debt collection reflecting a policy that debt collectors should independently research the potential voidability of a contract underlying a debt prior to attempting collection. In light of Plaintiffs' express disavowal of reliance on Monterey's knowledge, this Court concludes that Monterey's practice of collecting on valid (but voidable) contracts does not state a claim of "unfair" business practices in violation of the UCL.

Fraudulent: Plaintiffs' last theory is that Monterey misled consumers by telling them that they owed money on Be's contracts, while not disclosing that the consumers had the right to void the contracts. In essence, Plaintiffs say Monterey presented consumers with a false dichotomy–pay or have your credit rating negatively affected–when a third option (elect to void the contract) was available.

13

California courts have been skeptical of UCL claims under the "fraudulent" prong arguing that omitting certain information that consumers probably would find useful rises to the level of a UCL violation. See Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1136-37 (Ct. App. 2010) (health insurance provider not required to tell plaintiffs they could lower their premiums by designating younger spouse as primary or by adding two minor dependents to a single family plan rather than maintaining two separate plans); Searle v. Wyndham Int'l, Inc., 102 Cal. App. 4th 1327, 1335 (Ct. App. 2002) (hotel not required to tell guests what portion of service fee is paid to server); Kunert v. Mission Fin. Servs. Corp., 110 Cal. App. 4th 242, 264 (Ct. App. 2003) (car dealership's failure to disclose that dealer financing rate was higher than actual loan rate from lender not a fraudulent business practice). Those cases often invoke the notion of what would be obvious to a consumer in light of the nature of the entity making the representation.

Plaintiffs' theory of liability would impose a requirement on debt collectors to explain to consumers exactly how not to pay the bill in question without facing any consequences. Common sense would dictate to any consumer that a debt collector is not in the business of informing consumers of ways they may be able to escape their contracts, and the Court concludes that members of the public would not likely be deceived into thinking that debt collection efforts reflect a representation by the debt collector that it has researched the contract in question and concluded it is not voidable. The Court therefore concludes that Plaintiffs have not stated a claim under the UCL's "fraudulent" prong.

Accordingly, the Court DENIES Plaintiff's motion to certify the UCL claims for class treatment.

### 3. Federal and State Debt Collection Statutes

Plaintiffs' other claim falling under the general rubric of Monterey's debt collection efforts asserts that Monterey failed to provide certain written notice to consumers after communicating with them about their debts, in violation of 15 U.S.C. § 1692g(a) and state law adopting that federal provision. See SAC ¶ 174; Mot. at 9 n.5. Plaintiffs, however, have not stated a claim under § 1692g(a), which only requires the written notice where certain

14

1 information is not "contained in the initial communication." Plaintiffs have not alleged that
2 Monterey's initial communications lacked the relevant information.

3 The Court therefore DENIES Plaintiffs' motion for class certification as it relates to
4 claims under the debt collection statutes.

### D. Be's Deceit

Plaintiffs allege that Be–and Monterey, as an aider and abettor–fraudulently induced class members into paying money to sign up with Be; specifically, Be orally misrepresented to parents that their children had been selected based on their demonstrated talent and marketability, when in fact Be selected families based on their ability and willingness to pay Be's fees. See SAC ¶ 80. The class certification dispute for the fraud claims centers on whether Be's alleged misrepresentations were sufficiently uniform, which implicates both Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s[7] predominance requirement.

Plaintiffs say this case is just like In re First Alliance, 471 F.3d 977 (9th Cir. 2006), where the Ninth Circuit explained that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action," but that "a case may be unsuited for class treatment 'if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.'" Id. at 990 (quoting Fed. R. Civ. P. 23 advisory committee note).

The Ninth Circuit held that class treatment is appropriate for fraud claims stemming from a "common course of conduct." Id. In doing so, the court "rejected a talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations, unless those representations are all but identical." Id. at 991. Rather, class treatment may be appropriate where, for example, "a standardized sales pitch" is employed, because the "center of gravity of the fraud transcends the specific details of the oral communications." Id.

---

[7] Plaintiffs concede that certification is inappropriate under Rule 23(b)(2) where the claims would require individualized monetary awards for each class member. See Dukes, 131 S. Ct. at 2557; Reply at 15.

Though some of the language from First Alliance is broad, the court's actual holding was based on a set of facts reflecting a relatively high degree of uniformity in the alleged oral misrepresentations. There, the defendant "trained its loan officers to follow a manual and script known as the 'Track' which was to be memorized verbatim by sales personnel and executed as taught." Id. at 985. The "elaborate and detailed sales presentation prescribed by the manual was unquestionably designed to obfuscate," and the "loan officers were taught to present . . . documents in a misleading manner" and "to deflect attention away from things that consumers might normally look at." Id.

The Ninth Circuit rejected the defendant's argument that the plaintiffs had to show "a specifically-worded false statement repeated to each and every [member] of the plaintiff class, traceable to a specific directive in the Track." It was enough that the plaintiffs showed "a standardized protocol the sales agents were carefully trained to perform," based on a "standardized training program for sales agents, which included a script that was required to be memorized and strict adherence to a specific method of hiding information and misleading borrowers." Id. at 991-92.

The evidence and allegations here do not establish a level of uniformity appropriate for certification under First Alliance. Plaintiffs rely on the declaration of Erik DeSando, former president of Be, which includes a section entitled "Be's Sales Practices." See DeSando Decl. ¶¶ 4-22; see also SAC ¶¶ 74-80.[8] According to DeSando, during post-audition interviews Be's talent directors "would tell the family that Be would assess the child's screen test to determine whether the child was likely to achieve professional success in the entertainment industry." DeSando Decl. ¶ 6. He also says that later "Be's talent directors would . . . call to congratulate the child on 'making the cut' and invit[e] the child and parent(s) to a meeting to join Be." Id. ¶ 12. Plaintiffs' fraud theory is that customers

---

[8] Monterey points out that DeSando's declaration was not actually submitted in this action, but in Bankruptcy Court in the Central District of California. Opp'n at 15; see dkt. 187-1. But Monterey does not argue in its opposition that the Court should not consider the substance of DeSando's declaration; indeed, it relies on the substance of that declaration in making its own arguments. See Opp'n at 11-15, 15-16. The Court thus assumes without deciding that it is proper to consider the content of that declaration.

16

relied on those misrepresentations regarding Be's supposed evaluation of talent in deciding to sign up with Be.

Notably absent from Plaintiffs' evidence is some basis for concluding that the representations were uniform across <u>all</u> sales presentations. Unlike in <u>First Alliance</u>, Plaintiffs here do not claim that Be had a written training manual or a script that employees were instructed to deliver in substance; DeSando's declaration purports to describe Be's "practices," without detailing whether those practices were followed by all employees, most employees, or only some employees.

When Monterey pointed out the weakness in Plaintiffs' showing of uniformity, Plaintiffs responded that they have presented evidence of a uniform video presentation used during the sales meetings. But Plaintiffs never claim that the video made any representations about Be's selection criteria. <u>See</u> DeSando Decl. ¶¶ 14-15 ("The sales presentation included playing a video . . . . The gist of the presentation was that Be had the experience, connections, and the relationships to facilitate its client's professional success in the entertainment industry.").[9]

Tellingly, instead of insisting that DeSando's declaration sufficiently sets out uniform misrepresentations about Be's selection criteria under <u>First Alliance</u>, Plaintiffs' reply brief attempts to rewrite the fraud theory around the video's representations about Be's industry connections. The new theory makes no sense, and it is too late. Plaintiffs say that "[i]n light of <u>In re First Alliance</u> . . . it is sufficient for Plaintiffs to show that the gist of Be's marketing was that Be had the experience, connections, and the relationships to facilitate its clients' professional success in the entertainment industry, but that in fact Class members were selected on the basis of their ability to pay." Reply at 11.

The extent of Be's industry connections and its criteria for selecting clients are two different issues. In theory, Be could have misrepresented facts relevant to its industry

---

[9] Plaintiffs also point out in their opening brief that Be's website represented that "only a small percentage of the children screened[] meet the industry profile," Preston Decl. ¶ 8, but Plaintiffs do not rely on that fact in responding to Monterey's argument about lack of uniformity, presumably in recognition of the predominance problem that would be posed by an inquiry into whether each class member read and relied on the website prior to signing up with Be.

17

connections and Plaintiffs could have relied on those misrepresentations in deciding to join Be; but after three years of litigation, Monterey is entitled to hold Plaintiffs to their stated theory regarding Be's misstatement of its selection criteria, and on that theory, Plaintiffs have not presented evidence of uniform misrepresentations sufficient to satisfy Rule 23.

Accordingly, the Court DENIES Plaintiffs' motion to certify the fraud claims for class treatment.

## IV. CONCLUSION

For the foregoing reasons, the Court:

- GRANTS Plaintiffs' motion to certify for class treatment the equitable claims against Monterey premised on Be's failure to provide services for the full contract term, APPOINTS Plaintiffs Timothy and Jeanne DuFour as Class Representatives, and APPOINTS their counsel as class counsel.

- DENIES Plaintiffs' motion to certify the remaining contract-based claims premised on Monterey's collection on Be's contracts that violated the AFTSA; and

- DENIES Plaintiffs' motion to certify the claims premised on Be's fraud.

**IT IS SO ORDERED.**

Dated: May 20, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE